IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SP TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  08 CV 3248 |
| vs. | ) | |
| | ) | Honorable Judge Pallmeyer |
| GARMIN INTERNATIONAL, INC., TOMTOM, | ) | Mag. Judge Valdez |
| INC., and MAGELLAN NAVIGATION, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF SP TECHNOLOGIES' OPPOSITION TO DEFENDANT GARMIN'S
MOTION FOR PARTIAL DISMISSAL OF PLAINTIFF'S AMENDED COMPLAINT**

Raymond P. Niro
Sally Wiggins
NIRO, SCAVONE, HALLER & NIRO
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0733
Fax:  (312) 236-3137
rniro@nshn.com; wiggins@nshn.com

*ATTORNEYS FOR
PLAINTIFF, SP TECHNOLOGIES, LLC*

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................. 1

II.  SPT'S WILFULLNESS CLAIM SATISFIES
BASIC NOTICE PLEADING STANDARD.................................................... 3

III. SPT ADEQUATELY PLEADS AN INDUCEMENT CLAIM UNDER THE BASIC
NOTICE PLEADING STANDARD EMPLOYED IN PATENT CASES...................... 4

IV. ALTERNATIVELY, SPT SEEKS LEAVE TO AMEND THE COMPLAINT TO ADD
FACTS PRECEDING THE SERVICES OF THE AMENDED COMPLAINT............. 6

V.  CONCLUSION................................................................................................ 7

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Atlantic Mutual Insurance Co. v. Jardis Industries, Inc.*,
2008 U.S. App. LEXIS 18462 (7th Cir. August 27, 2008) ........................................... 1, 6

*Bell Atlantic v. Twombly*,
127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ..................................................................... 5

*C&F Packing v. IBP, Inc.*,
224 F.3d 1296 (Fed. Cir. 2000) ...................................................................................... 5

*Catapano v. Wyeth Ayerst Pharmaceuticals*,
88 F. Supp. 2d 27 (E.D.N.Y. 2000) ................................................................................ 6

*Coolsavings v. Catalina Marketing Corp.*,
1999 U.S. Dist. LEXIS 7891 (N.D. Ill. 1999) .................................................................. 6

*DSU Medical Corp. v. JMS Corp.*,
471 F.3d 1293 (Fed. Cir. 2006) ...................................................................................... 6

*McZeal v. Sprint Nextel Corp.*,
501 F.3d 1354, 1356-57 (Fed. Cir. 2007) ............................................................. 1, 3, 5

*Ristvedt-Johnson, Inc. v. Nelson Peltz*,
1991 U.S. Dist. LEXIS 17233 (N.D. Ill. 1991) ................................................................ 6

*Schwendimann v. Arkwright, Inc.*,
2008 U.S. Dist. LEXIS 56421 (D. Minn.) ........................................................................ 4

*In re Seagate Technology, LLC*,
497 F.3d 1360 (Fed. Cir. 2007) ...................................................................................... 3

*Shearing v. Optical Radiation Corp.*,
1994 U.S. Dist. LEXIS 18973 (D. Nev. 1994) ................................................................ 6

*Sony Electronics, Inc. v. Soundview*,
157 F. Supp. 190 (D. Conn. 2001) ................................................................................. 5

*Takeda Pharmaceutical v. Sandoz*,
2007 U.S. Dist. LEXIS 74860 (S.D. NY) ..................................................................... 6, 7

*Taltwell LLC v. Zonet USA Corp.*,
2007 U.S. Dist. LEXIS 93465 (E.D. Va.) ........................................................................ 3

I.    **INTRODUCTION**

Garmin improperly invokes a heightened pleading standard in reviewing the willful infringement and inducement claims asserted by Plaintiff SP Technologies ("SPT") instead of applying the basic notice pleading standard that is employed in patent infringement cases.  See McZeal v. Sprint Nextel Corp., 501 F. 3d 1354, 1356-1357 (Fed. Cir. 2007) (stating that the Supreme Court decision in Bell Atlantic v. Twombly (citation omitted) did not change the general rule that basic notice pleading remains the standard for patent infringement claims).  Moreover, SPT was not even required to plead every fact or every legal theory in its complaint.  See Atlantic Mutual Ins. Co. v. Jardis Industries, Inc., 2008 U.S. App. LEXIS 18462 (7th Cir. August 27, 2008) (reversing the district court's Rule 12(b)(6) dismissal of complaint on the grounds that the Circuit "has repeatedly held that pleaders in a notice system do not have any obligation to plead legal theories … and nothing in Bell Atlantic v. Twombly (citation omitted) changed that….").  SPT alleges sufficient facts to survive Garmin's motion. The premise of basic notice pleading is to allow the defendant to answer, which coincidentally, defendants TomTom and Magellan -- who are not moving to dismiss – managed to do.

Furthermore, Garmin's argument to dismiss SPT's claim for willful infringement is somewhat disingenuous because what Garmin does not tell this Court about in its motion (and admittedly better suited for discovery on this issue) is the activity that occurred prior to Garmin filing its motion to dismiss.  Garmin received notice of the asserted '873 patent in this case with a cover letter between SPT's counsel and Garmin's in-house attorney transmitting a courtesy copy of the Original Complaint.

Garmin was never, however, served with the Original Complaint (although admittedly it was filed). And, Garmin never answered the Original Complaint. After SPT's letter, the parties engaged in a face-to-face settlement meeting at Garmin's counsel's offices in Kansas City. Only after the case did not settle, was Garmin then served with the Amended Complaint (Exhibit B) which is the subject of Garmin's motion. Thus, at a minimum, the period of time between when Garmin received notice of the asserted '873 patent via SPT's letter and the Original Complaint and the time when Garmin's answer to the Amended Complaint (at issue here) came due is sufficient to allege willful infringement. If such additional facts need to be pled, then SPT seeks leave to file a Second Amended Complaint to add them (see Section IV below).

Next, Garmin's argument to dismiss SPT's claim for inducement to infringe also improperly employ more than the basic notice pleading standard. As set forth above, Garmin had notice of the asserted '873 patent before being served with the Amended Complaint. And, SPT's Amended Complaint alleges facts sufficient to conclude that Garmin indeed induced consumers in this district to infringe SPT's patent by buying accused products:

- Garmin has a retail store in Chicago where it offers the accused navigation devices for sale (¶ 5);

- Garmin offers the accused products for sale over the Internet (¶ 6);

- Garmin offers accused products for sale in retail stores such as Wal-Mart (¶ 6);

- "Garmin further by **inducing residents located in this district to infringe the '873 patent by purchase of accused touch-screen PND products**." (¶ 6).

(Exhibit B, Amended Complaint) (emphasis added).

## II.    SPT'S WILFULLNESS CLAIM SATISFIES
## BASIC NOTICE PLEADING STANDARD

Indeed, the Federal Circuit's decision in In re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007), changed the standard for willful infringement.  But Seagate was decided at the discovery stage – not a motion to dismiss.  And while Seagate set forth the law today on willful infringement, it does not change the law that basic notice pleading is the standard to survive a motion to dismiss under Rule 12(b)(6).

Even the Supreme Court's decision in Bell Atlantic v. Twombly, did not change the long standing rule that simple notice pleading is all that is required in patent cases.  See McZeal v. Sprint Nextel Corp., 501 F. 3d 1354, 1356-1357 (Fed. Cir. 2007).  So long as a "complaint contains enough detail to allow the defendants to answer and thus meets the notice pleading required to survive a Rule 12(b)(6) motion …. **Nothing more is required**."  McZeal at 1357 (emphasis added).  Moreover, the Federal Circuit has identified Form 18 of the Federal Rules (Exhibit D) as adequate allegations to survive a Rule 12(b)(6) motion.  McZeal, 501 F.3d at 1356-1357.

District courts presented with the issue of what is adequate pleading in a patent case since McZeal have likewise applied the long standing rule of notice pleading.  See e.g. Taltwell LLC v. Zonet USA Corp., 2007 U.S. Dist. LEXIS 93465, *38 (E.D. Va.) (Exhibit C):

> [A] patent infringement cause of action is sufficiently pled under Twombly standard if it: (1) asserts that the plaintiff owns the patent at issue; (2) names the defendants; (3) states that the defendant infringed the patent; (4) describes, in general terms, the means by which the patent was infringed; (5) and identifies the specific parts of patent law that are implicated. … Fulfilling each of these elements is sufficient to put the defendant on notice and permit the action to survive Rule 12(b)(6).

Id. at *39.  See also, <u>Schwendimann</u> v. <u>Arkwright, Inc.</u>, 2008 U.S. Dist. LEXIS 56421 (D. Minn.), where in considering the scope of <u>Twombly</u> in the context of a motion to dismiss a patent infringement claim the court stated:

> <u>Twombly</u> did not radically alter the elementary rules of civil procedure that have governed litigation in the federal courts for the past seventy years. … [Rather] the Court's "new standard" was merely a specific way to articulate a solution to what it perceived to be a specific pleading problem in a specific area …. **It was not a broad based new license for federal courts to ramp up pleading requirements**.

2008 U.S. Dist. LEXIS 56421, *6-7 (Exhibit C) (emphasis added).

SPT alleges that Garmin's infringement has been willful (Exhibit B at ¶ 15).  That is sufficient to give Garmin notice.  But if it is not, as stated above, Garmin received notice at least through receipt of SPT's letter and copy of the Original Complaint.  While filed, Garmin was never "served" with the Original Complaint.  Garmin was sent a notice letter and a copy of the Original Complaint.  And while the parties agreed to engage in settlement discussions and the Original Complaint was never served.   The parties did explore settlement, the case did not settle.  Only then, on July 31, 2008 did SPT serve Garmin with the Amended Complaint (Exhibits E and F, Docket Sheet and Affidavit of Service of Summons).    As discussed in Section IV below, if this Court concludes that this chronology of events should be explicitly plead, then SPT seeks leave to add such facts.

## III.   SPT ADEQUATELY PLEADS AN INDUCEMENT CLAIM UNDER THE BASIC NOTICE PLEADING STANDARD EMPLOYED IN PATENT CASES

For the reasons discussed above, Garmin had notice of the asserted '873 patent at least as early as receiving the notice letter of infringement and the Original Complaint (Exhibit A) from SPT's counsel as well as the subsequent settlement discussions.  Yet,

Garmin continues to sell the accused products.  And the requisite intent to induce infringement can be inferred.  See Sony Electronics, Inc. v. Soundview, 157 F. Supp. 190, 196 (D. Conn. 2001) (citing Water Technologies, 850 F. 2d at 669, where the Federal Circuit held that requisite intent to induce infringement can be inferred from all of the circumstances).

SPT asserts sufficient facts in the Amended Complaint from which an inducement claim may be found:

- Defendant Garmin International Inc. **having one retail store** (opened in 2006) where it offers its GPS products for sale located in this judicial district at the Garmin retail store located at 633 North Michigan Avenue, Chicago, Illinois (Exhibit B).

(Exhibit B, Amended Complaint at ¶ 5 and Exhibit B to the Amended Complaint).

- Defendant Garmin transacts substantial business in this judicial district and has committed acts of patent infringement complained of in the Complaint in this judicial district, at least by selling and offering to sell at least its touch-screen personal navigation devices ("PND") (such as the nüvi 260, Exhibit C) over the internet, through Garmin's retail store located in this district at 633 North Michigan Avenue, Chicago, Illinois, 60611 and for example, at the Wal-Mart store in Crystal Lake, Illinois (Exhibit D), **and further by inducing residents located in this district to infringe the '873 patent by purchase of accused touch-screen PND products.**

(Exhibit B, Amended Complaint at ¶ 6) (emphasis added).

The Federal Circuit will apply the law of the regional circuit.  McZeal, 501 F.3d at 1356 (citing C&F Packing v. IBP, Inc., 224 F.3d 1296, 1306 (Fed. Cir. 2000)).  As the Seventh Circuit recently stated in Atlantic Mutual in reversing the district court's dismissal under Rule 12(b)(6):

> This Court has repeatedly held that pleaders in a notice system do not have any obligation to plead legal theories … nothing in Bell Atlantic v. Twombly, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007), changes that.

See <u>Atlantic Mutual Ins. Co.</u> v. <u>Jardis Industries, Inc.</u>, 2008 U.S. App. LEXIS 18462, *4-5 (7th Cir. August 27, 2008).  Under <u>Atlantic Mutual</u>, SPT's complaint arguably included more theories than needed at this stage of the litigation.

The cases on which Garmin relies <u>Ristvedt-Johnson, Inc</u>. v. <u>Nelson Peltz</u>, 1991 U.S. Dist. LEXIS 17233 (N.D. Ill. 1991); <u>Coolsavings</u> v. <u>Catalina Marketing Corp.</u>, 1999 U.S. Dist. LEXIS 7891 (N.D. Ill. 1999); <u>Catapano</u> v. <u>Wyeth Ayerst Pharms.</u>, 88 F. Supp. 2d 27 (E.D.N.Y. 2000) and <u>Shearing</u> v. <u>Optical Radiation Corp.</u>, 1994 U.S. Dist. LEXIS 18973 (D. Nev. 1994), all predate the clarification of the Federal Circuits' opinion in <u>McZeal</u>.  As such, they are of little guidance here.  Moreover, <u>DSU Medical Corp. v. JMS Corp.,</u> 471 F.3d 1293 (Fed. Cir. 2006), is also distinguishable as it did not involve a Rule 12(b)(6) analysis of the pleading standard in an inducement claim.  And, as explained in <u>Takeda Pharmaceutical</u> v. <u>Sandoz</u>, 2007 U.S. Dist. LEXIS 74860 (S.D. NY) (Exhibit C), in <u>DSU Medical</u>, the Federal Circuit reviewed the sufficiency of the evidence of inducement following a trial, not the sufficiency of an inducement claim under Rule 8 pleading standards.   See <u>Takeda Pharmaceutical</u>, 2007 U.S. Dist. LEXIS 74860 at *11 (distinguishing <u>DSU</u>).

## IV.    ALTERNATIVELY, SPT SEEKS LEAVE TO AMEND THE COMPLAINT TO ADD FACTS PRECEDING THE SERVICES OF THE AMENDED COMPLAINT

In the alternative, SPT seeks leave to file a Second Amended Complaint to include, among other things, allegations regarding events and settlement discussions among SPT, Garmin, Magellan and TomTom (although Magellan and TomTom do not move to dismiss either claim), which took place before each defendant was served with the Amended Complaint.

And, if such leave is granted, SPT would also seek leave to correct an inadvertent drafting error that occurred when SPT added defendants TomTom and Magellan on July 7, 2008. (See Exhibit B, Amended Complaint at ¶¶ 7-10, 16, 19, 20-23). Defendants TomTom and Magellan were added to the Amended Complaint on July 7, 2008. (Id.) During that process, SPT did assert in separate paragraphs a request for damages as well as injunctive relief against TomTom (¶18-19) and Magellan (¶22-23). Defendants TomTom and Magellan were not however expressly identified in the prayer for relief. Thus, the allegation for relief is in the Amended Complaint. If a Second Amended Complaint is to be filed, SPT would then also fix the drafting error and expressly identify defendants Magellan and TomTom in the prayer for relief.

## V.    CONCLUSION

Plaintiff SPT respectfully requests that defendants Garmin's motion for partial dismissal be denied, or in the alternative for leave to file a Second Amended Complaint.

Respectfully submitted,


_____/s/ Sally Wiggins_____
Raymond P. Niro
Sally Wiggins
NIRO, SCAVONE, HALLER & NIRO
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0733
Fax: (312) 236-3137
rniro@nshn.com; wiggins@nshn.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2008, I caused the foregoing **PLAINTIFF SP TECHNOLOGIES' OPPOSITION TO DEFENDANT GARMIN'S MOTION FOR PARTIAL DISMISSAL OF PLAINTIFF'S AMENDED COMPLAINT** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Adam P. Seitz                    aseitz@shb.com
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, Missouri  64108
(816) 474-6550
Facsimile:  (816) 421-5547

Mark D. Andrews                  mandrews@pjjq.com
Walter Jones, Jr.                wjones@pjjq.com
Uma Chandrasekaran               uchandrasekaran@pjjq.com
Pugh, Jones, Johnson & Quandt, P.C.
180 North LaSalle Street, Suite 3400
Chicago, Illinois  60601
(312) 768-7800
Fax:  (312) 768-7801
*Attorneys for Defendant Garmin*

Brian A. Carpenter               carpenterb@gtlaw.com
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, Colorado  80202
(303) 572-6573
Facsimile:  (303) 572-6540

Daniel T. McCloskey              mccloskeyd@gtlaw.com
Earl Patrick Ellison             ellisonp@gtlaw.com
Greenberg Traurig, LLP
1900 University Avenue, LLP
East Palo Alto, California  94303
(650) 328-8500
Facsimile:  (650) 328-8508

Herbert H. Finn                  finnh@gtlaw.com
Kevin J. O'Shea                  osheak@gtlaw.com

Greenberg Traurig, LLP
77 West Wacker Drive – Suite 2500
Chicago, Illinois  60601
(312) 456-1025
Fax: (312) 899-0385
**Attorneys for Defendant Magellan Navigation, Inc.**

James H. Wallace, Jr.          jwallace@wileyrein.com
Kevin P. Anderson
Robert J. Scheffel
Wiley Rein LLP
1776 K Street NW
Washington, D.C. 20006
 (202) 719-7000
Facsimile:  (202) 719-7049

Peter V. Baugher        baugher@sw.com
Todd H. Flaming         flaming@sw.com
Lesley G. Smith          lgsmith@sw.com
Schopf & Weiss LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois  60606
(312) 701-9300
Facsimile:  (312) 701-9335
**Attorney for Defendant TomTom, Inc.**


I certify that all parties in this case are represented by counsel who are CM/ECF

participants.


                        _____/s/  Sally Wiggins_____
                        Attorney for Plaintiff

9

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SP TECHNOLOGIES, LLC, | ) | FILED: JUNE 5, 2008 |
| | ) | 08 CV 3248    JH |
| Plaintiff, | ) | JUDGE PALLMEYER |
| | ) | MAGISTRATE JUDGE VALDEZ |
| vs. | ) | Civil Action No. |
| | ) | |
| GARMIN LIMITED and | ) | JURY TRIAL DEMANDED |
| GARMIN INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SP Technologies, LLC ("SPT") complains of defendants, Garmin Limited and Garmin International, Inc. ("Garmin") as follows:

1.    This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, including 35 U.S.C. §§ 271 and 281. This Court has exclusive jurisdiction over the subject matter of this case under 28 U.S.C. § 1338(a).

2.    SP Technologies, LLC is a Delaware limited liability corporation having offices at 950 North Michigan Avenue, No. 2406, Chicago, Illinois  60611 and 300 Beach Drive NE #802, St. Petersburg, Florida 33701.  SPT owns all right, title and interest in and has standing to sue for infringement of United States Patent No. 6,784,873 B1 ("the '873 patent"), entitled "Method and Medium for Computer Readable Keyboard Display Incapable of User Termination" issued August 31, 2004 (Exhibit A).

3.    Defendant Garmin Limited is a corporation organized under the laws of the Cayman Islands and having offices at 1200 East 151st, Olathe, Kansas  66062 and 45 Market Street, Gardenia Court, Camana Bay, Cayman Islands.

4.      Defendant Garmin International Inc. is a subsidiary of Garmin Ltd. having offices at 1200 East 151st Street, Olathe, Kansas 66062.

5.      Defendant Garmin International Inc. having one retail store (opened in 2006) where it offers its GPS products for sale located in this judicial district at the Garmin retail store located at 633 North Michigan Avenue, Chicago, Illinois (Exhibit B).

6.      Garmin transacts substantial business in this judicial district and has committed acts of patent infringement complained of in the Complaint in this judicial district, at least by selling and offering to sell at least its touch-screen personal navigation devices ("PND") (such as the nŭvi 260, Exhibit C) over the Internet, through Garmin's retail store located in this district at 633 North Michigan Avenue, Chicago, Illinois, 60611 and for example, at the Wal-Mart store in Crystal Lake, Illinois (Exhibit D), and further by inducing residents located in this district to infringe the '873 patent through use of such accused touch-screen PND products as defined in the asserted claims of the '873 patent.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

### GARMIN'S ACTS OF PATENT INFRINGEMENT

8.      Garmin has infringed, and is now infringing, at least claims 1, 4, 9 and 10 of the '873 patent through, among other activities, the use, sale, offer for sale of its touch-screen PND product (such as the nŭvi 260) and by knowingly and actively inducing others to infringe and by contributing to the infringement by others, located in this judicial district.

9.      Garmin's infringement, contributory infringement and inducement to infringe has injured and will contribute to injure SPT unless and until this Court enters

2

an injunction prohibiting further infringement and enjoining further sale, offer for sale or inducement to infringe Garmin products that fall within the scope of the '873 patent. SPT is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

10.    Garmin's infringement and inducement to infringe has been willful and deliberate and has injured and will continue to injure SPT, unless and until this Court enters an injunction prohibiting further infringement of the '873 patent.

WHEREFORE, plaintiff SP Technologies LLC respectfully requests this Court enter judgment against defendant Garmin Limited, and against its subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with it, granting the following relief:

A.    The entry of judgment in favor of SPT and against the defendant Garmin;

B.    An award of damages adequate to compensate SPT for the infringement that has occurred (together with prejudgment interest from the date the infringement began), but in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284;

C.    A finding that Garmin's infringement has been willful and an award of increased damages as provided by 35 U.S.C. § 284;

D.    A finding that this case is exceptional and an award to SPT of its attorneys' fees and costs as provided by 35 U.S.C. § 285;

E.    A permanent injunction prohibiting further infringement and inducement of the '873 patent; and,

3

F.    Such other relief that SPT is entitled to under law and any other relief that

this Court or a jury may deem just and proper.

**Jury Demand**

SPT demands a trial by jury on all issues presented in this complaint.

Respectfully submitted,


/s/Raymond P. Niro

Raymond P. Niro
Sally Wiggins
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois  60602
Telephone:  (312) 236-0733
Facsimile:  (312) 236-3137

Attorneys for Plaintiff SP Technologies, LLC

4

08 CV 3248
JUDGE PALLMEYER
MAGISTRATE JUDGE VALDEZ

# Exhibit A

US006784873B1

(12) **United States Patent**
Boesen et al.

(10) Patent No.: **US 6,784,873 B1**
(45) Date of Patent: **Aug. 31, 2004**

(54) **METHOD AND MEDIUM FOR COMPUTER READABLE KEYBOARD DISPLAY INCAPABLE OF USER TERMINATION**

(76) Inventors: **Peter V. Boesen**, 4026 Beaver Ave., Des Moines, IA (US) 50310; **Thomas J. Mann**, 330 N. 93rd St., Omaha, NE (US) 68114

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 70 days.

(21) Appl. No.: **09/632,922**

(22) Filed: **Aug. 4, 2000**

(51) Int. Cl.$^7$ .................................. **G09G 5/00**
(52) U.S. Cl. ........................ 345/173; 345/174; 345/175; 345/168
(58) Field of Search ................................. 345/173, 175, 345/174, 168

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,736,973 A  *  4/1998  Godfrey et al. .............. 345/102
6,081,263 A     6/2000  LeCall et al. ............... 345/327
6,094,197 A  *  7/2000  Buxton et al. .............. 345/358

OTHER PUBLICATIONS

Alan Freeman, The Computer Desktop Encyclopedia, 1999, The Computer Language Company Inc., second edition, pp. 99, 254, 678, 976.*

Article entitled "Wireless Future Sizzles," by Keith Darce, The Times Picayne, Sep. 26, 1999.

Article entitled "Tiny computers come in handy, doctors find" by Thomas R. O'Connell, The Des Moines Register, pp. 1B, 4B.

* cited by examiner

Primary Examiner—Matthew C. Bella
Assistant Examiner—Tam Tran
(74) Attorney, Agent, or Firm—McKee, Voorhees & Sease, P.L.C.

(57)            **ABSTRACT**

A method and medium for a computer readable input area. The input area is created by a computer program on a display capable of receiving touch-screen input. The computer on which the input area in used is at least a 32-bit system. The input area may contain a keyboard which is an image map. External programming may selectively access the input area through a dynamic link library. The input area has no task bar and may not be minimized, maximized, or deleted. Therefore, the input area becomes an integral component and provides the user with a constant and reliable method of inputting information into the computer program.

**10 Claims, 2 Drawing Sheets**



**U.S. Patent**         Aug. 31, 2004         Sheet 1 of 2         **US 6,784,873 B1**



Fig. 1



*Fig. 2*

US 6,784,873 B1

1

## METHOD AND MEDIUM FOR COMPUTER READABLE KEYBOARD DISPLAY INCAPABLE OF USER TERMINATION

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to a method and medium for inputting data, and more particularly, to a keyboard of constant size and shape present on the screen of a touch-screen style computer whenever user input may be desired. The keyboard display may be used by any number of computer software programs, including any known operating system in which a touch-sensitive computer display may be incorporated. Additionally, the present invention may be used in conjunction with any individual computer, network and/or Internet based system.

2. Problem in the Art

Computers with touch-screen displays, allowing a user to simply press on a desired location to obtain a desired input, have been around for some time. For example, a pen-based computer, such as the Fujitsu Model Point 1600, allows a user to press on the screen using the attached pen or other styli, and thereby provide user input. The use of such a pen-based computer allows a user to enter all necessary data without the need for an external keyboard, mouse or other input device. The use of an on-screen keyboard in such a computer allows a user to input data without the need for additional handwriting recognition software. Handwriting recognition software, while constantly improving, is often inaccurate and cumbersome. Further, such handwriting recognition software is often processor intensive.

Currently, on-screen keyboards allow a user to maximize, minimize, or simply remove the keyboard on the display. Further, the shape and size of the keyboard may be altered. Often, such alterations or terminations are accidental and returning a keyboard to a useable size and shape wastes valuable time. In a medical setting, for example, it is highly undesirable to have a care provider attempting to recover from an accidental keyboard alteration when the care provider should be attending to and recording information on patients. It is therefore desirable to provide an on-screen keyboard which is incapable of alteration or termination by a user.

More and more applications are being developed for pen-based or touch-screen based computers. These applications will typically require a user to input data at a specific location on the screen. An on-screen keyboard may be necessary to provide the desired input. However, current on-screen keyboards may be moved by the user and therefore placed in undesirable locations which may block necessary text input fields or instructions. Further, current on-screen keyboard include a task bar having minimizing and maximizing buttons which allow a user to enlarge or reduce the window in which the keyboard appears. Often, such keyboards also include a close button which allows the user to terminate the keyboard. Upon pressing these buttons, many computer novices have difficulty launching another instance of the keyboard or recovering the keyboard to a usable state. It is therefore desirable to have an on-screen keyboard which is capable of permanent placement on a computer display.

Computer programs may require input only randomly. Many ask for user input and then present the results. As it would clearly hamper the presentation of results, data or other information to have an on-screen keyboard present at all times, it is desirable to provide an on-screen keyboard which may be selectively called up as a subroutine or subprogram by a variety of programming.

There is therefore a need to have an on-screen keyboard which solves these and other problems in the art.

### FEATURES OF THE INVENTION

A general feature of the present invention is the provision of an input area which overcomes the problems found in the prior art.

A further feature of the present invention is the provision of an input area which may be used in conjunction with touch-sensitive displays.

Another feature of the present invention is the provision of an input area which is immutable.

A further feature of the present invention is the provision of an input area which may not be moved.

A still further feature of the present invention is the provision of an input area which allows a user to input data without the need for handwriting recognition software.

An additional feature of the present invention is the provision of an input area which may not be maximized.

Another feature of the present invention is the provision of an input area which may not be minimized.

A still further feature of the present invention is the provision of an input area which may not be removed by the user.

A further feature of the present inventions the provision of an input area which contains a keyboard.

Another feature of the present invention i the provision of an input area which may be selectively used by a computer program.

A still further feature of the present invention is the provision of an input area which provides an easy to use and reliable method of inputting information into a computer system regardless of the level of computer skill possessed by the user.

These, as well as other features and advantages of the present invention will become apparent from the following specification and claims.

### SUMMARY OF THE INVENTION

The present invention generally comprises an immutable keyboard display. In a preferred embodiment, the present invention includes a software application that provides a keyboard display which may not be minimized, maximized, closed, or deleted. Further, the keyboard display allows a user to input information as desired via a touch-screen based or pen based computer.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a pictorial representation of a display of a pen-based computer incorporating the keyboard display of the present invention.

FIG. 2 is a close-up view of the keyboard display of the present invention.

### DETAILED DESCRIPTION OF THE EMBODIMENT

The present invention will be described as it applies to its preferred embodiment. It is not intended that the present invention be limited to the described embodiment. It is intended that the invention cover all modifications and

US 6,784,873 B1

**3**

alternatives which may be included within the spirit and scope of the invention.

As shown in FIG. 1, a pen-based computer **10**, such as the Fujitsu Model Point 1600, includes a touch-sensitive display **12**. On the display **12** is shown the user interface for a software application **14** which may be running from or accessed by the computer **10**. It is to be understood that the computer **10** could be a stand-alone computer or a part of any network or Internet based system. However, the computer **10** preferably provides a 32 bit environment. Computer **10** may access any type of software application through any number of known drives or via a network or web server. Once accessed, the user will see the application as it appears on the display **12** of the computer **10**. The application may ask for user input at various locations through the use of text boxes **16** or other fields. The user may provide the desired input by holding the pen **18** or any other known input device which may include the user's finger, and pressing on the display **12** of the computer **10** so as to strike a desired key **22** of the keyboard **20**.

The keyboard **20** is preferably an image map or active map incorporated at a set location on the display **12**. The keyboard **20** may not be moved, maximized, or minimized. Therefore, the keyboard **20** provides the user with a constant input area to which the user may become accustomed and becomes an integral component.

The keyboard **20**, as shown in FIG. 2, contains a plurality of keys **22**. The keys **22** may include all those currently found on any standard typewriter or computer keyboard, or may be application-specific. For instance, if the software in which user input is desired is primarily financial software, the keyboard **20** may include only numbers. Further, if the software requires the user to input names or words, the keyboard **20** may include one key **22** for every letter of the alphabet and any necessary punctuation or function keys. Further, the keys **22** may be programmed to represent any symbol or accentuated letter to allow the keyboard to be used in applications in which input may be required in various languages.

The keyboard **20** is preferably the result of a software application written in Visual Basic or C++, though various software programming languages may be used. The keyboard has all task bars removed and may not be minimized, maximized, deleted, closed or resized and is therefore immutable. Preferably, the keyboard application is a subroutine or subprogram which is made available for use by external software applications. The keyboard application is preferably part of the operating system running on the computer **10**. Incorporating the keyboard application into the computer **10** allows the keyboard application to be available to any external software application capable of running on the computer **10**. The keyboard application may include a dynamic link library (dll) application. The dll application allows the external software to selectively use the keyboard and either have the keyboard in or out. This allows the software to use the entirety of the screen when necessary for displaying information or results.

An example of the keyboard application programming as it would appear in Visual Basic is:

```
Option Explicit
Public Sub Shift_Down( )
cmdLeftShift.Caption="LowerCase"
cmdRightShift.Caption="LowerCase"
cmdLeftShift.Tag="OFF"
cmdRightShift.Tag="OFF"
Caps_OFF
```

**4**

```
Command1(26).Caption="0"
Command1(27).Caption="1"
Command1(28).Caption="2"
Command1(29).Caption="3"
Command1(30).Caption="4"
Command1(31).Caption="5"
Command1(32).Caption="6"
Command1(33).Visible=False
Command1(44).Visible=True
Command1(34).Caption="8"
Command1(35).Caption="9"
Command1(36).Caption=","
Command1(37).Caption="."
Command1(38).Caption="/"
Command1(39).Caption=";"
Command1(40).Caption="""
Command1(41).Caption="["
Command1(42).Caption="]"
Command1(43).Caption="\"
Command1(48).Caption="F1"
Command1(49).Caption="F2"
Command1(50).Caption="F3"
Command1(51).Caption="F4"
Command1(52).Caption="F5"
Command1(53).Caption="F6"
Command1(54).Caption="F7"
Command1(55).Caption="F8"
Command1(56).Caption="F9"
Command1(57).Caption="F10"
Command1(58).Caption="F11"
Command1(59).Caption="F12"
Command1(46).Caption="−"
Command1(47).Caption="="
Command1(45).Caption="""
Command1(0).Caption="a"
Command1(1).Tag="b"
Command1(2).Tag="c"
Command1(3).Tag="d"
Command1(4).Tag="e"
Command1(5).Tag="f"
Command1(6).Tag="g"
Command1(7).Tag="h"
Command1(8).Tag="i"
Command1(9).Tag="j"
Command1(10).Tag="k"
Command1(11).Tag="l"
Command1(12).Tag="m"
Command1(13).Tag="n"
Command1(14).Tag="o"
Command1(15).Tag="p"
Command1(16).Tag="q"
Command1(17).Tag="r"
Command1(18).Tag="s"
Command1(19).Tag="t"
Command1(20).Tag="u"
Command1(21).Tag="v"
Command1(22).Tag="w"
Command1(23).Tag="x"
Command1(24).Tag="y"
Command1(25).Tag="z"
Command1(26).Tag="0"
Command1(27).Tag="1"
Command1(28).Tag="2"
Command1(29).Tag="3"
Command1(30).Tag="4"
Command1(31).Tag="5"
Command1(32).Tag="6"
```

US 6,784,873 B1

**5**

```
Command1(44).Tag="7"
Command1(34).Tag="8"
Command1(35).Tag="9"
Command1(36).Tag ","
Command1(37).Tag="."
Command1(38).Tag="/"
Command1(39).Tag=";"
Command1(40).Tag="'"
Command1(41).Tag="["
Command1(42).Tag="]"
Command1(43).Tag="\"
Command1(48).Tag="{F1}"
Command1(49).Tag="{F2}"
Command1(50).Tag="{F3}"
Command1(51).Tag="{F4}"
Command1(52).Tag="{F5 }"
Command1(53).Tag="{F6}"
Command1(54).Tag="{F7}"
Command1(55).Tag="{F8}"
Command1(56).Tag="{F9}"
Command1(57).Tag="{F10}"
Command1(54).Tag="{F11}"
Command1(58).Tag="{F12}"
Command1(46).Tag="-"
Command1(47).Tag="="
Command1(45).Tag=""
cmdTab.Caption="Tab>"
End Sub
Public Sub Shift__Up( )
cmdLeftShift.Caption="UpperCase"
cmdRightShift.Caption="UpperCase"
cmdLeftShift.Tag="ON"
cmdRightShift.Tag="ON"
Caps__On
Command1(26).Caption=")"
Command1(27).Caption="!"
Command1(28).Caption="@"
Command1(29).Caption="#"
Command1(30).Caption="$"
Command1(31).Caption="%"
Command1(32).Caption="^"
Command1(33).Visible=True
Command1(44).Visible=False
Command1(34).Caption="*"
Command1(35).Caption="("
Command1(36).Caption="<"
Command1(37).Caption=">"
Command1(38).Caption="?"
Command1(39).Caption=":"
Command1(40).Caption="""
Command1(41).Caption="{"
Command1(42).Caption="}"
Command1(43).Caption="|"
Command1(48).Caption="F13"
Command1(49).Caption="F14"
Command1(50).Caption="F15"
Command1(51).Caption="F16"
Command1(52).Caption="F17"
Command1(53).Caption="F18"
Command1(54).Caption="F19"
Command1(55).Caption="F20"
Command1(56).Caption="F21"
Command1(57).Caption="F22"
Command1(58).Caption="F23"
Command1(59).Caption="F24"
Command1(46).Caption="__"
Command1(47).Caption="+"
```

**6**

```
Command1(45).Caption="--"
Command1(0).Tag="+A"
Command1(1).Tag="B"
Command1(2).Tag="C"
Command1(3).Tag="D"
Command1(4).Tag="E"
Command1(5).Tag="F"
Command1(6).Tag="G"
Command1(7).Tag="H"
Command1(8).Tag="I"
Command1(9).Tag="J"
Command1(10).Tag="K"
Command1(11).Tag="L"
Command1(12).Tag="M"
Command1(13).Tag="N"
Command1(14).Tag="O"
Command1(15).Tag="P"
Command1(16).Tag="Q"
Command1(17).Tag="R"
Command1(18).Tag="S"
Command1(19).Tag="T"
Command1(20).Tag="U"
Command1(21).Tag="V"
Command1(22).Tag="W"
Command1(23).Tag="X"
Command1(24).Tag="Y"
Command1(25).Tag="Z"
Command1(26).Tag="{)}"
Command1(27).Tag="!"
Command1(28).Tag="@"
Command1(29).Tag="#"
Command1(30).Tag="$"
Command1(31).Tag="{%}"
Command1(32).Tag="{^}"
Command1(44).Tag="7"
Command1(34).Tag="*"
Command1(35).Tag="{(}"
Command1(36).Tag="<"
Command1(37).Tag=">"
Command1(38).Tag="!"
Command1(39).Tag=":"
Command1(40).Tag="""
Command1(41).Tag="{{}"
Command1(42).Tag="{}}"
Command1(43).Tag="|"
Command1(48).Tag="{F13}"
Command1(49).Tag="{F14}"
Command1(50).Tag="{F15}"
Command1(51).Tag="{F16}"
Command1(52).Tag="{F17}"
Command1(53).Tag="{F18}"
Command1(54).Tag="{F19}"
Command1(55).Tag="{F20}"
Command1(56).Tag="{F21}"
Command1(57).Tag="{F22}"
Command1(58).Tag="{F23}"
Command1(59).Tag="{F24}"
Command1(46).Tag="__"
Command1(47).Tag="{+}"
Command1(45).Tag="{--}"
cmdTab.Caption="Tab>"
End Sub
Public Sub Caps__On( )
Command1(0).Caption="A"
Command1(1).Caption="B"
Command1(2).Caption="C"
Command1(3).Caption="D"
```

US 6,784,873 B1

**7**

```
Command1(4).Caption="E"
Command1(5).Caption="F"
Command1(6).Caption="G"
Command1(7).Caption="H"
Command1(8).Caption="I"
Command1(9).Caption="J"
Command1(10).Caption="K"
Command1(11).Caption="L"
Command1(12).Caption="M"
Command1(13).Caption="N"
Command1(14).Caption="O"
Command1(15).Caption="P"
Command1(16).Caption="Q"
Command1(17).Caption="R"
Command1(18).Caption="S"
Command1(19).Caption="T"
Command1(20).Caption="U"
Command1(21).Caption="V"
Command1(22).Caption="W"
Command1(23).Caption="X"
Command1(24).Caption="Y"
Command1(25).Caption="Z"
End Sub
Public Sub Caps__OFF( )
Command1(0).Caption="a"
Command1(1).Caption="b"
Command1(2).Caption="c"
Command1(3).Caption="d"
Command1(4).Caption="e"
Command1(5).Caption="f"
Command1(6).Caption="g"
Command1(7).Caption="h"
Command1(8).Caption="i"
Command1(9).Caption="j"
Command1(10).Caption="k"
Command1(11).Caption="l"
Command1(12).Caption="m"
Command1(13).Caption="n"
Command1(14).Caption="o"
Command1(15).Caption="p"
Command1(16).Caption="q"
Command1(17).Caption="r"
Command1(18).Caption="s"
Command1(19).Caption="t"
Command1(20).Caption="u"
Command1(21).Caption="v"
Command1(22).Caption="w"
Command1(23).Caption="x"
Command1(24).Caption="y"
Command1(25).Caption="z"
End Sub
Public Sub Set__Caps__Lock( )
  If cmdCapsLock.Tag="OFF" Then
  cmdCapsLock.Caption="Caps On"
  cmdCapsLock.Tag="ON"
  Caps__On
  Else
  cmdCapsLock.Caption="Caps Off"
  cmdCapsLock.Tag="OFF"
  Caps__OFF
  End If
  strKeys=""
  strKeys=strKeys & "{CAPSLOCK}"
  SendVKeys (strKeys)
End Sub
Public Sub Key__Layoutl( )
```

**8**

```
Dim intTemp, intRightBorder As Integer
Dim lngpcnt As Double
Dim dblFontSize As Double
Dim lngFormWidth As Long
Dim intRow1Top, intRow2Top, intRow3Top,
intRow4Top, intRow5Top, intRow6Top, intRow7Top As
Integer
Dim intFontSize, intHeight, intLetterWidth, intFunction-
Width As Integer
lngFormWidth=frmKeys.Width
  If frmKeys.BorderStyle>0 Then
    lngPcnt=lngFormWidth/7135
  Else
    lngPcnt=lngFormWidth/6975
  End If
  'lngPcnt=lngFormWidth/6975
  'pKB.Height=2790*lngPcnt
  'pKB.Height=(3390*lngPcnt)
  intHeight=330*lngPcnt
  intLetterWidth=350*lngPcnt
  intFunctionWidth=470*lngpcnt
  intTemp=intFunctionWidth/24
  intFunctionWidth=(intTemp+1)*24
  intFontSize=9*lngPcnt
  dblFontSize=8*lngPcnt
  intRow1Top=60*lngPcnt
  intRow2Top=540 lngpcnt
  intRow3Top=960*lngPcnt
  intRow4Top=1380*lngPcnt
  intRow5Top=1860*lngpcnt
  intRow6Top=2340*lngPcnt
  intRow7Top=2820*lngPcnt
  'Set the form height to proportion with form width
  If frmKeys.BorderStyle>0 Then
    frmKeys.Height=intRow6Top+intHeight+465
  Else
    frmKeys.Height=intRow6Top+intHeight+60
  End If
  'Row 1
  'Escape Key
  cmdEscape.Font.Size=dblFontSize
  cmdEscape.Top=intRow1Top
  cmdEscape.Left=60*lngpcnt
  cmdEscape.Width=670*lngPcnt
  cmdEscape.Height=intHeight
  'F1 Key
  Command1(48).Font.Size=intFontSize
  Command1(48).Top=intRow1Top
  Command1(48).Left=805*lngpcnt
  Command1(48).Width=intFunctionWidth
  Command1(48).Height=intHeight
  'F2 Key
  Command1(49).Font.Size=intFontSize
  Command1(49).Top=intRow1Top
  Command1(49).Left=Command1(48).Left+Command1
    (48).Width '1285*lngpcnt
  Command1(49).Width=intFunctionWidth
  Command1(49).Height=intHeight
  'F3 Key
```

US 6,784,873 B1

**9**

Command1(50).Font.Size=intFontSize
Command1(50).Top=intRow1Top
Command1(50).Left=Command1(49).Left+Command1
(49).Width '1765*lngPcnt
Command1(50).Width=intFunctionWidth
Command1(50).Height=intHeight
'F4 Key
Command1(51).Font.Size=intFontSize
Command1(51).Top=intRow1Top
Command1(51).Left=Command1(50).Left+Command1
(50).Width '2245*lngpcnt
Command1(51).Width=intFunctionWidth
Command1(51).Height=intHeight
'F5 Key
Command1(52).Font.Size=intFontSize
Command1(52).Top=intRow1Top
Command1(52).Left=2905*lngpcnt
Command1(52).Width=intFunctionWidth
Command1(52).Height=intHeight
'F6 Key
Command1(53).Font.Size=intFontSize
Command1(53).Top=intRow1Top
Command1(53).Left=Command1(52).Left+Command1
(52).Width '3385*lngPcnt
Command1(53).Width=intFunctionWidth
Command1(53).Height=intHeight
'F7 Key
Command1(54).Font.Size=intFontSize
Command1(54).Top=intRow1Top
Command1(54).Left=Command1(53).Left+
Command1(53).Width '3865*lngPcnt
Command1(54).Width=intFunctionWidth
Command1(54).Height=intHeight
'F8 Key
Command1(55).Font.Size=intFontSize
Command1(55).Top=intRow1Top
Command1(55).Left=Command1(54).Left+Command1
(54).Width '4345*lngPcnt
Command1(55).Width=intFunctionWidth
Command1(55).Height=intHeight
'F9 Key
Command1(56).Font.Size=intFontSize
Command1(56).Top=intRow1Top
Command1(56).Left=5005*lngPcnt
Command1(56).Width=intFunctionWidth
Command1(56).Height=intHeight
'F10 Key
Command1(57).Font.Size=dblFontSize
Command1(57).Top=intRow1Top
Command1(57).Left=Command1(56).Left+Command1
(56).Width '5485*lngPcnt
Command1(57).Width=intFunctionWidth
Command1(57).Height=intHeight
'F11 Key
Command1(58).Font.Size=dblFontSize
Command1(58).Top intRow1Top
Command1(58).Left=Command1(57).Left+Command1
(57).Width '5965*lngpcnt

**10**

Command1(58).Width=intFunctionWidth
Command1(58).Height=intHeight
'F12 Key
Command1(59).Font.Size=dblFontSize
Command1(59).Top=intRow1Top
Command1(59).Left=Command1(58).Left+Command1
(58).Width '6445*lngpcnt
Command1(59).Width=intFunctionWidth
Command1(59).Height=intHeight
intRightBorder=Command1(59).Left+Command1(59).
Width
'Row 2
"Key
Command1(45).Font.Size=intFontSize
Command1(45).Top=intRow2Top
Command1(45).Left=60*lngpcnt
Command1(45).Width=intLetterWidth
Command1(45).Height=intHeight
'1 Key
Command1(27).Font.Size=intFontSize
Command1(27).Top=intRow2Top  Command1(27).Left=
480*lngPcnt
Command1(27).Width=intLetterWidth
Command1(27).Height=intHeight
'2 Key
Command1(28).Font.Size=intFontSize
Command1(28).Top=intRow2Top
Command1(28).Left=900*lngPcnt
Command1(28).Width=intLetterWidth
Command1(28).Height=intHeight
'3 Key
Command1(29).Font.Size=intFontSize
Command1(29).Top=intRow2Top
Command1(29).Left=1320*lngPcnt
Command1(29).Width=intLetterWidth
Command1(29).Height=intHeight
'4 Key
Command1(30).Font.Size=intFontSize
Command1(30).Top=intRow2Top
Command1(30).Left=1740*lngpcnt
Command1(30).Width=intLetterWidth
Command1(30).Height=intHeight
'5 Key
Command1(31).Font.Size=intFontSize
Command1(31).Top=intRow2Top
Command1(31).Left=2160*lngPcnt
Command1(31).Width=intLetterWidth
Command1(31).Height=intHeight
'6 Key
Command1(32).Font.Size=intFontSize
Command1(32).Top=intRow2Top  Command1(32).Left=
2580*lngPcnt
Command1(32).Width=intLetterWidth
Command1(32).Height=intHeight
'& Key
Command1(33).Font.Size=intFontSize
Command1(33).Top=intRow2Top

US 6,784,873 B1

<table>
<tr><td>

**11**

Command1(33).Left=3000*lngPcnt
Command1(33).Width=intLetterWidth
Command1(33).Height=intHeight
'7 Key
Command1(44).Font.Size=intFontSize
Command1(44).Top=intRow2Top
Command1(44).Left=3000*lngPcnt
Command1(44).Width=intLetterWidth
Command1(44).Height=intHeight
'8 Key
Command1(34).Font.Size=intFontSize
Command1(34).Top=intRow2Top
Command1(34).Left=3420*lngpcnt
Command1(34).Width=intLetterWidth
Command1(34).Height=intHeight
'9 Key
Command1(35).Font.Size=intFontSize
Command1(35).Top=intRow2Top
Command1(35).Left=3840*lngPcnt
Command1(35).Width=intLetterWidth
Command1(35).Height=intHeight
0 Key
Command1(26).Font.Size=intFontSize
Command1(26).Top=intRow2Top
Command1(26).Left=4260*lngpcnt
Command1(26).Width=intLetterWidth
Command1(26).Height=intHeight
'- Key
Command1(46).Font.Size=intFontSize
Command1(46).Top=intRow2Top
Command1(46).Left=4680*lngpcnt
Command1(46).Width=intLetterWidth
Command1(46).Height=intHeight
'= Key
Command1(47).Font.Size=intFontSize
Command1(47).Top=intRow2Top
Command1(47).Left=5100*lngPcnt
Command1(47).Width=intLetterWidth
Command1(47).Height=intHeight
'Backspace Key
cmdBackspace.Font.Size=dblFontSize
cmdBackspace.Top=intRow2Top
cmdBackspace.Left=5520*lngPcnt
cmdBackspace.Width=intRightBorder—
  cmdBackspace.Left
cmdBackspace.Height=intHeight
'Row 3
'TAB Key
cmdTabFont.Size=dblFontSize
cmdTabTop=intRow3Top
cmdTabLeft=60*lngpcnt
cmdTabWidth=650*lngpcnt
cmdTabHeight=intHeight
'Q Key
Command1(16).Font.Size=intFontSize
Command1(16).Top=intRow3Top
Command1(16).Left=780*lngpcnt

</td><td>

**12**

Command1(16).Width=intLetterWidth
Command1(16).Height=intHeight
'W Key
Command1(22).Font.Size=intFontSize
Command1(22).Top=intRow3Top
Command1(22).Left=1200*lngPcnt
Command1(22).Width=intLetterWidth
Command1(22).Height=intHeight
'E Key
Command1(4).Font.Size=intFontSize
Command1(4).Top=intRow3Top
Command1(4).Left=1620*lngpcnt
Command1(4).Width=intLetterWidth
Command1(4).Height=intHeight
'R Key
Command1(17).Font.Size=intFontSize
Command1(17).Top=intRow3Top
Command1(17).Left=2040*lngpcnt
Command1(17).Width=intLetterWidth
Command1(17).Height=intHeight
'T Key
Command1(19).Font.Size=intFontSize
Command1(19).Top=intRow3Top
Command1(19).Left=2460*lngPcnt
Command1(19).Width=intLetterWidth
Command1(19).Height=intHeight
'Y Key
Command1(24).Font.Size=intFontSize
Command1(24).Top=intRow3Top
Command1(24).Left=2880*lngpcnt
Command1(24).Width=intLetterWidth
Command1(24).Height=intHeight
'U Key
Command1(20).Font.Size=intFontSize
Command1(20).Top=intRow3Top
Command1(20).Left=3300*lngPcnt
Command1(20).Width=intLetterWidth
Command1(20).Height=intHeight
'I Key
Command1(8).Font.Size=intFontSize
Command1(8).Top=intRow3Top
Command1(8).Left=3720*lngpcnt
Command1(8).Width=intLetterWidth
Command1(8).Height=intHeight
'O Key
Command1(14).Font.Size=intFontSize
Command1(14).Top=intRow3Top
Command1(14).Left=4140*lngpcnt
Command1(14).Width=intLetterWidth
Command1(14).Height=intHeight
'P Key
Command1(15).Font.Size=intFontSize
Command1(15).Top=intRow3Top
Command1(15).Left=4560*lngPcnt
Command1(15).Width=intLetterWidth
Command1(15).Height=intHeight

</td></tr>
</table>

5

10

15

20

25

30

35

40

45

50

55

60

65

US 6,784,873 B1

**13**

```
'[ Key
Command1(41).Font.Size=intFontSize
Command1(41).Top=intRow3Top
Command1(41).Left=4980*lngPcnt
Command1(41).Width=intLetterWidth
Command1(41).Height=intHeight
'] Key
Command1(42).Font.Size=intFontSize
Command1(42).Top=intRow3Top
Command1(42).Left=5400*lngPcnt
Command1(42).Width=intLetterWidth
Command1(42).Height=intHeight
'\ Key
Command1(43).Font.Size=intFontSize
Command1(43).Top=intRow3Top
Command1(43).Left=5820*lngPcnt
Command1(43).Width=intLetterWidth
Command1(43).Height=intHeight
'Delete
cmdDelete.Font.Size=dblFontSize
cmdDelete.Top=intRow3Top
cmdDelete.Left=6240*lngpcnt
cmdDelete.Width=intRightBorder—cmdDelete.Left
cmdDelete.Height=intHeight
'Row 4
'Caps Lock Key
cmdCapsLock.Font.Size=dblFontSize
cmdCapsLock.Top=intRow4Top
cmdCapsLock.Left=60*lngPcnt
cmdCapsLock.Width=1070*lngPcnt
cmdCapsLock.Height=intHeight
'A Key
Command1(0).Font.Size=intFontSize
Command1(0).Top=intRow4Top
Command1(0).Left=1200*lngPcnt
Command1(0).Width=intLetterWidth
Command1(0).Height=intHeight
'S Key
Command1(18).Font.Size=intFontSize
Command1(18).Top=intRow4Top
Command1(18).Left=1620*lngpcnt
Command1(18).Width=intLetterWidth
Command1(18).Height=intHeight
'D Key
Command1(3).Font.Size=intFontSize
Command1(3).Top=intRow4Top
Command1(3).Left=2040*lngpcnt
Command1(3).Width=intLetterWidth
Command1(3).Height=intHeight
'F Key
Command1(5).Font.Size=intFontSize
Command1(5).Top=intRow4Top
Command1(5).Left=2460*lngPcnt
Command1(5).Width=intLetterWidth
Command1(5).Height=intHeight
'G Key
```

**14**

```
Command1(6).Font.Size=intFontSize
Command1(6).Top=intRow4Top
Command1(6).Left=2880*lngPcnt
Command1(6).Width=intLetterWidth
Command1(6).Height=intHeight
'H Key
Command1(7).Font.Size=intFontSize
Command1(7).Top=intRow4Top
Command1(7).Left=3300*lngpcnt
Command1(7).Width=intLetterWidth
Command1(7).Height=intHeight
'J Key
Command1(9).Font.Size=intFontSize
Command1(9).Top=intRow4Top
Command1(9).Left=3720*lngPcnt
Command1(9).Width=intLetterWidth
Command1(9).Height=intHeight
'K Key
Command1(10).Font.Size=intFontSize
Command1(10).Top=intRow4Top
Command1(10).Left=4140*lngPcnt
Command1(10).Width=intLetterWidth
Command1(10).Height=intHeight
'L Key
Command1(11).Font.Size=intFontSize
Command1(11).Top=intRow4Top
Command1(11).Left=4560*lngPcnt
Command1(11).Width=intLetterWidth
Command1(11).Height=intHeight
'; Key
Command1(39).Font.Size=intFontSize
Command1(39).Top=intRow4Top
Command1(39).Left=4980*lngpcnt
Command1(39).Width=intLetterWidth
Command1(39).Height=intHeight
'"Key
Command1(40).Font.Size=intFontSize
Command1(40).Top=intRow4Top
Command1(40).Left=5400*lngPcnt
Command1(40).Width=intLetterWidth
Command1(40).Height=intHeight
'Enter
cmdEnter.Font.Size dblFontSize
cmdEnter.Top=intRow4Top
cmdEnter.Left=5820*lngpcnt
cmdEnter.Width=intRightBorder—cmdEnter.Left
cmdEnter.Height=intHeight
'Row 5
'Left Shift Key cmdLeftShift.Font.Size=dblFontSize
    cmdLeftShift.Top=intRow5Top cmdLeftShift.Left=
    60*lngPcnt cmdLeftShift.Width=1293*lngPcnt
    cmdLeftShift.Height=intHeight
'Z Key
Command1(25).Font.Size=intFontSize
Command1(25).Top=intRow5Top
Command1(25).Left=1423*lngPcnt
Command1(25).Width=intLetterWidth
```

US 6,784,873 B1

**15**

Command1(25).Height=intHeight
'X Key
Command1(23).Font.Size=intFontSize
Command1(23).Top=intRow5Top
Command1(23).Left=1843*lngPcnt
Command1(23).Width=intLetterWidth
Command1(23).Height=intHeight
'C Key
Command1(2).Font.Size=intFontSize
Command1(2).Top=intRow5Top
Command1(2).Left=2263*lngPcnt
Command1(2).Width=intLetterWidth
Command1(2).Height=intHeight
'V Key
Command1(21).Font.Size=intFontSize
Command1(21).Top=intRow5Top
Command1(21).Left=2683*lngPcnt
Command1(21).Width=intLetterWidth
Command1(21).Height=intHeight
'B Key
Command1(1).Font.Size=intFontSize
Command1(1).Top=intRow5Top
Command1(1).Left=3103*lngPcnt
Command1(1).Width=intLetterWidth
Command1(1).Height=intHeight
'N Key
Command1(13).Font.Size=intFontSize
Command1(13).Top=intRow5Top
Command1(13).Left=3523*lngPcnt
Command1(13).Width=intLetterWidth
Command1(13).Height=intHeight
'M Key
Command1(12).Font.Size=intFontSize
Command1(12).Top=intRow5Top
Command1(12).Left=3943*lngPcnt
Command1(12).Width=intLetterWidth
Command1(12).Height=intHeight
', Key
Command1(36).Font.Size=intFontSize
Command1(36).Top=intRow5Top
Command1(36).Left=4363*lngPcnt
Command1(36).Width=intLetterWidth
Command1(36).Height=intHeight
'. Key
Command1(37).Font.Size=intFontSize
Command1(37).Top=intRow5Top
Command1(37).Left=4783*lngPcnt
Command1(37).Width=intLetterWidth
Command1(37).Height=intHeight
'/ Key
Command1(38).Font.Size=intFontSize
Command1(38).Top=intRow5Top
Command1(38).Left=5203*lngPcnt
Command1(38).Width=intLetterWidth
Command1(38).Height=intHeight
'Right Shift Key

**16**

cmdRightShift.Font.Size=dblFontSize
cmdRightShift.Top=intRow5Top
cmdRightShift.Left=5623*lngpcnt
cmdRightShift.Width=intRightBorder—
    cmdRightShift.Left
cmdRightShift.Height=intHeight
'Row 6
'Left Ctrl Key
cmdCntrl.Font.Size=dblFontSize
cmdCntrl.Top=intRow6Top
cmdCntrl.Left=60*lngpcnt
cmdCntrl.Width=795*lngpcnt
cmdCntrl.Height=intHeight
'Left Alt Key
cmdAlt.Font.Size=dblFontSize
cmdAlt.Top=intRow6Top
cmdAlt.Left=925*lngpcnt
cmdAlt.Width=735*lngpcnt
cmdAlt.Height=intHeight
'Move Left Key
cmdMoveLeft.Font.Size=intFontSize
cmdMoveLeft.Top=intRow6Top
cmdMoveLeft.Left=1730*lngPcnt
cmdMoveLeft.Width=465*lngpcnt
cmdMoveLeft.Height=intHeight
'Space Bar Key
cmdSpaceBar.Font.Size=intFontSize
cmdSpaceBar.Top=intRow6Top
cmdSpaceBar.Left=2265*lngPcnt
cmdSpaceBar.Width=2445*lngPcnt
cmdSpaceBar.Height=intHeight
'Move Right Key
cmdMoveRight.Font.Size=intFontSize
cmdMoveRight.Top=intRow6Top
cmdMoveRight.Left=4780*lngpcnt
cmdMoveRight.Width=465*lngpcnt
cmdMoveRight.Height=intHeight
'Right Alt Key
cmdAlt2.Font.Size=dblFontSize
cmdAlt2.Top=intRow6Top
cmdAlt2.Left=5315*lngpcnt
cmdAlt2.Width=735*lngpcnt
cmdAlt2.Height=intHeight
'Right Ctrl Key
cmdCntrl2.Font.Size=dblFontSize
cmdCntrl2.Top=intRow6Top
cmdCntrl2.Left=6120*lngPcnt
cmdCntrl2.Width intRightBorder—cmdCntrl2.Left
cmdCntrl2.Height=intHeight
'Exit Keyboard
cmdExitKeyboard.Font.Size=dblFontSize
cmdExitKeyboard.Top=intRow7Top
cmdExitKeyboard.Left=60*lngPcnt
cmdExitKeyboard.Width=6915*lngpcnt
cmdExitKeyboard.Height=intHeight

US 6,784,873 B1

**17**

```
End Sub
Private Sub cmdAlt__Click( )
    If cmdAlt.Tag="OFF" Then
    cmdAlt.Tag="ON"
    cmdAlt.Caption="Alt On"
    cmdAlt2.Tag="ON"
    cmdAlt2.Caption="Alt On"
    Else
    cmdAlt.Tag="OFF"
    cmdAlt.Caption="Alt Off"
    cmdAlt2.Tag="OFF"
    cmdAlt2.Caption="Alt Off"
    End If
End Sub
Private Sub cmdAlt2__Click( )
    cmdAlt__Click
End Sub
Private Sub cmdBackspace__Click( )
    strKeys="{BKSP}"
    SendVKeys (strKeys)
End Sub
Private Sub cmdCntrl__Click( )
    If cmdCntrl.Tag="OFF" Then
    cmdCntrl.Tag="ON"
    cmdCntrl.Caption="Ctrl On"
    cmdCntrl2.Tag="ON"
    cmdCntrl2.Caption="Ctrl On"
    Else
    cmdCntrl.Tag="OFF"
    cmdCntrl.Caption="Ctrl Off"
    cmdCntrl2.Tag="OFF"
    cmdCntrl2.Caption="Ctrl Off"
    End If
End Sub
Private Sub cmdCntrl2__Click( )
    cmdCntrl__Click
End Sub
Private Sub cmdDelete__Click( )
    strKeys=" "
    strKeys=strKeys & "{DEL}"
    SendVKeys (strKeys)
End Sub
Private SubcmdEnter__Click( )
    strKeys=""
    strKeys=strKeys & "{ENTER}"
    SendVKeys (strKeys)
End Sub
Private SubcmdEscape__Click( )
    strKeys="{ESC}"
    SendVKeys (strKeys)
End Sub
Private SubcmdExitKeyboard__Click( )
End
End Sub
Private Sub cmdLeftShift__Click( )
    If cmdLeftShift.Tag="OFF" Then
    If cmdCapsLock.Tag="OFF" Then
    Shift__Up
    Else
    Set__Caps__Lock
    Shift__Up
    End If
    Else
```

**18**

```
    Shift__Down
    End If
End Sub
Private Sub cmdMoveLeft__Click( )
    strKeys=" "
    strKeys=strKeys & "{LEFT}"
    SendVKeys (strKeys)
End Sub
Private Sub cmdMoveRight__Click( )
    strKeys=""
    strKeys=strKeys & "{RIGHT}"
    SendVKeys (strKeys)
End Sub
Private Sub cmdRightShift__Click( )
    cmdLeftShift__Click
End Sub
Private Sub cmdSpaceBar__Click( )
    strKeys=""
    strKeys=strKeys & " "
    SendVKeys (strKeys)
End Sub
Private Sub cmdTab__Click( )
    strKeys=""
    If cmdLeftShift.Tag="ON" Then
    strKeys=strKeys & "+"
    End If
    strKeys=strKeys & "{TAB}"
    SendVKeys (strKeys)
End Sub
Private Sub Form__Activate( )
    Dim dl&
    ' KeyboardWindow=GetForegroundWindow  dl&=
SetWindowPos(hwnd, −1, 4905, 7965, 6975, 2475, &H1 Or
&H2)
End Sub
Private Sub Form__GotFocuso
    If Me.WindowState <>0 Then
    Me.WindowState=0
    ' Me.Width=7000
    End If
End Sub
Private Sub Form__Resize( )
    If Me.WindowState <>0 Then
    Me.WindowState=0
    Me.Width=7000
    End If
    Key__Layout1
    End Sub
Private Sub cmdCapsLock__Click( )
    ' Caps Lock Key
    If cmdCapsLock.Tag="OFF" Then
    cmdCapsLock.Caption="Caps On"
    cmdCapsLock.Tag="ON"
    Caps__On
    Else
    cmdCapsLock.Caption="Caps Off"
cmdCapsLock.Tag="OFF"
    Caps__OFF
    End If
    strkeys=""
    strkeys=strkeys & "{CAPSLOCKII"
    SendVKeys (strKeys)
End Sub
Private Sub Command1__Click(Index As Integer)
    strKeys=""
    If cmdCapsLock.Tag="ON" Then
    strKeys=strKeys & "{CAPSLOCK}"
```

US 6,784,873 B1

**19**

```
End If
If cmdLeftShift.Tag="ON" Then
strKeys=strKeys & "+"
End If
If cmdAlt.Tag="ON" Then
strKeys=strKeys & "%"
End If
If cmdCntrl.Tag="ON" Then
strKeys=strKeys & "^"
End If
strKeys=strKeys & Command1(Index).Tag
SendVKeys (strKeys)
End Sub
Private Sub Form_Load( )
Dim hSysMenu As Long
Dim nCnt As Long
' First, show the form
Me.Show
' Get handle to our form's system menu
' (Restore, Maximize, Move, close etc.)
SysMenu=GetSystemMenu(Me.hwnd, False)
If hSysMenu Then
'=0 Get System menu's menu count
nCnt=GetMenuItemCount(hSysMenu)
If nCnt Then
'Menu count is based on 0 (0, 1, 2, 3 . . . )
RemoveMenu hSysMenu, nCnt–1, __
MF_BYPOSITION Or MF_REMOVE
RemoveMenu hSysMenu, nCnt–2, __
MF_BYPOSITION Or MF_REMOVE ' Remove the sep-
erator
DrawMenuBar Me.hwnd
' Force caption bar's refresh. Disabling X button
Me.Caption="GeniSus Keyboard"
End If
End If
   Shift_Down
   Hook
#If CurrentProcOnly=1 Then
   Form1.Show
#End If
DeactivateClose
End Sub
Private Sub Form_Unload(Cancel As Integer)
   UnHook
End Sub
Public Sub DeactivateClose( )
   End Sub
   An example of an accompanying dynamic link library, .dll
application, through which external applications may access
the keyboard application is:
// vKeyHook.cpp : Defines the entry point for the DLL
application.
//
#include <windows.h>
#include <winuser.h>
#pragma data_seg(".SHARDATA")
   static int hWndActive=0;
   static int hWndSelf=0;
   static HHOOK hHook=0;
#pragma data_seg( )
BOOL APIENTRY DllMain( HANDLE hModule,
       DWORD ul_reason_for_call,
       LPVOID lpReserved
       )
{
   switch (ul_reason_for_call)
```

**20**

```
   }
   case DLL_PROCESS_ATTACH:
   case DLL_THREAD_ATTACH:
   case DLL_THREAD_DETACH:
   case DLL_PROCESS_DETACH: break;
   }
   return TRUE;
}
long CALLBACK CBTProc(
   int nCode, // hook code
   WPARAM wparam, // current-process flag
   LPARAM lParam // message data
)
{
   if (nCode==HCBT_ACTIVATE &&
      (int)wParam !=hWndSelf){
   hWndActive=(int)wParam;
   }
   return CallNextHookEx(hHook, nCode, wParam,
lparam);
}
void _stdcall HookMsg(int hwnd)
}
   HINSTANCE hModule;
   hModule=GetModuleHandle("vKeyHook.dll");
   hHook=SetWindowsHookEx(WH_CBT, CBTProc,
hModule, 0);
   hWndSelf=hwnd;
}
void _stdcall UnHookMsg( )
{
   UnhookWindowsHookEx(hHook);
}
int _stdcall GetActiveWnd( )
{
   return hWndActive;
```

   These codes are preferably executed in conjunction with
a Windows 98® operating system. These codes may be
executed in any type of system, including, but not limited to,
a web based system, a computer network, or any personal
computer, personal digital assistant or other device.

   As can clearly be seen in FIGS. 1 and 2, there are no
minimizing, maximizing, or close options available for the
user. Therefore, a user can input data by selecting keys 22 on
the keyboard 20 as necessary.

   A general description of the present invention as well as
a preferred embodiment of the present invention has been set
forth above. Those skilled in the art to which the present
invention pertains will recognize and be able to practice
additional variations in the methods and systems described
which fall within the teachings of this invention.
Accordingly, all such modifications and additions are
deemed to be within the scope of the invention which is to
be limited only by the claims appended hereto.

   What is claimed is:
   1. A method of entering data on a touch screen display, the
method comprising:
      invoking a computer program in which user input is
      sought;
      invoking an input area, including a plurality of data input
      fields;
      invoking a graphical keyboard area incapable of user
      termination independent of termination of the input
      area, the graphical keyboard area having a plurality of
      keys on the display;
      selecting keys on the keyboard to provide the desired
      input; and

US 6,784,873 B1

21

automatically terminating the graphical keyboard area after the desired input is received in the input area.

2. The method of entering data on a touch screen display of claim 1 wherein the input area is created by an executable code.

3. The method of entering data on a touch screen display of claim 2 wherein the executable code is compiled visual basic code.

4. The method of entering data on a touch screen display of claim 1 wherein the computer program invokes the input area.

5. The method of entering data on a touch screen display of claim 4 wherein the computer program accesses a dynamic link library file in order to invoke the input area.

6. The method of entering data on a touch screen display of claim 5 wherein the dynamic link library file is a C++ program.

7. The method of entering data on a touch screen display of claim 1 wherein the computer program is executing on a personal computer.

8. The method of entering data on a touch screen display of claim 1 wherein the computer program is executing on a pen-based computer.

9. The method of entering data on a touch screen display of claim 1 wherein the computer program is executing on a computer with a touch-screen display.

22

10. A method of providing a user interface for receiving information from a user using a user immutable graphical keyboard linked to an input area, comprising:

invoking the input area;

determining that input from the user using the graphical keyboard is needed within the input area;

invoking the graphical keyboard on a touch screen display to receive input from a user, the graphical keyboard placed in a set position;

persistently maintaining the graphical keyboard on the touch screen display such that the user cannot move, resize, remove, or close the graphical keyboard through the user interface while the input area remains and requires input;

receiving input within the input area from the user through the graphical keyboard;

determining that further input from the user is no longer needed in the input area; and

removing the graphical keyboard.

*   *   *   *   *

```
08 CV 3248
JUDGE PALLMEYER
MAGISTRATE JUDGE VALDEZ
```

# Exhibit B



Home » Retail

search [          ] go

**Company Links**

Why Garmin?

Facilities

Chicago Store

Investor Relations

Employment

Environment

Sponsorship

**Chicago Store Feed**

There's a Plane in the Store!
Had you walked by the Garmin
Store on Chicago's famed
Michigan Avenue yesterday you
probably would have done a...

Forerunner 405: Perfect for
Mother's Day - or Win One for
Yourself
With its release at the Boston
Marathon and arrival at running
stores, the Forerunner 405 has
raced to the...

HEADLINES BY
FEEDBURNER



Garmin Chicago Store, Michigan Avenue

### Experience Garmin Navigation

Step into our retail store on Michigan Avenue in Chicago and let us show you how our innovative GPS products are
changing people's lives. At the Garmin store, you can experience and use all of our most popular GPS navigation
devices in a spectacular setting — it's the only place you can view the entire Garmin product line under one roof.

### What you'll find

You'll find hands-on product demonstrations, interactive kiosks and in-depth product training and seminars, coupled
with exceptional customer service and the latest GPS technology and devices on the market. It's a high-tech,
interactive and unique shopping experience. Welcome to the Garmin store.

| Address: | Store Hours: | Coordinates: |
|---|---|---|
| 663 N. Michigan Avenue | Mon – Sat | 10am – 7pm | N41° 53.655 | W87° 37.450 |
| Chicago, IL | Sun | 11am – 5pm | |
| (312) 787.3221 | | |



Not only does the Garmin Chicago store feature a complete range of units and accessories, but you can place your order by phone too.

Order by phone: 312.787.3221

Delivery Times
7 - 10 days: $6
3 - 4 days: $15
2 - 3 days: $25

Cartography is the art and science of making maps. This mapping detail supplements your unit's existing map data and improves navigation.

We are constantly updating and improving our map data. All maps carried at the Garmin Chicago Store are in stock and ready for immediate shipping.

### On The Road

- City Navigator Australia NT
- City Navigator Brazil NT
- City Navigator Europe NT – Full Version
- City Navigator Europe NT – Italy & Greece
- City Navigator Europe NT – Alps
- City Navigator Europe NT – Northwest Eastern Europe
- City Navigator Europe NT – DACH & Czech
- City Navigator Europe NT – UK & Ireland
- City Navigator Europe NT – Spain & Portugal
- City Navigator Europe NT – Nordics
- City Navigator Europe NT – BeNeLux & France
- City Navigator Mexico NT
- City Navigator Middle East NT
- City Navigator North America NT – Full Version
- City Navigator North America NT – Canada
- City Navigator North America NT – Hawaii
- City Navigator New Zealand
- City Navigator Singapore/Malaysia NT
- City Navigator Thailand NT

### On The Water

**BlueChart microSD cards:**
- Lake of the Woods / Rainy Lake
- Lake Superior
- Lake Michigan
- Lake Huron / Lake St. Clair
- Lake Erie / Lake St. Clair
- Lake Ontario to Montreal
- St. Lawrence Seaway
- Southeast Florida
- Chesapeake
- Cape Cod through New Jersey

**U.S. Inland Lakes microSD cards:**
- West
- North Central
- Northeast
- South Central
- Southeast

### On The Trail

- All 11 TOPO U.S. 2008 microSD cards
- All 13 TOPO Canada microSD cards

With the purchase of any GPS device at The Garmin Chicago Store, you are eligible for a free one-on-one tutorial with a Garmin Product Expert. In GPS Academy, there's a friendly, relaxed instructional setting where you can get it all – from GPS Basics to Geocaching! This personalized service can arranged in advance to fit the busiest of schedules. Garmin Chicago GPS Academy gets an A+!

Copyright © 1996 – 2008 Garmin Ltd. or its subsidiaries | Privacy Statement | Terms of Use | Site Map

```
08 CV 3248
JUDGE PALLMEYER
MAGISTRATE JUDGE VALDEZ
```

# Exhibit C



08 CV 3248
JUDGE PALLMEYER
MAGISTRATE JUDGE VALDEZ

# Exhibit D



# WAL★MART
## ALWAYS LOW PRICES.
*Always*

WAL★MART
WE SELL FOR LESS
MANAGER JASON WEISENBERGER
( 815 ) 455 - 4200
ST# 1413 OP# 00005673 TE# 60 TR# 07679
PRODUCT SERIAL # 17T355153
NUVI 260    075375907477        260.00 X



```
                 SUBTOTAL
     TAX 1   7.000 %
                   TOTAL
     VISA  TEND
```

ACCOUNT #9207
APPROVAL #05712D
TRANS ID -0168147621233141
VALIDATION -RCRS
PAYMENT SERVICE - E
                    CHANGE DUE      0.00

# # ITEMS SOLD 3

TC# 4126 0328 4524 7035 9055 8

Economic stimulus checks cashed free.
Keep all of your money. We can help.
   05/26/08    12:15:34

***CUSTOMER COPY***

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SP TECHNOLOGIES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 08 CV 3248 |
| vs. | ) |
| | ) |
| GARMIN LIMITED, GARMIN | ) Honorable Judge Pallmeyer |
| INTERNATIONAL, INC., TOMTOM, INC., | ) Mag. Judge Valdez |
| and MAGELLAN NAVIGATION, INC. | ) |
| | ) JURY TRIAL DEMANDED |
| Defendants. | ) |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SP Technologies, LLC ("SPT") complains of defendants, Garmin Limited and Garmin International, Inc. ("Garmin"), TomTom, Inc. ("TomTom") and Magellan Navigation, Inc. ("Magellan") as follows:

### NATURE OF ACTION

1.     This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, including 35 U.S.C. §§ 271 and 281. This Court has exclusive jurisdiction over the subject matter of this case under 28 U.S.C. § 1338(a).

### PLAINTIFF SP TECHNOLOGIES AND THE PATENT IN SUIT

2.     SP Technologies, LLC is a Delaware limited liability corporation having offices at 950 North Michigan Avenue, #2406, Chicago, Illinois 60611 and 300 Beach Drive NE #802, St. Petersburg, Florida 33701. SPT owns all right, title and interest in and has standing to sue for infringement of United States Patent No. 6,784,873 B1 ("the '873 patent"), entitled "Method and Medium for Computer Readable Keyboard Display Incapable of User Termination" issued August 31, 2004 (Exhibit A).

1

## DEFENDANTS

### Garmin

3.     Defendant Garmin Limited is a corporation organized under the laws of the Cayman Islands and having offices at 1200 East 151st, Olathe, Kansas  66062 and 45 Market Street, Gardenia Court, Camana Bay, Cayman Islands.

4.     Defendant Garmin International Inc. is a subsidiary of Garmin Ltd. having offices at 1200 East 151st Street, Olathe, Kansas  66062.

5.     Defendant Garmin International Inc. having one retail store (opened in 2006) where it offers its GPS products for sale located in this judicial district at the Garmin retail store located at 633 North Michigan Avenue, Chicago, Illinois (Exhibit B).

6.     Defendant Garmin transacts substantial business in this judicial district and has committed acts of patent infringement complained of in the Complaint in this judicial district, at least by selling and offering to sell at least its touch-screen personal navigation devices ("PND") (such as the nüvi 260, Exhibit C) over the Internet, through Garmin's retail store located in this district at 633 North Michigan Avenue, Chicago, Illinois, 60611 and for example, at the Wal-Mart store in Crystal Lake, Illinois (Exhibit D), and further by inducing residents located in this district to infringe the '873 patent by purchase of accused touch-screen PND products.

### TomTom

7.     Defendant TomTom, Inc. is a corporation of the Commonwealth of Massachusetts having offices at 150 Baker Avenue, Concord, Massachusetts  01742.

2

8.     Defendant TomTom transacts substantial business in this district and has committed acts of patent infringement complained of in the Complaint in this judicial district, at least by offering to sell its touch-screen personal navigation devices ("PNDs") (such as the TomTom *One*, Exhibit E) over the Internet, and through retail stores in this district such as the Wal-Mart store located in Crystal Lake, Illinois (Exhibit D) and further by inducing residents located in this district to infringe the '873 patent by purchasing and using the accused TomTom products.

### Magellan

9.     Defendant Magellan Navigation, Inc. is a Delaware corporation having offices at 471 El Camino Real, Santa Clara, CA  95050-4300.

10.     Defendant Magellan transacts substantial business in this district and has committed acts of patent infringement complained of in the Complaint in this judicial district, at least by offering to sell its touch-screen personal navigation devices ("PNDs") (such as the Magellan *Maestro 3Z20*, Exhibit F) over the Internet and offering such accused products for sale through numerous retail stores in this district such as the Wal-Mart store located in Crystal Lake, Illinois (Exhibit D) and further by inducing residents located in this district to infringe the '873 patent by purchasing and using the accused Magellan products.

11.     Venue is proper in this district as to all defendants under 28 U.S.C. §§ 1391 and 1400(b).

### GARMIN'S ACTS OF PATENT INFRINGEMENT

12.     Plaintiff reasserts paragraphs 1-11 of the above allegations herein.

3

13.    Garmin has infringed, and is now infringing, at least claims 1, 4, 9 and 10 of the '873 patent through, among other activities, the use, sale, offer for sale of its touch-screen PND product (such as the nüvi 260) and by knowingly and actively inducing others to infringe and by contributing to the infringement by others, located in this judicial district.

14.    Garmin's infringement, contributory infringement and inducement to infringe has injured and will contribute to injure SPT unless and until this Court enters an injunction prohibiting further infringement and enjoining further sale, offer for sale or inducement to infringe Garmin products that fall within the scope of the '873 patent. SPT is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

15.    Garmin's infringement and inducement to infringe has been willful and deliberate and has injured and will continue to injure SPT, unless and until this Court enters an injunction prohibiting further infringement of the '873 patent.

## TOMTOM'S ACTS OF PATENT INFRINGEMENT

16.    Plaintiff reasserts paragraphs 1-11 of the above allegations herein.

17.    TomTom has infringed, and is now infringing, at least claims 1, 4, 9 and 10 of the '873 patent through, among other activities, the use, sale, offer for sale of its touch-screen PND product (such as the TomTom *One*) and by knowingly and actively inducing others to infringe and by contributing to the infringement by others, located in this judicial district.

18.    TomTom's infringement, contributory infringement and inducement to infringe has injured and will contribute to injure SPT unless and until this Court enters

an injunction prohibiting further infringement and enjoining further sale, offer for sale or inducement to infringe TomTom products that fall within the scope of the '873 patent. SPT is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

19.     TomTom's infringement and inducement to infringe has been willful and deliberate and has injured and will continue to injure SPT, unless and until this Court enters an injunction prohibiting further infringement of the '873 patent.

## MAGELLAN'S ACTS OF PATENT INFRINGEMENT

20.     Plaintiff reasserts paragraphs 1-11 of the above allegations herein.

21.     Magellan has infringed, and is now infringing, at least claims 1, 4, 9 and 10 of the '873 patent through, among other activities, the use, sale, offer for sale of its touch-screen PND product (such as the Magellan *Maestro 3Z20*) and by knowingly and actively inducing others to infringe and by contributing to the infringement by others, located in this judicial district.

22.     Magellan's infringement, contributory infringement and inducement to infringe has injured and will contribute to injure SPT unless and until this Court enters an injunction prohibiting further infringement and enjoining further sale, offer for sale or inducement to infringe Magellan products that fall within the scope of the '873 patent. SPT is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

23.     Magellan's infringement and inducement to infringe has been willful and deliberate and has injured and will continue to injure SPT, unless and until this Court enters an injunction prohibiting further infringement of the '873 patent.

WHEREFORE, plaintiff SP Technologies LLC respectfully requests this Court enter judgment against defendant Garmin Limited, and against its subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with it, granting the following relief:

A.     The entry of judgment in favor of SPT and against the defendant Garmin;

B.     An award of damages adequate to compensate SPT for the infringement that has occurred (together with prejudgment interest from the date the infringement began), but in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284;

C.     An award to SPT  of all remedies available under 35 U.S.C. § 284;

D.     An award to SPT of all remedies available under 35 U.S.C. § 285;

E.     A permanent injunction prohibiting further infringement and inducement of the '873 patent; and,

F.     Such other relief that SPT is entitled to under law and any other relief that this Court or a jury may deem just and proper.

### Jury Demand

SPT demands a trial by jury on all issues presented in this complaint.

Respectfully submitted,

/s/Sally Wiggins

Raymond P. Niro
Sally Wiggins
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois  60602
Telephone:  (312) 236-0733
Facsimile:  (312) 236-3137

Attorneys for Plaintiff SP Technologies, LLC

6

# Exhibit A

|||||| US006784873B1

(12) **United States Patent**     (10) **Patent No.:**     **US 6,784,873 B1**

Boesen et al.                     (45) **Date of Patent:**     **Aug. 31, 2004**

---

(54) **METHOD AND MEDIUM FOR COMPUTER READABLE KEYBOARD DISPLAY INCAPABLE OF USER TERMINATION**

(76) Inventors: **Peter V. Boesen**, 4026 Beaver Ave., Des Moines, IA (US) 50310; **Thomas J. Mann**, 330 N. 93rd St., Omaha, NE (US) 68114

( * ) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 70 days.

(21) Appl. No.: **09/632,922**

(22) Filed:     **Aug. 4, 2000**

(51) Int. Cl.$^7$ ................................................ G09G 5/00

(52) U.S. Cl. ...................... 345/173; 345/174; 345/175; 345/168

(58) Field of Search ................................. 345/173, 175, 345/174, 168

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,736,973 A | * | 4/1998 | Godfrey et al. .............. | 345/102 |
| 6,081,263 A | | 6/2000 | LeCall et al. ................ | 345/327 |
| 6,094,197 A | * | 7/2000 | Buxton et al. .............. | 345/358 |

OTHER PUBLICATIONS

Alan Freeman, The Computer Desktop Encyclopedia, 1999, The Computer Language Company Inc., second edition, pp. 99, 254, 678, 976.*

Article entitled "Wireless Future Sizzles," by Keith Darce, The Times Picayne, Sep. 26, 1999.

Article entitled "Tiny computers come in handy, doctors find" by Thomas R. O'Connell, The Des Moines Register, pp. 1B, 4B.

* cited by examiner

Primary Examiner—Matthew C. Bella
Assistant Examiner—Tam Tran
(74) Attorney, Agent, or Firm—McKee, Voorhees & Sease, P.L.C.

(57)             **ABSTRACT**

A method and medium for a computer readable input area. The input area is created by a computer program on a display capable of receiving touch-screen input. The computer on which the input area in used is at least a 32-bit system. The input area may contain a keyboard which is an image map. External programming may selectively access the input area through a dynamic link library. The input area has no task bar and may not be minimized, maximized, or deleted. Therefore, the input area becomes an integral component and provides the user with a constant and reliable method of inputting information into the computer program.

**10 Claims, 2 Drawing Sheets**



Case 1:08-cv-03248    Document 49-2    Filed 09/03/2008    Page 10 of 33

*Fig. 1*



*Fig. 2*

US 6,784,873 B1

1

# METHOD AND MEDIUM FOR COMPUTER READABLE KEYBOARD DISPLAY INCAPABLE OF USER TERMINATION

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to a method and medium for inputting data, and more particularly, to a keyboard of constant size and shape present on the screen of a touch-screen style computer whenever user input may be desired. The keyboard display may be used by any number of computer software programs, including any known operating system in which a touch-sensitive computer display may be incorporated. Additionally, the present invention may be used in conjunction with any individual computer, network and/or Internet based system.

2. Problem in the Art

Computers with touch-screen displays, allowing a user to simply press on a desired location to obtain a desired input, have been around for some time. For example, a pen-based computer, such as the Fujitsu Model 1600, allows a user to press on the screen using the attached pen or other styli, and thereby provide user input. The use of such a pen-based computer allows a user to enter all necessary data without the need for an external keyboard, mouse or other input device. The use of an on-screen keyboard in such a computer allows a user to input data without the need for additional handwriting recognition software. Handwriting recognition software, while constantly improving, is often inaccurate and cumbersome. Further, such handwriting recognition software is often processor intensive.

Currently, on-screen keyboards allow a user to maximize, minimize, or simply remove the keyboard on the display. Further, the shape and size of the keyboard may be altered. Often, such alterations or terminations are accidental and returning a keyboard to a useable size and shape wastes valuable time. In a medical setting, for example, it is highly undesirable to have a care provider attempting to recover from an accidental keyboard alteration when the care provider should be attending to and recording information on patients. It is therefore desirable to provide an on-screen keyboard which is incapable of alteration or termination by a user.

More and more applications are being developed for pen-based or touch-screen based computers. These applications will typically require a user to input data at a specific location on the screen. An on-screen keyboard may be necessary to provide the desired input. However, current on-screen keyboards may be moved by the user and therefore placed in undesirable locations which may block necessary text input fields or instructions. Further, current on-screen keyboard include a task bar having minimizing and maximizing buttons which allow a user to enlarge or reduce the window in which the keyboard appears. Often, such keyboards also include a close button which allows the user to terminate the keyboard. Upon pressing these buttons, many computer novices have difficulty launching another instance of the keyboard or recovering the keyboard to a usable state. It is therefore desirable to have an on-screen keyboard which is capable of permanent placement on a computer display.

Computer programs may require input only randomly. Many ask for user input and then present the results. As it would clearly hamper the presentation of results, data or other information to have an on-screen keyboard present at

2

all times, it is desirable to provide an on-screen keyboard which may be selectively called up as a subroutine or subprogram by a variety of programming.

There is therefore a need to have an on-screen keyboard which solves these and other problems in the art.

## FEATURES OF THE INVENTION

A general feature of the present invention is the provision of an input area which overcomes the problems found in the prior art.

A further feature of the present invention is the provision of an input area which may be used in conjunction with touch-sensitive displays.

Another feature of the present invention is the provision of an input area which is immutable.

A further feature of the present invention is the provision of an input area which may not be moved.

A still further feature of the present invention is the provision of an input area which allows a user to input data without the need for handwriting recognition software.

An additional feature of the present invention is the provision of an input area which may not be maximized.

Another feature of the present invention is the provision of an input area which may not be minimized.

A still further feature of the present invention is the provision of an input area which may not be removed by the user.

A further feature of the present inventions the provision of an input area which contains a keyboard.

Another feature of the present invention i the provision of an input area which may be selectively used by a computer program.

A still further feature of the present invention is the provision of an input area which provides an easy to use and reliable method of inputting information into a computer system regardless of the level of computer skill possessed by the user.

These, as well as other features and advantages of the present invention will become apparent from the following specification and claims.

## SUMMARY OF THE INVENTION

The present invention generally comprises an immutable keyboard display. In a preferred embodiment, the present invention includes a software application than provides a keyboard display which may not be minimized, maximized, closed, or deleted. Further, the keyboard display allows a user to input information as desired via a touch-screen based or pen based computer.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a pictorial representation of a display of a pen-based computer incorporating the keyboard display of the present invention.

FIG. 2 is a close-up view of the keyboard display of the present invention.

## DETAILED DESCRIPTION OF THE EMBODIMENT

The present invention will be described as it applies to its preferred embodiment. It is not intended that the present invention be limited to the described embodiment. It is intended that the invention cover all modifications and

US 6,784,873 B1

3

alternatives which may be included within the spirit and scope of the invention.

As shown in FIG. 1, a pen-based computer 10, such as the Fujitsu Model Point 1600, includes a touch-sensitive display 12. On the display 12 is shown the user interface for a software application 14 which may be running from or accessed by the computer 10. It is to be understood that the computer 10 could be a stand-alone computer or a part of any network or Internet based system. However, the computer 10 preferably provides a 32 bit environment. Computer 10 may access any type of software application through any number of known drives or via a network or web server. Once accessed, the user will see the application as it appears on the display 12 of the computer 10. The application may ask for user input at various locations through the use of text boxes 16 or other fields. The user may provide the desired input by holding the pen 18 or any other known input device which may include the user's finger, and pressing on the display 12 of the computer 10 so as to strike a desired key 22 of the keyboard 20.

The keyboard 20 is preferably an image map or active map incorporated at a set location on the display 12. The keyboard 20 may not be moved, maximized, or minimized. Therefore, the keyboard 20 provides the user with a constant input area to which the user may become accustomed and becomes an integral component.

The keyboard 20, as shown in FIG. 2, contains a plurality of keys 22. The keys 22 may include all those currently found on any standard typewriter or computer keyboard, or may be application-specific. For instance, if the software in which user input is desired is primarily financial software, the keyboard 20 may include only numbers. Further, if the software requires the user to input names or words, the keyboard 20 may include one key 22 for every letter of the alphabet and any necessary punctuation or function keys. Further, the keys 22 may be programmed to represent any symbol or accentuated letter to allow the keyboard to be used in applications in which input may be required in various languages.

The keyboard 20 is preferably the result of a software application written in Visual Basic or C++, though various software programming languages may be used. The keyboard has all task bars removed and may not be minimized, maximized, deleted, closed or resized and is therefore immutable. Preferably, the keyboard application is a subroutine or subprogram which is made available for use by external software applications. The keyboard application is preferably part of the operating system running on the computer 10. Incorporating the keyboard application into the computer 10 allows the keyboard application to be available to any external software application capable of running on the computer 10. The keyboard application may include a dynamic link library (dll) application. The dll application allows the external software to selectively use the keyboard and either have the keyboard in or out. This allows the software to use the entirety of the screen when necessary for displaying information or results.

An example of the keyboard application programming as it would appear in Visual Basic is:

```
Option Explicit
Public Sub Shift_Down( )
cmdLeftShift.Caption="LowerCase"
cmdRightShift.Caption="LowerCase"
cmdLeftShift.Tag="OFF"
cmdRightShift.Tag="OFF"
Caps_OFF
```

4

```
Command1(26).Caption="0"
Command1(27).Caption="1"
Command1(28).Caption="2"
Command1(29).Caption="3"
Command1(30).Caption="4"
Command1(31).Caption="5"
Command1(32).Caption="6"
Command1(33).Visible=False
Command1(44).Visible=True
Command1(34).Caption="8"
Command1(35).Caption="9"
Command1(36).Caption=","
Command1(37).Caption="."
Command1(38).Caption="/"
Command1(39).Caption=";"
Command1(40).Caption="'"
Command1(41).Caption="["
Command1(42).Caption="]"
Command1(43).Caption="\"
Command1(48).Caption="F1"
Command1(49).Caption="F2"
Command1(50).Caption="F3"
Command1(51).Caption="F4"
Command1(52).Caption="F5"
Command1(53).Caption="F6"
Command1(54).Caption="F7"
Command1(55).Caption="F8"
Command1(56).Caption="F9"
Command1(57).Caption="F10"
Command1(58).Caption="F11"
Command1(59).Caption="F12"
Command1(46).Caption="-"
Command1(47).Caption="="
Command1(45).Caption="'"
Command1(0).Caption="a"
Command1(1).Tag="b"
Command1(2).Tag="c"
Command1(3).Tag="d"
Command1(4).Tag="e"
Command1(5).Tag="f"
Command1(6).Tag="g"
Command1(7).Tag="h"
Command1(8).Tag="i"
Command1(9).Tag="j"
Command1(10).Tag="k"
Command1(11).Tag="l"
Command1(12).Tag="m"
Command1(13).Tag="n"
Command1(14).Tag="o"
Command1(15).Tag="p"
Command1(16).Tag="q"
Command1(17).Tag="r"
Command1(18).Tag="s"
Command1(19).Tag="t"
Command1(20).Tag="u"
Command1(21).Tag="v"
Command1(22).Tag="w"
Command1(23).Tag="x"
Command1(24).Tag="y"
Command1(25).Tag="z"
Command1(26).Tag="0"
Command1(27).Tag="1"
Command1(28).Tag="2"
Command1(29).Tag="3"
Command1(30).Tag="4"
Command1(31).Tag="5"
Command1(32).Tag="6"
```

US 6,784,873 B1

**5**

Command1(44).Tag="7"
Command1(34).Tag="8"
Command1(35).Tag="9"
Command1(36).Tag ","
Command1(37).Tag="."
Command1(38).Tag="/"
Command1(39).Tag=";"
Command1(40).Tag=""
Command1(41).Tag="["
Command1(42).Tag="]"
Command1(43).Tag="\"
Command1(48).Tag="{F1}"
Command1(49).Tag="{F2}"
Command1(50).Tag="{F3}"
Command1(51).Tag="{F4}"
Command1(52).Tag="{F5 }"
Command1(53).Tag="{F6}"
Command1(54).Tag="{F7}"
Command1(55).Tag="{F8}"
Command1(56).Tag="{F9}"
Command1(57).Tag="{F10}"
Command1(54).Tag="{F11}"
Command1(58).Tag="{F12}"
Command1(46).Tag="−"
Command1(47).Tag="="
Command1(45).Tag=""
cmdTab.Caption="Tab>"
End Sub
Public Sub Shift_Up( )
cmdLeftShift.Caption="UpperCase"
cmdRightShift.Caption="UpperCase"
cmdLeftShift.Tag="ON"
cmdRightShift.Tag="ON"
Caps_On
Command1(26).Caption=")"
Command1(27).Caption="!"
Command1(28).Caption="@"
Command1(29).Caption="#"
Command1(30).Caption="$"
Command1(31).Caption="%"
Command1(32).Caption="^"
Command1(33).Visible=True
Command1(44).Visible=False
Command1(34).Caption="*"
Command1(35).Caption="("
Command1(36).Caption="<"
Command1(37).Caption=">"
Command1(38).Caption="?"
Command1(39).Caption=":"
Command1(40).Caption=""""
Command1(41).Caption="{"
Command1(42).Caption="}"
Command1(43).Caption="|"
Command1(48).Caption="F13"
Command1(49).Caption="F14"
Command1(50).Caption="F15"
Command1(51).Caption="F16"
Command1(52).Caption="F17"
Command1(53).Caption="F18"
Command1(54).Caption="F19"
Command1(55).Caption="F20"
Command1(56).Caption="F21"
Command1(57).Caption="F22"
Command1(58).Caption="F23"
Command1(59).Caption="F24"
Command1(46).Caption="_"
Command1(47).Caption="+"

**6**

Command1(45).Caption="~"
Command1(0).Tag="+A"
Command1(1).Tag="B"
Command1(2).Tag="C"
Command1(3).Tag="D"
Command1(4).Tag="E"
Command1(5).Tag="F"
Command1(6).Tag="G"
Command1(7).Tag="H"
Command1(8).Tag="I"
Command1(9).Tag="J"
Command1(10).Tag="K"
Command1(11).Tag="L"
Command1(12).Tag="M"
Command1(13).Tag="N"
Command1(14).Tag="O"
Command1(15).Tag="P"
Command1(16).Tag="Q"
Command1(17).Tag="R"
Command1(18).Tag="S"
Command1(19).Tag="T"
Command1(20).Tag="U"
Command1(21).Tag="V"
Command1(22).Tag="W"
Command1(23).Tag="X"
Command1(24).Tag="Y"
Command1(25).Tag="Z"
Command1(26).Tag="()}"
Command1(27).Tag="!"
Command1(28).Tag="@"
Command1(29).Tag="#"
Command1(30).Tag="$"
Command1(31).Tag="{%}"
Command1(32).Tag="{^}"
Command1(44).Tag="7"
Command1(34).Tag="*"
Command1(35).Tag="{(}"
Command1(36).Tag="<"
Command1(37).Tag=">"
Command1(38).Tag="!"
Command1(39).Tag=":"
Command1(40).Tag=""""
Command1(41).Tag="{{}"
Command1(42).Tag="{}}"
Command1(43).Tag="|"
Command1(48).Tag="{F13}"
Command1(49).Tag="{F14}"
Command1(50).Tag="{F15}"
Command1(51).Tag="{F16}"
Command1(52).Tag="{F17}"
Command1(53).Tag="{F18}"
Command1(54).Tag="{F19}"
Command1(55).Tag="{F20}"
Command1(56).Tag="{F21}"
Command1(57).Tag="{F22}"
Command1(58).Tag="{F23}"
Command1(59).Tag="{F24}"
Command1(46).Tag="_"
Command1(47).Tag="{+}"
Command1(45).Tag="{~}"
cmdTab.Caption="Tab>"
End Sub
Public Sub Caps_On( )
Command1(0).Caption="A"
Command1(1).Caption="B"
Command1(2).Caption="C"
Command1(3).Caption="D"

US 6,784,873 B1

**7**

```
Command1(4).Caption="E"
Command1(5).Caption="F"
Command1(6).Caption="G"
Command1(7).Caption="H"
Command1(8).Caption="I"
Command1(9).Caption="J"
Command1(10).Caption="K"
Command1(11).Caption="L"
Command1(12).Caption="M"
Command1(13).Caption="N"
Command1(14).Caption="O"
Command1(15).Caption="P"
Command1(16).Caption="Q"
Command1(17).Caption="R"
Command1(18).Caption="S"
Command1(19).Caption="T"
Command1(20).Caption="U"
Command1(21).Caption="V"
Command1(22).Caption="W"
Command1(23).Caption="X"
Command1(24).Caption="Y"
Command1(25).Caption="Z"
End Sub
Public Sub Caps__OFF( )
Command1(0).Caption="a"
Command1(1).Caption="b"
Command1(2).Caption="c"
Command1(3).Caption="d"
Command1(4).Caption="e"
Command1(5).Caption="f"
Command1(6).Caption="g"
Command1(7).Caption="h"
Command1(8).Caption="i"
Command1(9).Caption="j"
Command1(10).Caption="k"
Command1(11).Caption="l"
Command1(12).Caption="m"
Command1(13).Caption="n"
Command1(14).Caption="o"
Command1(15).Caption="p"
Command1(16).Caption="q"
Command1(17).Caption="r"
Command1(18).Caption="s"
Command1(19).Caption="t"
Command1(20).Caption="u"
Command1(21).Caption="v"
Command1(22).Caption="w"
Command1(23).Caption="x"
Command1(24).Caption="y"
Command1(25).Caption="z"
End Sub
Public Sub Set__Caps_Lock( )
  If cmdCapsLock.Tag="OFF" Then
  cmdCapsLock.Caption="Caps On"
  cmdCapsLock.Tag="ON"
  Caps_On
  Else
  cmdCapsLock.Caption="Caps Off"
  cmdCapsLock.Tag="OFF"
  Caps__OFF
  End If
  strKeys=""
  strKeys=strKeys & "{CAPSLOCK}"
  SendVKeys (strKeys)
End Sub
Public Sub Key__Layoutl( )
```

**8**

```
  Dim intTemp, intRightBorder As Integer
  Dim lngpcnt As Double
  Dim dblFontSize As Double
  Dim lngFormWidth As Long
  Dim intRow1Top, intRow2Top, intRow3Top,
intRow4Top, intRow5Top, intRow6Top, intRow7Top As
Integer
  Dim intFontSize, intHeight, intLetterWidth, intFunction-
Width As Integer
  lngFormWidth=frmKeys.Width
  If frmKeys.BorderStyle>0 Then
    lngPcnt=lngFormWidth/7135
  Else
    lngPcnt=lngFormWidth/6975
  End If
  'lngPcnt=lngFormWidth/6975
  'pKB.Height=2790*lngPcnt
  'pKB.Height=(3390*lngPcnt)
  intHeight=330*lngPcnt
  intLetterWidth=350*lngPcnt
  intFunctionWidth=470*lngpcnt
  intTemp=intFunctionWidth/24
  intFunctionWidth=(intTemp+1)*24
  intFontSize=9*lngPcnt
  dblFontSize=8*lngPcnt
  intRow1Top=60*lngPcnt
  intRow2Top=540 lngpcnt
  intRow3Top=960*lngPcnt
  intRow4Top=1380*lngPcnt
  intRow5Top=1860*lngpcnt
  intRow6Top=2340*lngPcnt
  intRow7Top=2820*lngPcnt
  'Set the form height to porportion with form width
  If frmKeys.BorderStyle>0 Then
    frmKeys.Height=intRow6Top+intHeight+465
  Else
    frmKeys.Height=intRow6Top+intHeight+60
  End If
  'Row 1
  'Escape Key
  cmdEscape.Font.Size=dblFontSize
  cmdEscape.Top=intRow1Top
  cmdEscape.Left=60*lngpcnt
  cmdEscape.Width=670*lngPcnt
  cmdEscape.Height=intHeight
  'F1 Key
  Command1(48).Font.Size=intFontSize
  Command1(48).Top=intRow1Top
  Command1(48).Left=805*lngpcnt
  Command1(48).Width=intFunctionWidth
  Command1(48).Height=intHeight
  'F2 Key
  Command1(49).Font.Size=intFontSize
  Command1(49).Top=intRow1Top
  Command1(49).Left=Command1(48).Left+Command1
    (48).Width '1285*lngpcnt
  Command1(49).Width=intFunctionWidth
  Command1(49).Height=intHeight
  'F3 Key
```

US 6,784,873 B1

**9**

Command1(50).Font.Size=intFontSize
Command1(50).Top=intRow1Top
Command1(50).Left=Command1(49).Left+Command1
(49).Width '1765*lngPcnt
Command1(50).Width=intFunctionWidth
Command1(50).Height=intHeight
'F4 Key
Command1(51).Font.Size=intFontSize
Command1(51).Top=intRow1Top
Command1(51).Left=Command1(50).Left+Command1
(50).Width '2245*lngpcnt
Command1(51).Width=intFunctionWidth
Command1(51).Height=intHeight
'F5 Key
Command1(52).Font.Size=intFontSize
Command1(52).Top=intRow1Top
Command1(52).Left=2905*lngpcnt
Command1(52).Width=intFunctionWidth
Command1(52).Height=intHeight
'F6 Key
Command1(53).Font.Size=intFontSize
Command1(53).Top=intRow1Top
Command1(53).Left=Command1(52).Left+Command1
(52).Width '3385*lngPcnt
Command1(53).Width=intFunctionWidth
Command1(53).Height=intHeight
'F7 Key
Command1(54).Font.Size=intFontSize
Command1(54).Top=intRow1Top
Command1(54).Left=Command1(53).Left+
Command1(53).Width '3865*lngPcnt
Command1(54).Width=intFunctionWidth
Command1(54).Height=intHeight
'F8 Key
Command1(55).Font.Size=intFontSize
Command1(55).Top=intRow1Top
Command1(55).Left=Command1(54).Left+Command1
(54).Width '4345*lngPcnt
Command1(55).Width=intFunctionWidth
Command1(55).Height=intHeight
'F9 Key
Command1(56).Font.Size=intFontSize
Command1(56).Top=intRow1Top
Command1(56).Left=5005*lngPcnt
Command1(56).Width=intFunctionWidth
Command1(56).Height=intHeight
'F10 Key
Command1(57).Font.Size=dblFontSize
Command1(57).Top=intRow1Top
Command1(57).Left=Command1(56).Left+Command1
(56).Width '5485*lngPcnt
Command1(57).Width=intFunctionWidth
Command1(57).Height=intHeight
'F11 Key
Command1(58).Font.Size=dblFontSize
Command1(58).Top intRow1Top
Command1(58).Left=Command1(57).Left+Command1
(57).Width '5965*lngpcnt

**10**

Command1(58).Width=intFunctionWidth
Command1(58).Height=intHeight
'F12 Key
Command1(59).Font.Size=dblFontSize
Command1(59).Top=intRow1Top
Command1(59).Left=Command1(58).Left+Command1
(58).Width '6445*lngpcnt
Command1(59).Width=intFunctionWidth
Command1(59).Height=intHeight
intRightBorder=Command1(59).Left+Command1(59).
Width
'Row 2
"Key
Command1(45).Font.Size=intFontSize
Command1(45).Top=intRow2Top
Command1(45).Left=60*lngpcnt
Command1(45).Width=intLetterWidth
Command1(45).Height=intHeight
'1 Key
Command1(27).Font.Size=intFontSize
Command1(27).Top=intRow2Top Command1(27).Left=
480*lngpcnt
Command1(27).Width=intLetterWidth
Command1(27).Height=intHeight
'2 Key
Command1(28).Font.Size=intFontSize
Command1(28).Top=intRow2Top
Command1(28).Left=900*lngpcnt
Command1(28).Width=intLetterWidth
Command1(28).Height=intHeight
'3 Key
Command1(29).Font.Size=intFontSize
Command1(29).Top=intRow2Top
Command1(29).Left=1320*lngpcnt
Command1(29).Width=intLetterWidth
Command1(29).Height=intHeight
'4 Key
Command1(30).Font.Size=intFontSize
Command1(30).Top=intRow2Top
Command1(30).Left=1740*lngpcnt
Command1(30).Width=intLetterWidth
Command1(30).Height=intHeight
'5 Key
Command1(31).Font.Size=intFontSize
Command1(31).Top=intRow2Top
Command1(31).Left=2160*lngpcnt
Command1(31).Width=intLetterWidth
Command1(31).Height=intHeight
'6 Key
Command1(32).Font.Size=intFontSize
Command1(32).Top=intRow2Top Command1(32).Left=
2580*lngpcnt
Command1(32).Width=intLetterWidth
Command1(32).Height=intHeight
'& Key
Command1(33).Font.Size=intFontSize
Command1(33).Top=intRow2Top

US 6,784,873 B1

11

Command1(33).Left=3000*lngPcnt
Command1(33).Width=intLetterWidth
Command1(33).Height=intHeight
'7 Key
Command1(44).Font.Size=intFontSize
Command1(44).Top=intRow2Top
Command1(44).Left=3000*lngPcnt
Command1(44).Width=intLetterWidth
Command1(44).Height=intHeight
'8 Key
Command1(34).Font.Size=intFontSize
Command1(34).Top=intRow2Top
Command1(34).Left=3420*lngpcnt
Command1(34).Width=intLetterWidth
Command1(34).Height=intHeight
'9 Key
Command1(35).Font.Size=intFontSize
Command1(35).Top=intRow2Top
Command1(35).Left=3840*lngPcnt
Command1(35).Width=intLetterWidth
Command1(35).Height=intHeight
0 Key
Command1(26).Font.Size=intFontSize
Command1(26).Top=intRow2Top
Command1(26).Left=4260*lngpcnt
Command1(26).Width=intLetterWidth
Command1(26).Height=intHeight
'- Key
Command1(46).Font.Size=intFontSize
Command1(46).Top=intRow2Top
Command1(46).Left=4680*lngpcnt
Command1(46).Width=intLetterWidth
Command1(46).Height=intHeight
'= Key
Command1(47).Font.Size=intFontSize
Command1(47).Top=intRow2Top
Command1(47).Left=5100*lngPcnt
Command1(47).Width=intLetterWidth
Command1(47).Height=intHeight
'Backspace Key
cmdBackspace.Font.Size=dblFontSize
cmdBackspace.Top=intRow2Top
cmdBackspace.Left=5520*lngPcnt
cmdBackspace.Width=intRightBorder—
    cmdBackspace.Left
cmdBackspace.Height=intHeight
'Row 3
'TAB Key
cmdTabFont.Size=dblFontSize
cmdTabTop=intRow3Top
cmdTabLeft=60*lngpcnt
cmdTabWidth=650*lngpcnt
cmdTabHeight=intHeight
'Q Key
Command1(16).Font.Size=intFontSize
Command1(16).Top=intRow3Top
Command1(16).Left=780*lngpcnt

12

Command1(16).Width=intLetterWidth
Command1(16).Height=intHeight
'W Key
Command1(22).Font.Size=intFontSize
Command1(22).Top=intRow3Top
Command1(22).Left=1200*lngPcnt
Command1(22).Width=intLetterWidth
Command1(22).Height=intHeight
'E Key
Command1(4).Font.Size=intFontSize
Command1(4).Top=intRow3Top
Command1(4).Left=1620*lngpcnt
Command1(4).Width=intLetterWidth
Command1(4).Height=intHeight
'R Key
Command1(17).Font.Size=intFontSize
Command1(17).Top=intRow3Top
Command1(17).Left=2040*lngpcnt
Command1(17).Width=intLetterWidth
Command1(17).Height=intHeight
'T Key
Command1(19).Font.Size=intFontSize
Command1(19).Top=intRow3Top
Command1(19).Left=2460*lngPcnt
Command1(19).Width=intLetterWidth
Command1(19).Height=intHeight
'Y Key
Command1(24).Font.Size=intFontSize
Command1(24).Top=intRow3Top
Command1(24).Left=2880*lngpcnt
Command1(24).Width=intLetterWidth
Command1(24).Height=intHeight
'U Key
Command1(20).Font.Size=intFontSize
Command1(20).Top=intRow3Top
Command1(20).Left=3300*lngPcnt
Command1(20).Width=intLetterWidth
Command1(20).Height=intHeight
'I Key
Command1(8).Font.Size=intFontSize
Command1(8).Top=intRow3Top
Command1(8).Left=3720*lngpcnt
Command1(8).Width=intLetterWidth
Command1(8).Height=intHeight
'O Key
Command1(14).Font.Size=intFontSize
Command1(14).Top=intRow3Top
Command1(14).Left=4140*lngpcnt
Command1(14).Width=intLetterWidth
Command1(14).Height=intHeight
'P Key
Command1(15).Font.Size=intFontSize
Command1(15).Top=intRow3Top
Command1(15).Left=4560*lngPcnt
Command1(15).Width=intLetterWidth
Command1(15).Height=intHeight

US 6,784,873 B1

**13**

'[ Key
Command1(41).Font.Size=intFontSize
Command1(41).Top=intRow3Top
Command1(41).Left=4980*lngPcnt
Command1(41).Width=intLetterWidth
Command1(41).Height=intHeight
'] Key
Command1(42).Font.Size=intFontSize
Command1(42).Top=intRow3Top
Command1(42).Left=5400*lngPcnt
Command1(42).Width=intLetterWidth
Command1(42).Height=intHeight
'\ Key
Command1(43).Font.Size=intFontSize
Command1(43).Top=intRow3Top
Command1(43).Left=5820*lngPcnt
Command1(43).Width=intLetterWidth
Command1(43).Height=intHeight
'Delete
cmdDelete.Font.Size=dblFontSize
cmdDelete.Top=intRow3Top
cmdDelete.Left=6240*lngpcnt
cmdDelete.Width=intRightBorder—cmdDelete.Left
cmdDelete.Height=intHeight
'Row 4
'Caps Lock Key
cmdCapsLock.Font.Size=dblFontSize
cmdCapsLock.Top=intRow4Top
cmdCapsLock.Left=60*lngPcnt
cmdCapsLock.Width=1070*lngPcnt
cmdCapsLock.Height=intHeight
'A Key
Command1(0).Font.Size=intFontSize
Command1(0).Top=intRow4Top
Command1(0).Left=1200*lngPcnt
Command1(0).Width=intLetterWidth
Command1(0).Height=intHeight
'S Key
Command1(18).Font.Size=intFontSize
Command1(18).Top=intRow4Top
Command1(18).Left=1620*lngpcnt
Command1(18).Width=intLetterWidth
Command1(18).Height=intHeight
'D Key
Command1(3).Font.Size=intFontSize
Command1(3).Top=intRow4Top
Command1(3).Left=2040*lngpcnt
Command1(3).Width=intLetterWidth
Command1(3).Height=intHeight
'F Key
Command1(5).Font.Size=intFontSize
Command1(5).Top=intRow4Top
Command1(5).Left=2460*lngPcnt
Command1(5).Width=intLetterWidth
Command1(5).Height=intHeight
'G Key

**14**

Command1(6).Font.Size=intFontSize
Command1(6).Top=intRow4Top
Command1(6).Left=2880*lngpcnt
Command1(6).Width=intLetterWidth
Command1(6).Height=intHeight
'H Key
Command1(7).Font.Size=intFontSize
Command1(7).Top=intRow4Top
Command1(7).Left=3300*lngpcnt
Command1(7).Width=intLetterWidth
Command1(7).Height=intHeight
'J Key
Command1(9).Font.Size=intFontSize
Command1(9).Top=intRow4Top
Command1(9).Left=3720*lngPcnt
Command1(9).Width=intLetterWidth
Command1(9).Height=intHeight
'K Key
Command1(10).Font.Size=intFontSize
Command1(10).Top=intRow4Top
Command1(10).Left=4140*lngPcnt
Command1(10).Width=intLetterWidth
Command1(10).Height=intHeight
'L Key
Command1(11).Font.Size=intFontSize
Command1(11).Top=intRow4Top
Command1(11).Left=4560*lngPcnt
Command1(11).Width=intLetterWidth
Command1(11).Height=intHeight
'; Key
Command1(39).Font.Size=intFontSize
Command1(39).Top=intRow4Top
Command1(39).Left=4980*lngpcnt
Command1(39).Width=intLetterWidth
Command1(39).Height=intHeight
''' Key
Command1(40).Font.Size=intFontSize
Command1(40).Top=intRow4Top
Command1(40).Left=5400*lngPcnt
Command1(40).Width=intLetterWidth
Command1(40).Height=intHeight
'Enter
cmdEnter.Font.Size dblFontSize
cmdEnter.Top=intRow4Top
cmdEnter.Left=5820*lngpcnt
cmdEnter.Width=intRightBorder—cmdEnter.Left
cmdEnter.Height=intHeight
'Row 5
'Left Shift Key  cmdLeftShift.Font.Size=dblFontSize
cmdLeftShift.Top=intRow5Top  cmdLeftShift.Left=
60*lngPcnt  cmdLeftShift.Width=1293*lngPcnt
cmdLeftShift.Height=intHeight
'Z Key
Command1(25).Font.Size=intFontSize
Command1(25).Top=intRow5Top
Command1(25).Left=1423*lngPcnt
Command1(25).Width=intLetterWidth

US 6,784,873 B1

**15**

Command1(25).Height=intHeight
'X Key
Command1(23).Font.Size=intFontSize
Command1(23).Top=intRow5Top
Command1(23).Left=1843*lngPcnt
Command1(23).Width=intLetterWidth
Command1(23).Height=intHeight
'C Key
Command1(2).Font.Size=intFontSize
Command1(2).Top=intRow5Top
Command1(2).Left=2263*lngPcnt
Command1(2).Width=intLetterWidth
Command1(2).Height=intHeight
'V Key
Command1(21).Font.Size=intFontSize
Command1(21).Top=intRow5Top
Command1(21).Left=2683*lngPcnt
Command1(21).Width=intLetterWidth
Command1(21).Height=intHeight
'B Key
Command1(1).Font.Size=intFontSize
Command1(1).Top=intRow5Top
Command1(1).Left=3103*lngPcnt
Command1(1).Width=intLetterWidth
Command1(1).Height=intHeight
'N Key
Command1(13).Font.Size=intFontSize
Command1(13).Top=intRow5Top
Command1(13).Left=3523*lngPcnt
Command1(13).Width=intLetterWidth
Command1(13).Height=intHeight
'M Key
Command1(12).Font.Size=intFontSize
Command1(12).Top=intRow5Top
Command1(12).Left=3943*lngPcnt
Command1(12).Width=intLetterWidth
Command1(12).Height=intHeight
', Key
Command1(36).Font.Size=intFontSize
Command1(36).Top=intRow5Top
Command1(36).Left=4363*lngPcnt
Command1(36).Width=intLetterWidth
Command1(36).Height=intHeight
'. Key
Command1(37).Font.Size=intFontSize
Command1(37).Top=intRow5Top
Command1(37).Left=4783*lngPcnt
Command1(37).Width=intLetterWidth
Command1(37).Height=intHeight
'/ Key
Command1(38).Font.Size=intFontSize
Command1(38).Top=intRow5Top
Command1(38).Left=5203*lngPcnt
Command1(38).Width=intLetterWidth
Command1(38).Height=intHeight
'Right Shift Key

**16**

cmdRightShift.Font.Size=dblFontSize
cmdRightShift.Top=intRow5Top
cmdRightShift.Left=5623*lngpcnt
cmdRightShift.Width=intRightBorder—
cmdRightShift.Left
cmdRightShift.Height=intHeight
'Row 6
'Left Ctrl Key
cmdCntrl.Font.Size=dblFontSize
cmdCntrl.Top=intRow6Top
cmdCntrl.Left=60*lngpcnt
cmdCntrl.Width=795*lngpcnt
cmdCntrl.Height=intHeight
'Left Alt Key
cmdAlt.Font.Size=dblFontSize
cmdAlt.Top=intRow6Top
cmdAlt.Left=925*lngpcnt
cmdAlt.Width=735*lngpcnt
cmdAlt.Height=intHeight
'Move Left Key
cmdMoveLeft.Font.Size=intFontSize
cmdMoveLeft.Top=intRow6Top
cmdMoveLeft.Left=1730*lngPcnt
cmdMoveLeft.Width=465*lngpcnt
cmdMoveLeft.Height=intHeight
'Space Bar Key
cmdSpaceBar.Font.Size=intFontSize
cmdSpaceBar.Top=intRow6Top
cmdSpaceBar.Left=2265*lngPcnt
cmdSpaceBar.Width=2445*lngPcnt
cmdSpaceBar.Height=intHeight
'Move Right Key
cmdMoveRight.Font.Size=intFontSize
cmdMoveRight.Top=intRow6Top
cmdMoveRight.Left=4780*lngpcnt
cmdMoveRight.Width=465*lngpcnt
cmdMoveRight.Height=intHeight
'Right Alt Key
cmdAlt2.Font.Size=dblFontSize
cmdAlt2.Top=intRow6Top
cmdAlt2.Left=5315*lngpcnt
cmdAlt2.Width=735*lngpcnt
cmdAlt2.Height=intHeight
'Right Ctrl Key
cmdCntrl2.Font.Size=dblFontSize
cmdCntrl2.Top=intRow6Top
cmdCntrl2.Left=6120*lngPcnt
cmdCntrl2.Width intRightBorder—cmdCntrl2.Left
cmdCntrl2.Height=intHeight
'Exit Keyboard
cmdExitKeyboard.Font.Size=dblFontSize
cmdExitKeyboard.Top=intRow7Top
cmdExitKeyboard.Left=60*lngPcnt
cmdExitKeyboard.Width=6915*lngpcnt
cmdExitKeyboard.Height=intHeight

US 6,784,873 B1

17                                                  18

```
End Sub
Private Sub cmdAlt_Click( )
    If cmdAlt.Tag="OFF" Then
    cmdAlt.Tag="ON"
    cmdAlt.Caption="Alt On"
    cmdAlt2.Tag="ON"
    cmdAlt2.Caption="Alt On"
    Else
    cmdAlt.Tag="OFF"
    cmdAlt.Caption="Alt Off"
    cmdAlt2.Tag="OFF"
    cmdAlt2.Caption="Alt Off"
    End If
End Sub
Private Sub cmdAlt2_Click( )
    cmdAlt_Click
End Sub
Private Sub cmdBackspace_Click( )
    strKeys="{BKSP}"
    SendVKeys (strKeys)
End Sub
Private Sub cmdCntrl_Click( )
    If cmdCntrl.Tag="OFF" Then
    cmdCntrl.Tag="ON"
    cmdCntrl.Caption="Ctrl On"
    cmdCntrl2.Tag="ON"
    cmdCntrl2.Caption="Ctrl On"
    Else
    cmdCntrl.Tag="OFF"
    cmdCntrl.Caption="Ctrl Off"
    cmdCntrl2.Tag="OFF"
    cmdCntrl2.Caption="Ctrl Off"
    End If
End Sub
Private Sub cmdCntrl2_Click( )
    cmdCntrl_Click
End Sub
Private Sub cmdDelete_Click( )
    strKeys=" "
    strKeys=strKeys & "{DEL}"
    SendVKeys (strKeys)
End Sub
Private SubcmdEnter_Click( )
    strKeys=""
    strKeys=strKeys & "{ENTER}"
    SendVKeys (strKeys)
End Sub
Private SubcmdEscape_Click( )
    strKeys="{ESC}"
    SendVKeys (strKeys)
End Sub
Private SubcmdExitKeyboard_Click( )
    End
End Sub
Private Sub cmdLeftShift_Click( )
    If cmdLeftShift.Tag="OFF" Then
    If cmdCapsLock.Tag="OFF" Then
        Shift_Up
    Else
        Set_Caps_Lock
        Shift_Up
    End If
    Else
```

```
    Shift_Down
    End If
End Sub
Private Sub cmdMoveLeft_Click( )
    strKeys=" "
    strKeys=strKeys & "{LEFT}"
    SendVKeys (strKeys)
End Sub
Private Sub cmdMoveRight_Click( )
    strKeys=""
    strKeys=strKeys & "{RIGHT}"
    SendVKeys (strKeys)
End Sub
Private Sub cmdRightShift_Click( )
    cmdLeftShift_Click
End Sub
Private Sub cmdSpaceBar_Click( )
    strKeys=""
    strKeys=strKeys & " "
    SendVKeys (strKeys)
End Sub
Private Sub cmdTab_Click( )
    strKeys=""
    If cmdLeftShift.Tag="ON" Then
    strKeys=strKeys & "+"
    End If
    strKeys=strKeys & "{TAB}"
    SendVKeys (strKeys)
End Sub
Private Sub Form_Activate( )
    Dim dl&
    ' KeyboardWindow=GetForegroundWindow dl&=
SetWindowPos(hwnd, -1, 4905, 7965, 6975, 2475, &H1 Or
&H2)
End Sub
Private Sub Form_GotFocuso
    If Me.WindowState <>0 Then
    Me.WindowState=0
    ' Me.Width=7000
    End If
End Sub
Private Sub Form_Resize( )
    If Me.WindowState <>0 Then
    Me.WindowState=0
    Me.Width=7000
    End If
    Key_Layout1
End Sub
Private Sub cmdCapsLock_Click( )
    ' Caps Lock Key
    If cmdCapsLock.Tag="OFF" Then
    cmdCapsLock.Caption="Caps On"
    cmdCapsLock.Tag="ON"
    Caps_On
    Else
    cmdCapsLock.Caption="Caps Off"
cmdCapsLock.Tag="OFF"
    Caps_OFF
    End If
    strkeys=""
    strkeys=strkeys & "{CAPSLOCKII"
    SendVKeys (strKeys)
End Sub
Private Sub Command1_Click(Index As Integer)
    strKeys=""
    If cmdCapsLock.Tag="ON" Then
    strKeys=strKeys & "{CAPSLOCK}"
```

US 6,784,873 B1

19                                          20

```
End If
If cmdLeftShift.Tag="ON" Then
strKeys=strKeys & "+"
End If
If cmdAlt.Tag="ON" Then
strKeys=strKeys & "%"
End If
If cmdCntrl.Tag="ON" Then
strKeys=strKeys & "^"
End If
strKeys=strKeys & Command1(Index).Tag
SendVKeys (strKeys)
End Sub
Private Sub Form_Load( )
Dim hSysMenu As Long
Dim nCnt As Long
' First, show the form
Me.Show
' Get handle to our form's system menu
' (Restore, Maximize, Move, close etc.)
SysMenu=GetSystemMenu(Me.hwnd, False)
If hSysMenu Then
'=0 Get System menu's menu count
nCnt=GetMenuItemCount(hSysMenu)
If nCnt Then
'Menu count is based on 0 (0, 1, 2, 3 . . . )
RemoveMenu hSysMenu, nCnt–1, _
MF_BYPOSITION Or MF_REMOVE
RemoveMenu hSysMenu, nCnt–2, _
MF_BYPOSITION Or MF_REMOVE ' Remove the sep-
erator
DrawMenuBar Me.hwnd
' Force caption bar's refresh. Disabling X button
Me.Caption="GeniSus Keyboard"
End If
End If
   Shift_Down
   Hook
#If CurrentProcOnly=1 Then
   Form1.Show
#End If
DeactivateClose
End Sub
Private Sub Form_Unload(Cancel As Integer)
   UnHook
End Sub
Public Sub DeactivateClose( )
   End Sub
   An example of an accompanying dynamic link library, .dll
application, through which external applications may access
the keyboard application is:
// vKeyHook.cpp : Defines the entry point for the DLL
application.
//
#include <windows.h>
#include <winuser.h>
#pragma data_seg(".SHARDATA")
   static int hWndActive=0;
   static int hWndSelf=0;
   static HHOOK hHook=0;
#pragma data_seg( )
BOOL APIENTRY DllMain( HANDLE hModule,
      DWORD ul_reason_for_call,
      LPVOID lpReserved
      )
{
   switch (ul_reason_for_call)
```

```
}
   case DLL_PROCESS_ATTACH:
   case DLL_THREAD_ATTACH:
   case DLL_THREAD_DETACH:
   case DLL_PROCESS_DETACH: break;
}
return TRUE;
}
long CALLBACK CBTProc(
   int nCode, // hook code
   WPARAM wparam, // current-process flag
   LPARAM lParam // message data
)
{
   if (nCode==HCBT_ACTIVATE &&
      (int)wParam !=hWndSelf){
   hWndActive=(int)wParam;
   }
   return CallNextHookEx(hHook, nCode, wParam,
lparam);
}
void_stdcall HookMsg(int hwnd)
}
   HINSTANCE hModule;
   hModule=GetModuleHandle("vKeyHook.dll");
   hHook=SetWindowsHookEx(WH_CBT, CBTProc,
hModule, 0);
   hWndSelf=hwnd;
}
void_stdcall UnHookMsg( )
{
   UnhookWindowsHookEx(hHook);
}
int_stdcall GetActiveWnd( )
{
   return hWndActive;
```

These codes are preferably executed in conjunction with
a Windows 98® operating system. These codes may be
executed in any type of system, including, but not limited to,
a web based system, a computer network, or any personal
computer, personal digital assistant or other device.

As can clearly be seen in FIGS. 1 and 2, there are no
minimizing, maximizing, or close options available for the
user. Therefore, a user can input data by selecting keys 22 on
the keyboard 20 as necessary.

A general description of the present invention as well as
a preferred embodiment of the present invention has been set
forth above. Those skilled in the art to which the present
invention pertains will recognize and be able to practice
additional variations in the methods and systems described
which fall within the teachings of this invention.
Accordingly, all such modifications and additions are
deemed to be within the scope of the invention which is to
be limited only by the claims appended hereto.

What is claimed is:

1. A method of entering data on a touch screen display, the
method comprising:

invoking a computer program in which user input is
sought;

invoking an input area, including a plurality of data input
fields;

invoking a graphical keyboard area incapable of user
termination independent of termination of the input
area, the graphical keyboard area having a plurality of
keys on the display;

selecting keys on the keyboard to provide the desired
input; and

US 6,784,873 B1

21

automatically terminating the graphical keyboard area after the desired input is received in the input area.

2. The method of entering data on a touch screen display of claim 1 wherein the input area is created by an executable code.

3. The method of entering data on a touch screen display of claim 2 wherein the executable code is compiled visual basic code.

4. The method of entering data on a touch screen display of claim 1 wherein the computer program invokes the input area.

5. The method of entering data on a touch screen display of claim 4 wherein the computer program accesses a dynamic link library file in order to invoke the input area.

6. The method of entering data on a touch screen display of claim 5 wherein the dynamic link library file is a C++ program.

7. The method of entering data on a touch screen display of claim 1 wherein the computer program is executing on a personal computer.

8. The method of entering data on a touch screen display of claim 1 wherein the computer program is executing on a pen-based computer.

9. The method of entering data on a touch screen display of claim 1 wherein the computer program is executing on a computer with a touch-screen display.

22

10. A method of providing a user interface for receiving information from a user using a user immutable graphical keyboard linked to an input area, comprising:

invoking the input area;

determining that input from the user using the graphical keyboard is needed within the input area;

invoking the graphical keyboard on a touch screen display to receive input from a user, the graphical keyboard placed in a set position;

persistently maintaining the graphical keyboard on the touch screen display such that the user cannot move, resize, remove, or close the graphical keyboard through the user interface while the input area remains and requires input;

receiving input within the input area from the user through the graphical keyboard;

determining that further input from the user is no longer needed in the input area; and

removing the graphical keyboard.

* * * * *

# Exhibit B



# GARMIN.

Company | Products | Solutions | Extras | Maps | Support | Shop | myGarmin

Home » Retail

search [    ] go

**Company Links**

Why Garmin?

Facilities

Chicago Store

Investor Relations

Employment

Environment

Sponsorship

**Chicago Store Feed**

There's a Plane in the Store!
Had you walked by the Garmin
Store on Chicago's famed
Michigan Avenue yesterday you
probably would have done a…

Forerunner 405: Perfect for
Mother's Day - or Win One for
Yourself
With its release at the Boston
Marathon and arrival at running
stores, the Forerunner 405 has
raced to the…

HEADLINES BY
FEEDBURNER

Garmin Chicago Store, Michigan Avenue

**Experience Garmin Navigation**

Step into our retail store on Michigan Avenue in Chicago and let us show you how our innovative GPS products are
changing people's lives. At the Garmin store, you can experience and use all of our most popular GPS navigation
devices in a spectacular setting — it's the only place you can view the entire Garmin product line under one roof.

**What you'll find**

You'll find hands-on product demonstrations, interactive kiosks and in-depth product training and seminars, coupled
with exceptional customer service and the latest GPS technology and devices on the market. It's a high-tech,
interactive and unique shopping experience. Welcome to the Garmin store.

**Address:**

663 N. Michigan Avenue
Chicago, IL
(312) 787.3221

**Store Hours:**

Mon – Sat | 10am – 7pm
Sun | 11am – 5pm

**Coordinates:**

N41° 53.655 | W87° 37.450

## Garmin | Chicago Store Calendar

Today ◀ ▶ June 2008 ▾                    🖶 Print  Week  Month  Agenda ▾

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7<br>8am Garmin<br>11am Foreru |
| 8 | 9 | 10 | 11 | 12 | 13 | 14<br>8am Garmin<br>11am Foreru |
| 15 | 16 | 17 | 18 | 19 | 20 | 21<br>8am Garmin<br>11am Foreru |
| 22 | 23 | 24 | 25 | 26 | 27 | 28<br>8am Garmin<br>11am Foreru |
| 29 | 30 | 1 | 2 | 3 | 4 | 5<br>8am Garmin<br>11am Foreru |

Events shown in time zone: Central Time

Google Calendar

Not only does the Garmin Chicago store feature a complete range of units and accessories, but you can place your order by phone too.

Order by phone: 312.787.3221

**Delivery Times**
7 - 10 days: $6
3 - 4 days: $15
2 - 3 days: $25

Cartography is the art and science of making maps. This mapping detail supplements your unit's existing map data and improves navigation.

We are constantly updating and improving our map data. All maps carried at the Garmin Chicago Store are in stock and ready for immediate shipping.

## On The Road

- City Navigator Australia NT
- City Navigator Brazil NT
- City Navigator Europe NT – Full Version
- City Navigator Europe NT – Italy & Greece
- City Navigator Europe NT – Alps
- City Navigator Europe NT – Northwest Eastern Europe
- City Navigator Europe NT – DACH & Czech
- City Navigator Europe NT – UK & Ireland
- City Navigator Europe NT – Spain & Portugal
- City Navigator Europe NT – Nordics
- City Navigator Europe NT – BeNeLux & France
- City Navigator Mexico NT
- City Navigator Middle East NT
- City Navigator North America NT – Full Version
- City Navigator North America NT – Canada
- City Navigator North America NT – Hawaii
- City Navigator New Zealand
- City Navigator Singapore/Malaysia NT
- City Navigator Thailand NT

## On The Water

**BlueChart microSD cards:**
- Lake of the Woods / Rainy Lake
- Lake Superior
- Lake Michigan
- Lake Huron / Lake St. Clair
- Lake Erie / Lake St. Clair
- Lake Ontario to Montreal
- St. Lawrence Seaway
- Southeast Florida
- Chesapeake
- Cape Cod through New Jersey

**U.S. Inland Lakes microSD cards:**
- West
- North Central
- Northeast
- South Central
- Southeast

## On The Trail

- All 11 TOPO U.S. 2008 microSD cards
- All 13 TOPO Canada microSD cards

With the purchase of any GPS device at The Garmin Chicago Store, you are eligible for a free one-on-one tutorial with a Garmin Product Expert. In GPS Academy, there's a friendly, relaxed instructional setting where you can get it all – from GPS Basics to Geocaching! This personalized service can arranged in advance to fit the busiest of schedules. Garmin Chicago GPS Academy gets an A+!

Copyright © 1996 – 2008 Garmin Ltd. or its subsidiaries | Privacy Statement | Terms of Use | Site Map

# Exhibit C



# Exhibit D

# WAL★MART®

### ALWAYS LOW PRICES.



WAL*MART
WE SELL FOR LESS
MANAGER JASON WEISENBERGER
( 815 ) 455 - 4200
ST# 1413 OP# 00005673 TE# 68 TR# 07679
PRODUCT SERIAL # 17T355153
NUVI 260      075375907477      268.88 X
MAESTRO 3220 076335711793      218.88 X
ONE  3RD ED 063692601742       148.88 X
                    SUBTOTAL    636.64
           TAX 1  7.000 %        44.56
                       TOTAL    681.20
                  VISA  TEND    681.20

ACCOUNT #9207
APPROVAL #05712D
TRANS ID -0168147621233141
VALIDATION -RCRS
PAYMENT SERVICE - E
                  CHANGE DUE     0.00

# # ITEMS SOLD 3

TC# 4126 0328 4524 7035 9055 8

Economic stimulus checks cashed free.
Keep all of your money. We can help.
    05/26/08      12:15:34

***CUSTOMER COPY***

# Exhibit E



# Exhibit F



# EXHIBIT C

LEXSEE 2008 U.S. DIST. LEXIS 56421

**Jodi A. Schwendimann, f/k/a Jodi A. Dalvey, Plaintiff, v. Arkwright, Inc., Defendant.**

**Civ. No. 08-162 ADM/JSM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2008 U.S. Dist. LEXIS 56421*

**July 23, 2008, Decided**
**July 23, 2008, Filed**

**COUNSEL:** [*1] For Jodi A Schwendimann, formerly known as Jodi A Dalvey, Plaintiff: Brooks F Poley, LEAD ATTORNEY, Winthrop & Weinstine, Mpls, MN; David A Davenport, Kyle J Kaiser, LEAD ATTORNEYS, Winthrop & Weinstine, PA, Mpls, MN.

For Arkwright, Inc., Defendant, Counter Claimant: Louis E Fogel, LEAD ATTORNEY, PRO HAC VICE, Sidley Austin, Chicago, IL; Richard T McCaulley, Jr, LEAD ATTORNEY, Sidley Austin, Chicago, IL; Tara C Norgard, Carlson Caspers Vandenburgh & Lindquist, Mpls, MN.

For Jodi A Schwendimann, Counter Defendant: Brooks F Poley, LEAD ATTORNEY, Winthrop & Weinstine, Mpls, MN; David A Davenport, Kyle J Kaiser, LEAD ATTORNEYS, Winthrop & Weinstine, PA, Mpls, MN.

**JUDGES:** Ann D. Montgomery, U.S. DISTRICT JUDGE.

**OPINION BY:** Ann D. Montgomery

**OPINION**

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

On June 5, 2008, the undersigned United States District Judge heard oral argument on Defendant Arkwright, Inc.'s ("Arkwright") Motion to Dismiss Plaintiff's Declaratory Judgment Action [Docket No. 7], Plaintiff Jodi A. Schwendimann's ("Schwendimann") Motion to Dismiss Count II of Defendant's Counterclaims [Docket No. 15], and Arkwright's Motion for Leave to Amend Counterclaims [Docket No. 42]. For the reasons stated below, Arkwright's [*2] Motion for Leave to Amend Counterclaims is granted, and Arkwright's and Schwendimann's respective Motions to Dismiss are denied.

**II. BACKGROUND**

The relevant allegations of Schwendimann's Complaint [Docket No. 1] are as follows. Schwendimann, a resident of Hennepin County, Minnesota, owns and operates a small business known as Cooler Concepts. Compl. P 1. Schwendimann owns *United States Patent No. 6,884,311* B1 (the "*311 Patent*"), which is entitled "Method of Image Transfer on a Colored Base." Id. P 7. Schwendimann filed a patent application on April 3, 2000, and the United States Patent and Trademark Office (the "USPTO") issued the *311 Patent* on April 26, 2005. Id. The *311 Patent* describes an image transfer sheet that reduces the number of steps necessary to transfer printed images onto items such as t-shirts. Id. PP 8-11. Cooler Concepts manufactures and sells the image transfer sheets covered by the *311 Patent*. Id. P 11.

Arkwright, a Rhode Island corporation, produces and sells image transfer sheets and other products that infringe claims of the *311 Patent*. Id. PP 2, 12. The infringing products allegedly include Arkwright's Multi-Surface Transfer Paper, Arkwright Stock No. 754-00, [*3] and Arkwright's Fashion Transfer for Dark Colored Fabrics, Arkwright Stock No. 889.55. Id. P 12. By assignment, Arkwright owns *United States Patent No. 6,667,093* (the "*093 Patent*") entitled "Ink-jet printable

*transfer* papers for use with fabric materials." Id. P 15 (emphasis in original). The application for the *'093 Patent* was filed on April 19, 2001, and the USPTO issued the *'093 Patent* on December 23, 2003. Id.

On January 16, 2008 Schwendimann initiated this litigation. Count I of Schwendimann's Complaint seeks injunctive and monetary relief. Id. PP 16-25. Count II seeks a declaratory judgment that Arkwright's *'093 Patent* is invalid under *35 U.S.C. § 102(e)(1)* because the invention described in the *'093 Patent* was already described in the application for the *'311 Patent*. Id. PP 26-29. Arkwright has filed Counterclaims [Docket No. 10] seeking declaratory judgment of noninfringement of the *'311 Patent* and invalidity of the *'311 Patent*.

## III. DISCUSSION

### A. Schwendimann's Motion to Dismiss; Arkwright's Motion For Leave to Amend

Schwendimann argues Count II of Arkwright's Counterclaims should be dismissed for failure to state a claim. *Rule 12(b)(6) of the Federal Rules of Civil Procedure* [*4] provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. *Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993)*. Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. *Ossman, 825 F. Supp. at 880*.

Under *Rule 8(a) of the Federal Rules of Civil Procedure*, pleadings "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief." A pleading must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*.

"A motion to dismiss for failure to state a claim upon which relief can be granted is a purely procedural question not pertaining to patent law." *McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1355-56 (Fed. Cir. 2007)*. Therefore, the law of the regional circuit applies. Id. However, the Eighth Circuit has not addressed whether Twombly [*5] affects the pleading standard for claims

under patent law. The Federal Circuit in McZeal held that under Twombly a plaintiff asserting a patent infringement claim "need only plead facts sufficient to place the alleged infringer on notice as to what he must defend." *McZeal, 510 F.3d at 1357*. Although McZeal addressed the pleading standard for a patent infringement claim and applied Fifth Circuit law, this Court finds that the pleading standard discussed in McZeal is applicable to the case at bar and will likely be the standard applied by the Eighth Circuit.

Count II of Arkwright's Counterclaims states that "[e]ach and every claim of the *'311 patent* is invalid for failure to comply with the patent laws, including, but not limited to, *35 U.S.C. §§ 101-103, 111-113, 133, 151*." Def.'s Counterclaims P 12. Recognizing that this sparse allegation may not be sufficient under Twombly, Arkwright has filed a Motion for Leave to Amend, and provided proposed Amended Counterclaims [Docket No. 44].

Under *Federal Rule of Civil Procedure 15(a)*, leave to amend should be freely given when justice so requires. Schwendimann argues that Arkwright's proposed amendments are futile. However, the Court finds that [*6] the allegations contained in Arkwright's proposed amended Count II adequately state a claim that Schwendimann's *'311 patent* is invalid. Paragraph twelve of Arkwright's proposed Amended Counterclaims asserts that "[e]ach claim of the *'311 patent* is invalid under *35 U.S.C. § 102(a)* because the subject matter of the claims was known or used by employees of Arkwright in the United States prior to the alleged invention by the inventors." Paragraph fourteen alleges "[e]ach claim o[f] the *'311 patent* is invalid under *35 U.S.C. § 102(b)* because . . . the subject matter of the asserted claims was asserted in EP 0881092 more than one year prior to the filing date to which the asserted claims of the *'311 patent* are entitled." These allegations are sufficient to place Schwendimann "on notice as to what [s]he must defend." *McZeal, 501 F.3d at 1357*. The Court grants Arkwright's Motion for Leave to Amend and denies Schwendimann's Motion to Dismiss Count II of the Amended Counterclaims.

### B. Arkwright's Motion to Dismiss Count II of Schwendimann's Complaint

Arkwright moves to dismiss Schwendimann's claim for declaratory judgment for lack of subject matter jurisdiction under *Federal Rule of Civil Procedure*

12(b)(1). [*7] *Rule 12(b)(1)* provides that a party may move to dismiss a complaint for lack of subject matter jurisdiction. On a motion to dismiss under *Rule 12(b)(1)*, a defendant may challenge the complaint on its face, or the defendant may contest the truthfulness of the alleged facts. *Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990)*. Here, Arkwright challenges the facial validity of the Complaint. Thus, the Court "restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion under *Rule 12(b)(6)*." Id. (citations omitted).

Arkwright argues Schwendimann has not adequately alleged a case or controversy regarding Arkwright's *'093 Patent*. The Supreme Court in *Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)*, recently addressed the standard for evaluating whether a declaratory judgment claim states a case or controversy. The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests"; "real and substantial"; and "admit of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical [*8] state of facts." *Id. at 771* (quotation and internal alteration mark omitted). In short, the question "'is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Id. (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941))*.

After reviewing the allegations in the Complaint, the Court finds that Schwendimann's declaratory judgment count adequately states an actual case or controversy regarding the validity of Arkwright's *'093 Patent*. Schwendimann's *'311 Patent* '311 Patent and Arkwright's *'093 Patent* describe inventions for image transfer sheets. Schwendimann has alleged that Arkwright's image transfer sheets infringe Schwendimann's *'311 Patent*, and that Arkwright's *'093 Patent* is invalid because the invention described therein was described in

Schwendimann's *'311 Patent* application. Assuming these allegations are true, any attempt by Arkwright to practice the invention described in the *'093 Patent* would infringe Schwendimann's *'311 Patent*. Liberally construed, the Complaint suggests that Arkwright was [*9] in fact practicing its *'093 Patent* when it produced the products that allegedly infringe Schwendimann's *'311 Patent*. The Court finds that Schwendimann's allegations demonstrate a substantial controversy that is immediate and real, and that adjudication of the controversy may warrant declaratory relief. Therefore, Arkwright's Motion to Dismiss Count II of Schwendimann's Complaint is denied.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

> 1. Defendant Arkwright, Inc.'s Motion for Leave to Amend Counterclaims [Docket No. 42] is **GRANTED;**

> 2. Plaintiff Jodi A. Schwendimann's Motion to Dismiss Count II of Defendant's Counterclaims [Docket No. 15] is **DENIED;** and

> 3. Defendant's Motion to Dismiss Plaintiff's Declaratory Judgment Action [Docket No. 7] is **DENIED.**

BY THE COURT:

/s/ Ann D. Montgomery

ANN D. MONTGOMERY

U.S. DISTRICT JUDGE

Dated: July 23, 2008.

LEXSEE 2008 U.S. APP. LEXIS 18462



Analysis
As of: Sep 03, 2008

**ATLANTIC MUTUAL INSURANCE COMPANY, as subrogee of TENSOR GROUP, INC., Plaintiff-Appellant, v. JARDIS INDUSTRIES, INC., Defendant-Appellee.**

**No. 08-1495**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*2008 U.S. App. LEXIS 18462*

**August 6, 2008, Argued**
**August 27, 2008, Decided**

**NOTICE:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 06 C 6300. Ronald A. Guzman, Judge.
*Atl. Mut. Ins. Co. v. Solace Transfer Co., 2007 U.S. Dist. LEXIS 89008 (N.D. Ill., Nov. 30, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insurance company, as subrogee of its insured, appealed a judgment of the United States District Court for the Northern District of Illinois, Eastern Division, dismissing its action against defendant company, in which it sought to recover for damages that defendant's employees caused to the insured's newly purchased machine when they negligently loaded a second machine into the truck that was carrying the first machine.

**OVERVIEW:** On appeal, the court held that the district court erred in dismissing the action because plaintiff's complaint set forth the critical events of the underlying occurrence on which its case rested: defendant's loading

of the machine into the truck on a particular date, for a particular shipment, and the resulting damage to the other cargo on the truck (the first machine). Plaintiff had no obligation to set forth the various legal theories under which it hoped to recover. Although the district court was correct that defendant had no duty to load the machine under the terms of an "F.O.B. place of shipment" contract, that did not exhaust the legal theories available to plaintiff. Assuming that it could prove the necessary facts, plaintiff could recover under the "Good Samaritan" rules. According to plaintiff's allegations, defendant gratuitously undertook to load the second machine into the truck. Defendant should have recognized that the machine had to be secured so that it would not damage the other contents of the trailer. Even though defendant had no contractual duty to load the machine, once it decided to do so, it was required to exercise reasonable care.

**OUTCOME:** The court vacated the district court's judgment and remanded for further proceedings.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*

[HN1] A plaintiff has no obligation, in the complaint, to set forth the various legal theories under which it hopes to recover. Pleaders in a notice system do not have any obligation to plead legal theories.

*Torts > Negligence > Duty > Affirmative Duty to Act > Voluntary Assumption of Duty*
[HN2] One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

**COUNSEL:** For ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff - Appellant: Timothy S. McGovern, SNYDER MCGOVERN, Palos Heights, IL.

For JARDIS INDUSTRIES, INCORPORATED, Defendant - Appellee: David Hansen, JARDIS INDUSTRIES, INCORPORATED, Itasca, IL.

**JUDGES:** Before FRANK H. EASTERBROOK, Chief Judge. MICHAEL S. KANNE, Circuit Judge. DIANE P. WOOD, Circuit Judge.

**OPINION**

**ORDER**

Atlantic Mutual Insurance Company, as subrogee of Tensor Group, is seeking to recover for damages that employees of Jardis Industries, Inc., caused to a newly purchased machine when they negligently loaded another machine into the truck that was carrying Tensor's machine. The district court dismissed Atlantic's claim against Jardis for failure to state a claim, see *FED. R. CIV. P. 12(b)(6)*, on the theory that Jardis had no duty to put the second machine into the truck and thus it could not be liable to Tensor. On appeal, Atlantic stresses the fact that its case did not rest on any supposed contractual duty. Instead, Atlantic's theory is that once Jardis voluntarily undertook to load the truck, it assumed a [*2] noncontractual duty to act with ordinary care. We agree

with Atlantic that the district court read the complaint too narrowly, and we therefore vacate the district court's judgment and remand for further proceedings.

Tensor manufactures equipment used by newspapers and commercial printers. In early 2002, it purchased a printing press from Jardis, which has facilities in Itasca and Woodridge, Illinois. Tensor hired Solace Transfer Co., a commercial carrier, to transport its machine from Jardis's plant to Tensor's client (Press Enterprise, Inc.) in Bloomsburg, Pennsylvania. The contract for carriage specified that it was to be "F.O.B. Itasca, II." Solace picked up the press in Woodridge, Illinois, but the truck then proceeded to Itasca, where a second printing press that Tensor had purchased from Jardis was waiting for pickup and was to be delivered in Pennsylvania along with the first one. Jardis employees loaded the second press onto the truck behind the first one, and the truck drove on to Pennsylvania.

Upon arrival in Pennsylvania, Tensor discovered that the first press had been damaged in transit from shifting or movement of the second machine. It turns out that, in order to load [*3] this type of machine properly, it is necessary not only to place it into the truck, but also to secure the box by nailing the wooden pallet on which the machine was packed to the floor of the trailer. The first press had been secured in this way, but the press that Jardis had loaded in Itasca had not - hence the banging around and damage to the first press. Tensor promptly reported the damage and submitted a claim to Atlantic, its insurer. The customer, Press Enterprise, refused to accept the damaged press, and thus a replacement valued at $ 54,324.44 had to be ordered. In addition, there was damage to the truck requiring the eventual replacement of three panels. Atlantic paid Tensor $ 23,793 in settlement of its insurance claim, in exchange for subrogation rights.

Atlantic then sued both Solace and Jardis, raising a claim under the Carmack Amendment, *49 U.S.C. § 14706*, against Solace, and common-law negligence claims against both Solace and Jardis under the court's supplemental jurisdiction, *28 U.S.C. § 1367*. The district court entered a default judgment against Solace, which had failed to appear, and it then turned to Jardis's motion to dismiss under *Rule 12(b)(6)*. In granting that [*4] motion, the district court reasoned that Atlantic had failed to state claim against Jardis because, under the Illinois Uniform Commercial Code, *810 ILCS § 5/2-319(1)(a)*, an F.O.B. "point of shipment" contract does not obligate the

shipper to load the goods. This contract was "F.O.B. Itasca," and so Jardis had no duty to load the second press. From that, it jumped to the conclusion that Atlantic could not recover for negligence even if Jardis's employees had caused the damage to the first press.

It was at that last step in the analysis that the district court went astray. Atlantic's complaint set forth the critical events of the underlying occurrence on which its case rested: Jardis's loading of the machine into the truck on a particular date, for a particular shipment, and the resulting damage to the other cargo on the truck (the first machine). [HN1] The plaintiff has no obligation, in the complaint, to set forth the various legal theories under which it hopes to recover. See, *e.g.*, *McDonald v. Household Intern., Inc.*, 425 F.3d 424, 427 (7th Cir. 2005) ("This court has repeatedly held that pleaders in a notice system do not have any obligation to plead legal theories.") (citing cases). Nothing [*5] in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007), changes that. See, *e.g.*, *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Servs., Inc.*, No. 07-1567, 2008 U.S. App. LEXIS 16428, 2008 WL 2941171, at *2 (7th Cir. Aug. 1, 2008).

Here, although the district court was correct about the fact that Jardis had no duty to load the machine under the terms of an "F.O.B. place of shipment" contract, that does not exhaust the legal theories available to Atlantic. As Atlantic has argued, there is another theory under which it would be entitled to recover, assuming that it could prove the necessary facts. Illinois courts follow the "Good Samaritan" rules outlined in the *Restatement (Second) of Torts, § 324A*, which provides as follows:

Liability to Third Person for Negligent Performance of Undertaking.

[HN2] One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third

person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) [*6] he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

See *Redmon v. Stone*, 281 Ill. App. 3d 517, 667 N.E.2d 526, 528, 217 Ill. Dec. 437 (Ill. App. Ct. 1996); *Triolo v. Frisella*, 3 Ill. App. 2d 200, 121 N.E.2d 49, 52 (Ill. App. Ct. 1954). See also *Gaines v. Ill. Cent. R.R. Co.*, 23 F.3d 1170, 1172 (7th Cir. 1994); *Cincinnati Ins. Co. v. City of Taylorville*, 818 F.2d 1345, 1348 (7th Cir. 1987).

Here, according to Atlantic's allegations (which we accept for this purpose only), Jardis gratuitously undertook to load the second printing press into Solace's truck. Jardis should have recognized that the press had to be secured so that it would not damage the other contents of the trailer. Even though Jardis had no contractual duty to load the press, once it decided to do so, it was required to exercise reasonable care.

Because Atlantic's complaint, so understood, stated a claim upon which relief can be granted, we VACATE the district court's judgment and REMAND for further proceedings consistent with this order.

LEXSEE 2007 U.S. DIST. LEXIS 93465



Positive
As of: Sep 03, 2008

**TALTWELL, LLC, Plaintiff, v. ZONET USA CORP., Defendant.**

**Civil Action No. 3:07cv543**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

*2007 U.S. Dist. LEXIS 93465*

**December 19, 2007, Decided**
**December 20, 2007, Filed**

**SUBSEQUENT HISTORY:** Patent interpreted by *Taltwell, LLC v. Zonet USA Corp., 2008 U.S. Dist. LEXIS 26010 (E.D. Va., Mar. 28, 2008)*

**COUNSEL:** [*1] For Taltwell, LLC, Plaintiff: John David Mayberry, LEAD ATTORNEY, Eric Louis Sophir, Kenneth Alexander Godlewski, Sean Michael Green, Stephen Eric Baskin, Kilpatrick Stockton LLP, Washington, DC; William K. Wells, Jr., Great Falls, VA.

For Zonet USA Corp., doing business as Zonet USA, Inc., doing business as Zonet, Inc., Defendant: Lawrence Alexis Dunn, LEAD ATTORNEY, Morris & Morris, Richmond, VA; Kenneth Kazuo Tanji, Jr., WorldEsquire Law Firm LLP, Pasadena, CA.

For Zonet USA Corp., Counter Claimant: Kenneth Kazuo Tanji, Jr., WorldEsquire Law Firm LLP, Pasadena, CA.

For Taltwell, LLC, Counter Defendant: John David Mayberry, LEAD ATTORNEY, Eric Louis Sophir, Kenneth Alexander Godlewski, Sean Michael Green, Stephen Eric Baskin, Kilpatrick Stockton LLP, Washington, DC; William K. Wells, Jr., Great Falls, VA.

**JUDGES:** Robert E. Payne, Senior United States District Judge.

**OPINION BY:** Robert E. Payne

**OPINION**

**MEMORANDUM OPINION**

Plaintiff, Taltwell, Inc. ("Taltwell"), alleges that the defendant, Zonet USA Corp. ("Zonet"), has infringed *U.S. Patent No. Re. 37,660* (the "*'660 patent*"), owned by Taltwell. The Complaint identifies a single Count: Infringement of the *'660 Patent*. (Compl. PP 10-16, Docket No. 1.)

In response to the [*2] Complaint, Zonet has filed three motions and a counterclaim. Zonet's motions are consolidated into one document: Motion for Lack of Personal Jurisdiction, Motion to Dismiss Claim for Failure to State a Claim upon Which Relief Can Be Granted, or in the Alternative to Transfer Venue. ("Mot. to Dismiss," Docket No. 13.) The first motion asks the Court to dismiss the action for lack of personal jurisdiction over Zonet under *Fed. R. Civ. Pro. 12(b)(2)*. (*Id.*) The second motion requests dismissal under *Fed. R. Civ. Pro. 12(b)(6)* for failure to state a claim. (*Id.*) If the motion to dismiss for lack of personal jurisdiction is not granted, Zonet asks in the third motion that the action be transferred to the United States District Court for the Central District of California pursuant to *Fed. R. Civ. Pro. 12(b)(3)* and *28 U.S.C. §§ 1400(b), 1404(a)*. (*Id.*)

Taltwell filed a motion requesting an order for expedited discovery. (Taltwell's Mot. for Expedited Jurisdictional Disc., Docket No. 17) ("Pl.'s Mot. Disc.") Taltwell asks that it be allowed to conduct limited discovery in advance of the scheduling conference on matters pertaining to Zonet's motions to dismiss for lack of personal jurisdiction. [*3] Through this motion, Taltwell hopes to uncover additional contacts between Zonet and the forum upon which to base this Court's jurisdiction.

In its Counterclaim, Zonet seeks to have the *'660 patent* declared invalid, in whole or in part, for its alleged failure to comply with *35 U.S.C. §§ 102-03, 112.* (Countercl. 2-3, Docket No. 10.)

For the reasons stated below, Zonet's motions to dismiss the action for lack of personal jurisdiction, to dismiss for failure to state a claim, and to transfer venue to the Central District of California are denied on their merits. Taltwell's motion for expedited jurisdictional discovery is denied as moot.

## BACKGROUND

David Talton was reissued the *'660 patent* on April 16, 2002. (Compl. P 7.) Talton assigned his interest in the *'660 patent* to Taltwell, a Vienna, Virginia-based limited liability company that is wholly owned by him. (*Id.* PP 3, 7; Pl.'s Financial Discl. Statement, Docket No. 6).

The subject of the *'660 patent*, called an "Automatic Dialing System," is a credit card-sized electronic device that stores an individual's credit card information and frequently dialed telephone numbers. Automatic Dialing System, *U.S. Patent No. Re. 37,660*, at [57] (reissued [*4] Apr. 16, 2002), Docket No. 1, Exhibit A. The device is intended to facilitate credit card calls from pay phones. (*See id.* Col.1-3.) The user holds the device up to the receiver of a telephone and a small speaker on the device "speaks" the desired phone numbers and credit card number into the phone. (*Id.*) It does not appear that Taltwell has manufactured any of the devices.

Zonet is a California corporation that produces network and connectivity devices, such as ethernet cards, notebook adapters, and modems. (Compl. PP 4, 8.) Taltwell contends that "Zonet's PCMCIA [1] Hardware Modem and/or PCMCIA Wireless Network Adapter include all elements of one or more claims of the *'660 patent*." (*Id.* P 9.) The products identified in the Complaint, "PCMCIA Hardware Modem" and "PCMCIA Wireless Network Adapter," are not so-named on Zonet's website and the Complaint does not reference product numbers. Assuming that the labels are descriptions of products, rather than specific product names, it appears that Taltwell is referring to the "56K/V.92 Data Fax PCMCIA Modem" (product no. ZFM5600CF) and the discontinued "Wireless 11b 32Bit PCMCIA Card" (product no ZEW1000WU), which are a PCMCIA-based hardware [*5] modem and wireless network adapter respectively. [2]

> 1    PCMCIA stands for Personal Computer Memory Card International Association. It is a trade organization that promulgates standards for certain computer components that ensures that products made by different manufacturers are compatible. *See* About PCMCIA, http://www.pcmcia.org/about.htm.
> 2    A PCMCIA hardware modem is a small component that can be inserted into a slot in a laptop computer to allow the user to connect to the internet through telephone wires. A PCMCIA wireless network adapter is similar to the hardware modem, except that it allows the user to connect to the internet wirelessly.

According to Taltwell, Zonet sells its products over the Internet through various online retailers, some of which are allegedly located within the Eastern District of Virginia. (*Id.* P 8.) Taltwell also alleges that Zonet sells its products directly through its website, which is interactive and accessible by persons in Virginia. [3] (*Id.* P 9.) Taltwell further maintains that Zonet's products can be purchased from "a retailer of Zonet within this judicial district." (*Id.*) It is unclear whether this assertion pertains to an online or a "bricks and mortar" [*6] retailer.

> 3    Zonet denies that consumers can purchase its products directly from its website. (Answer P 8, Docket No. 9.) A perusal of its website, www.zonetusa.com, appears to confirm Zonet's denial. Interested purchasers are directed to the websites of Zonet's retailers.

Although Zonet's Answer (Docket No. 9) initially denied Taltwell's allegations that some of Zonet's retailers were in Virginia (*see* Answer PP 8-9), however, Zonet later admitted in a brief that three of its 629 "resellers, distributors, or retailers" are located in Virginia. (Mem. of Law in Supp. Of Mot. to Dismiss for Lack of Personal

Jurisdiction, Mot. to Dismiss for Failure to State a Claim, or in the Alternative to Transfer Venue. 1) ("Def.'s Mem.") Zonet further admitted that it "has sold less than 20 of the allegedly infringing units within Virginia in the past seven (7) years," amounting to less than $ 500 in sales. (*Id.* at 1-2.)

Taltwell claims that the above-mentioned products infringe on claims of the *'660 patent* either directly or through the doctrine of equivalents. (Compl. P 12.) Accordingly, Taltwell is seeking injunctive relief and damages. (*Id.* P 1.)

## DISCUSSION

### I. Zonet's Motion To Dismiss For Lack Of Personal [*7] Jurisdiction

In patent infringement cases, the law of the Federal Circuit governs all procedural matters unique to patent law. *See Beverly Hills Fan Co. V. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1995); Reynolds & Reynolds Holdings, Inc. V. Data Supplies, Inc., 301 F.Supp.2d 545, 549 (E.D. Va. 2005).* Whether the Court may exercise personal jurisdiction over a defendant is arguably a procedural matter that is not unique to patent law; however, the Federal Circuit has held that jurisdictional issues respecting an out-of-state accused infringer are "intimately involved with the substance of the patent laws" and therefore subject to Federal Circuit precedents. *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).* [4]

> 4 The Supreme Court has not decided this issue so the decision in *Akro* controls the choice of law issue.

When personal jurisdiction over the defendant is challenged before discovery, a plaintiff need only make a prima facie showing of the court's jurisdiction. *Silent Drive, Inc. v. Strong Indus., 326 F.3d 1194, 1201 (Fed. Cir. 2003).* The court may rely on the pleadings and affidavits of both parties, but all factual inconsistencies are to be "construed . . . in [*8] the light most favorable to the plaintiff." *Id.; see also Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1347 (Fed. Cir. 2002)* ("[W]hen a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prime facie showing . . . and . . . [i]f the parties present conflicting affidavits, all factual disputes

are resolved in the plaintiff's favor.").

Whether personal jurisdiction exists is determined by a two-party inquiry: (1) whether the forum state's long-arm statute permit the exercise of jurisdiction, and (2) whether the assertion of jurisdiction comports with the *Fifth Amendment's Due Process Clause. Graphic Controls Corp. v. Utah Med. Prods., 149 F.3d 1382, 1385 (Fed. Cir. 1998); see also Akro, 45 F.3d at 1544-45* (noting that *Fifth Amendment* due process controls patent infringement cases, but that *Fourteenth Amendment* due process precedents are applicable).

Virginia's long-arm statute provides, in relevant part:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
> > 1. Transacting any [*9] business in this Commonwealth;
> >
> > . . . .
> >
> > 3. Causing tortious injury by an act or omission in this Commonwealth;
> >
> > 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business . . . or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth; . . . .

*Va. Code Ann. § 8.01-328.1(A).*

The Supreme Court of Virginia has interpreted the state's long-arm statute to assert jurisdiction "to the extent permissible under the *due process clause.*" *John G. Kolbe, Inc. v. Chromodern Chair Co., 211 Va. 736, 180 S.E.2d 664, 667 (Va. 1971).* Because the Virginia

long-arm statute's reach is coextensive with due process, some courts have concluded that "the court must undertake only the constitutional due process analysis" to adjudicate a challenge to personal jurisdiction in a patent law action. *Reynolds & Reynolds, 301 F.Supp.2d at 550; see also Chung v. NANA Dev. Corp., 783 F.2d 1124, 1127 n.2 (4th Cir. 1986)* ("[T]he state law and due process analyses are identical."). There is, however, Federal Circuit precedent to the contrary: "[T]he Virginia legislature also intended the particulars of the long-arm statute [*10] to be satisfied even though it could be argued that a lesser standard would meet due process. Thus, . . . it [is] more prudent to undertake a separate analysis." *Beverly Hills Fan, 21 F.3d at 1569 n.23; cf. Aitken v. Commc'n Workers of Am., 496 F.Supp.2d 653, 658-61 (E.D. Va. 2007)* (undertaking separate jurisdictional analyses under Virginia statute and *Due Process Clause*). *But see Deprenyl Animal Health, 297 F.3d at 1350.* For the sake of erring on the side of caution, jurisdiction will be analyzed separately under Virginia's long-arm statute and the *Fifth Amendment Due Process Clause.*

## A. Personal Jurisdiction Under Virginia's Long-Arm Statute

Taltwell, which bears the burden of proving jurisdiction, argues that the court has personal jurisdiction over Zonet under Virginia's long-arm statute by operation of *subsections (A)(1), (A)(3),* and *(A)(4)* of *Va. Code Ann. § 8.01-328.1.* For the reasons outlined below, Taltwell has made a prima facie showing of the Court's jurisdiction under *subsections (A)(1)* and *(A)(3).* However, it is doubtful that jurisdiction can be established under *§ 8.01-328.1(A)(4).* [5]

> 5    Further jurisdictional discovery would be useful in evaluating the latter subsection. [*11] Nonetheless, Taltwell need only fulfill one of the long-arm statute's provisions in order for the Court to proceed to the due process analysis.

### 1. § 8.01-328.1(A)(1)

*Subsection (A)(1)* provides that jurisdiction is proper if the events giving rise to the cause of action were the result of the defendant's "[t]ransacting any business in this Commonwealth." *§ 8.01-328.1(A)(1).* Referring to *subsection (A)(1),* the Supreme Court of Virginia has characterized the long-arm statute as a "single-act statute requiring only one transaction in Virginia to confer

jurisdiction on our courts." *Peninsula Cruise, Inc. v. River Yacht Sales, Inc., 257 Va. 315, 512 S.E.2d 560, 562 (Va. 1999).* Thus, where a sale occurs outside of the state, but the item is delivered by the seller to a buyer in Virginia, the long-arm statute's purpose is satisfied if the claim arises from the sale. *Id. at 563* (holding that the sale and delivery of one boat into Virginia by a foreign seller satisfied *§ 8.01-328.1(A)(1)).*

In its Complaint, Taltwell alleges that the purportedly infringing products "are being offered for sale and/or have been sold on at least Zonet's website, which is accessible and user interactive within this judicial [*12] district, and/or a retailer of Zonet within this judicial district." (Compl. P 9.) This allegation was initially denied by Zonet. (Answer PP 8-9.) Assuming the allegations are true, as the Court must do, Taltwell has satisfied *§ (A)(1)* of Virginia's long-arm statute by asserting that an allegedly infringing product has been sold into Virginia - the relevant transaction being a sale by Zonet to a retailer in Virginia. This conclusion is bolstered by a subsequent affidavit filed by Zonet, which the Court may consider in the context of a motion to dismiss for lack of personal jurisdiction. The statement of Zonet's General Manager, Jenny Yang, admits that three of Zonet's resellers, distributors, or retailers are located in Virginia and that $ 500 worth of the allegedly infringing goods have been delivered into the forum state. (Yang aff. PP 3, 5, Docket No. 7, Ex. 1.) Thus, Virginia's "single-act" long-arm statute is satisfied because some of the products giving rise to the claim in this action has been sold into Virginia.

### 2. § 8.01-328.1(A)(3)

*Section 8.01-328.1(A)(3)* provides that personal jurisdiction may be exercised where a tortious injury is caused by an act within Virginia. It [*13] is undisputed that Zonet is California corporation with its principal place of business in California (Compl. P 4). An identifiable act within Virginia, if one has occurred, must be found in the relationship of Zonet and a retailer or distributor located in Virginia. The record discloses the existence of an injury causing act within Virginia.

When a seller of allegedly infringing goods sells and delivers such goods to a buyer in another state, the situs of an act constituting the tort is the state where the buyer is located. *See North Am. Philips Corp. v. Am. Vending Sales, 35 F.3d 1576, 1579 (Fed. Cir. 1994)* ("We hold that to sell an infringing article to a buyer in Illinois is to

commit a tort there (though not necessarily only there).").
In the present action, Taltwell has alleged that Zonet used
retailers or distributors in Virginia. (Compl. P 8.) That
allegation necessarily means that Zonet has sold the
products to the retailers or distributors located in
Virginia. Furthermore, Zonet admits that it has three
Virginia-based retailers or distributors and that roughly
twenty of the allegedly infringing products have been
sold into Virginia. (Yang aff. PP 3, 5.) Thus, personal
jurisdiction [*14] may be exercised under §
8.01-328.1(A)(3).

### 3. § 8.01-328.1(A)(4)

Subsection (A)(4) permits the court to exercise
personal jurisdiction if the defendant "[c]aus[es] tortious
injury in this Commonwealth by an act or omission
outside this Commonwealth if he regularly does or
solicits business . . . or derives substantial revenue from
goods used or consumed or services rendered, in this
Commonwealth." Va. Code Ann. § 8.01-328.1(A)(4).
Under the stream of commerce theory, which is endorsed
by the Federal Circuit, selling a product to a retailer or
distributor with knowledge that the product will
ultimately be sold in the forum state is an act outside of
the forum state. Beverly Hills Fan, 21 F.3d at 1566
(construing Va. Code Ann. § 8.01-328.1(A)(4)). When an
allegedly infringing product is placed into the stream of
commerce, the situs of the injury is the place where the
infringing item is ultimately sold. Id. at 1571 ("Economic
loss occurs to the patent holder at the place where the
infringing sale is made because the patent owner loses
business there.").

Additionally, to assert jurisdiction under §
8.01-328.1(A)(4), the plaintiff must demonstrate that the
defendant "regularly solicits [*15] business . . . or
derives substantial revenue" from the sale of goods in
Virginia. When the quantity of goods sold into the forum
state is a small percentage of the defendant company's
nationwide sales, "the 'substantial revenue' test may be
satisfied . . . if [the revenue derived from the forum state]
exceed's the state's per capita share of substantial
nationally derived revenue." Stabilisierungsfonds Fur
Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd., 207
U.S. App. D.C. 375, 647 F.2d 200, 206 (D.C. Cir. 1981)
(construing language in D.C.'s long-arm statute that is
identical to Virginia's). This approach was endorsed by
the Federal Circuit as applied to Virginia's long-arm
statute. Beverly Hills Fan, 21 F.3d at 1567 n.17 (adopting

Stabilisierungsfonds's reasoning in finding jurisdiction
under § 8.01-328.1(A)(4)).

Under a stream of commerce theory, Taltwell would
have to present a prima facie case that Zonet delivered its
goods to a non-Virginia retailer, such as Amazon.com or
Tigerdirect.com, knowing that some of the goods would
be sold into Virginia. Taltwell has requested additional
jurisdictional discovery for this purpose. (Pl.'s Mot. Disc.,
Docket No. 17; see also Taltwell's Reply in Supp. of Mot.
[*16] for Extension of Time and Mot. Expedited
Jurisdictional Disc., Docket No. 29.) Taltwell does not
clearly state in its Complaint that the retailers have sold
the allegedly infringing products into Virginia. On this
matter, the Complaint says: "Zonet products are sold over
the Internet and through various online retailers,
including Amazon.com, Newegg.com, Buy.com, and
Tigerdirect.com, including upon information and belief,
retailers in this judicial jurisdiction." (Compl. P 8.)

It is certainly possible that, if Taltwell conducts
additional discovery directed at Zonet's non-Virginia
retailers, additional sale to Virginia will be revealed.
However, there is no way to know what results will be
obtained, and Taltwell alleges only that Zonet's
non-Virginia retailers sell the allegedly infringing
products in the United States; Taltwell does not allege
that the non-Virginia retailers sell the products into
Virginia. [6]

> [6] As a practical matter, it is highly likely that
> Zonet's non-Virginia retailers sell Zonet's
> products into Virginia. Websites such as
> Amazon.com and Tigerdiret.com are very popular
> and nationally known.

Taltwell does not allege that Zonet derives
"substantial revenue," § 8.01-328.1(A)(4), [*17] from
goods sold in Virginia. However, Zonet admits to selling
less than $ 500 worth of goods into Virginia in sales to
Virginia-based retailers. The first issue, of course, is
whether $ 500 is "substantial revenue," or at least a prima
facie showing thereof. Under Federal Circuit precedent,
the fact that Zonet's Virginia sales are less than 1% of its
annual revenue, (Yang aff. P 3), is irrelevant. [7] See
Beverly Hills Fan, 21 F.3d at 1567 n.17. The relevant
question is whether Zonet's sales to Virginia customers
are higher than its per capita nationwide average. The
Complaint does not make that allegation.

> [7] Additional jurisdictional discovery may reveal

that much more than 1% of Zonet's revenue is derived from sales to Virginia.

Accordingly, on the current record, § 8.01-328.1(A)(4) does not provide a basis for personal jurisdiction under Virginia's long-arm statute. That issue may be explored in the course of discovery, and Taltwell may raise the issue in a request for decision on the aspect of jurisdiction after the conclusion of discovery. The issue can be briefed and considered then.

## B. Personal Jurisdiction Under The Due Process Clause

Having found that there is jurisdiction under [*18] Virginia's long-arm statute, it is now necessary to determine whether the exercise of jurisdiction comports with the *Due Process Clause of the Fifth Amendment*. A defendant may be subject to the personal jurisdiction if the defendant has "minimum contacts" with the forum state such that hailing him into court does not violate "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*.

"In short, the *Due Process Clause* requires a court to determine whether a defendant 'should reasonably anticipate being hailed into court there.'" *LSI Indus. v. Hubbell Lighting, Inc, 232 F.3d 1369, 1375 (Fed. Cir. 2000)* (quoting *World-Wide Volkswagen Corp, v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*). Jurisdiction under *International Shoe* and its progeny can be either general or specific. Taltwell contends that Zonet is subject to both types of jurisdiction in Virginia.

### 1. General Jurisdiction Over Zonet

When general jurisdiction is established in the forum state, the defendant may be called into that state's courts for matters wholly unrelated to its contacts with the state. *Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 415 fn.9, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. [*19] General jurisdiction may be found where the defendant's contacts with the forum state are "continuous and systematic." *Id. 466 U.S. at 414-16*. There is no single test for determining whether a defendant's contacts with the forum state are continuous and systematic. *LSI Indus., 232 F.3d at 1375*. Rather, it is necessary to engage in an individual analysis of the facts of the case.

A number of factors present in this action have been addressed by various courts as bearing on the existence of general jurisdiction. Maintaining a place of business or being licensed to do business in the forum is evidence of continuous and systematic contacts. *See Helicopteros, 466 U.S. at 416* (absence of place of business in forum state weighs against general jurisdiction). However, a physical presence in the forum is not dispositive. "[E]ntering into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet" may constitute continuous and systematic contacts with the forum state. *Gorman v. Ameritrade Holding Corp., 352 U.S. App. D.C. 229, 293 F.3d 506, 513 (Fed. Cir. 2002)* (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1124 (W.D. Pa. 1997)*). [*20] Likewise, a broad distributorship network in a forum state that generates a substantial amount of revenue for the defendant may warrant general jurisdiction. *LSI Indus., 232 F.3d at 1375* (finding general jurisdiction where defendant generated millions of dollars in sales through a distribution network in the forum state). *But see Reynolds & Reynolds, 301 F.Supp.2d at 552* (declining to exercise general jurisdiction where defendant had two distributors in Virginia which accounted for $ 7,152 in sales over two years).

In this action, it is uncontroverted that Zonet is a California corporation with its place of business in California. (Compl. P 4.) Taltwell does not allege that Zonet has a place of business in Virginia, or even that Zonet sends representatives to the state to conduct business. Taltwell does allege that Zonet has an interactive website through which users in Virginia may purchase the allegedly infringing products. (Compl. P 9.) However, Taltwell does not make the factual allegation that Zonet has entered into "knowing and repeated" sales contracts with Virginia residents through the use of its website - or that *any* residents of Virginia have purchased the products. Lastly, [*21] Taltwell alleges, and Zonet admits (*see* Yang aff. PP 3, 5), that over the past seven years three Virginia retailers or distributors have purchased approximately twenty of the allegedly infringing products representing less than $ 500 dollars in sales. On this record, it appears that Zonet's sales to Virginia can be characterized as somewhat continuous and systematic, but the record is incomplete on that point. *See Reynolds & Reynolds, 301 F.Supp.2d at 552*. Taltwell's factual allegations, when viewed in their totality, do not establish a *prima facie* case of general

jurisdiction. However, that issue too can be explored in future discovery and raised again by Taltwell after the close of discovery. [8]

> [8] This course is appropriate given the finding in the following section that there is specific in personam jurisdiction over Zonet.

## 2. Specific Jurisdiction Over Zonet

The court may exercise specific jurisdiction over a defendant whose contacts with the forum state are "isolated and sporadic" so long as the claim in the action "arises out of" or "relates to" a contact with the forum state. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*. In the patent infringement context, three factors [*22] are used to assess specific jurisdiction: "(1) whether the defendant 'purposefully directed' its activities at residents in the forum; (2) whether the claim 'arises out of or relates to' the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is 'reasonable and fair.'" *Silent Drive, 326 F.3d at 1202* (quoting *Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001)*); *accord New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294-95 (4th Cir. 2005)* (utilizing similar three-part test for specific jurisdiction analysis). The plaintiff has the burden to prove the first two factors, but the defendant bears the burden of showing that jurisdiction is not reasonable and fair. *See Electronics for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1351-52 (Fed. Cir. 2003)*.

## A. "Purposefully Directed"

The first component of the specific jurisdiction analysis is whether the party challenging jurisdiction has purposefully directed activities at residents in the forum state. The defendant need not actually enter or send an agent to the forum state so long as the defendant purposefully directed activities at the forum state through a communication devise, [*23] such as a telephone, letter, or the Internet. *See Inamed, 249 F.3d at 1361-62*. Creating an ongoing business relationship with a resident of the forum state further indicates that the party has purposefully directed activities at forum. *See Burger King, 471 U.S. at 475-76; McGee v. Int'l Life Ins. Co., 355 U.S. 220, 222-23, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957)*. Thus, an out-of-state party has created minimum contacts with the forum state if it enters into a business arrangement with a resident of the forum state whereby

the party delivers goods or services to forum state and receives payments therefrom.

There are sufficient facts to conclude that Zonet has purposefully directed activities at Virginia. Zonet acknowledges that it has three "customers" located in Virginia. (Yang aff. P 3.) Zonet defines its customers as "resellers/distributors/retailers," but does not specify which category its Virginia customers fall into. (*Id.*) Zonet further states that it has sold roughly twenty of the allegedly infringing products to its Virginia customers over course of seven years. (*Id.* P 5.) By its own admissions, Zonet has established that it has minimum contacts with Virginia, namely a seven-year business relationship with three [*24] resellers, distributors, or retailers in the forum state. Therefore, Zonet has purposefully directed commercial activities at the forum state by maintaining a business relationship with these Virginia entities and selling approximately twenty of the allegedly infringing PCMCIA cards to these customers in the forum state. At oral argument, Zonet admitted that this component of the test was satisfied.

## B. "Arises Out Of Or Relates To"

When a party purposefully directs activities to the forum state, specific personal jurisdiction may be exercised only if the claim in the action arises out of or relates to those activities. *Akro, 45 F.3d at 1547*. The Supreme Court has not outlined a definitive method for assessing whether the plaintiff's cause of action "arises out of" or "relates to" the defendant's activities. *See Inamed, 249 F.3d at 1362*. Rather, the analysis appears to involve a commonsense determination that there is a substantial nexus or relationship between the activities and the cause of action. *Cf. Id.* ("[W]e have stated that it is significant that [arises out of or relates to] is disjunctive in nature, indicating an added flexibility and signaling a relaxation of the applicable [*25] standard from a pure 'arise out of' standard."); *Electronics for Imaging, 340 F.3d at 1351*. Additionally, for the purposes of determining whether the claim arises out of or relates to the defendant's actions in the forum state, it is immaterial that the "bulk of the harm" to the plaintiff may have resulted from the defendant's activities in locations other than the forum state. *See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780-81, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)* (noting that libel in a national publication may harm the defendant in many jurisdictions and that plaintiff may bring suit any jurisdiction in which the

defendant has the necessary minimum contacts).

Taltwell has set forth a *prima facie* case that its claim arises out of or relates to Zonet's activities that are purposefully directed at Virginia. Taltwell contends that "Zonet has in the past and continues to infringe . . . one or more claims of the *'660 patent* by making, using, offering for sale, and/or selling communication devices in the United States that are within the scope of claims of the *'660 patent*." (Compl. P 12.) From Taltwell's use of "in the United States," it is clear that the plaintiff is complaining of harm on a nationwide scale. [*26] To redress this alleged nationwide harm, Taltwell need only establish personal jurisdiction in this forum by demonstrating that some of Zonet's activities in Virginia gave rise to or relate to the claim. *See Keeton, 465 U.S. at 780-81*.

Taltwell has met this burden, largely through the admissions of Zonet. Zonet has acknowledged that approximately twenty of the allegedly infringing goods were sold to its resellers, distributors, or retailers in Virginia. (Yang aff. P 5.) Twenty sales of allegedly infringing goods are sufficient to support a finding of personal jurisdiction. *See Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1359 (Fed. Cir. 1998)* ("'[E]ven a single act can support jurisdiction,' so long as it creates a 'substantial connection' with forum . . . ."). Thus, it is clear that Taltwell's patent infringement claim relates to, if not arises out of, activities that Zonet has purposefully directed at Virginia, to wit: sales of allegedly infringing products directly to Virginia customers with whom Zonet had a longstanding business relationship. At oral argument, counsel for Zonet acknowledged that this component of the analysis has been satisfied by Taltwell.

## C. [*27] "Reasonable And Fair"

"Once the plaintiff has shown that there are sufficient minimum contacts to satisfy due process, it becomes the defendant's burden to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Electronics for Imaging, 340 F.3d at 1351-52* (quoting *Burger King, 471 U.S. at 477*). A finding that jurisdiction is not reasonable and fair should be "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so clearly attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Akro, 45 F.3d*

*at 1549*. Five factors are relevant to the reasonableness and fairness of the court's exercise of personal jurisdiction: "(1) the burden on the defendant, (2) the interests of the forum State, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering substantive social policies." *Inamed, 249 F.3d at 1363* (citing *Asahi Metal Indus. Co. v. Super. Ct. Of Cal., 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)*).

Given [*28] that Zonet bears the burden of demonstrating that this Court's exercise of jurisdiction would be unreasonable and unfair, it is significant Zonet did not make such an argument in its briefs. Zonet's arguments attacking jurisdiction have been confined to rebutting the minimum contacts prongs of the personal jurisdiction analysis. (*See* Def.'s Mem. at 2-6; Zonet USA Corp.'s Reply to Pl.'s Opp'n to Def.'s Mot. to Dismiss or in the Alternative to Transfer Venue 3-5, Docket No. 28.) Zonet did press this point at oral argument.

The only contentions by Zonet that are potentially relevant to a personal jurisdiction reasonableness and fairness analysis have been presented in the context arguments in support of Zonet's motion to transfer venue. These arguments are generally premised on the assertion that most of Zonet's witnesses are located in the Central District of California and it would be a hardship for Zonet to litigate the matter in Virginia.

Given the extraordinarily high burden of demonstrating that personal jurisdiction is so unreasonable or unfair that it violates due process, it is more appropriate that Zonet should raise its arguments in the context of a motion to transfer venue. [*29] On this matter, the Federal Circuit has stated:

> Where a defendant who purposefully has directed his activities at the forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations may be accommodated through means short of finding jurisdiction unconstitutional. For example . . . a defendant claiming substantial inconvenience may seek a

Case 1:08-cv-03248    Document 48-4    Filed 09/03/2008    Page 16 of 27

Page 9
2007 U.S. Dist. LEXIS 93465, *29

change of venue.

*Inamed*, 249 F.3d at 1363 (quoting *Akro, 45 F.3d at 1546*). On this record, the Court can find nothing unreasonable or unfair about requiring Zonet to defend this action here.

Accordingly, Zonet's motion to dismiss the action for lack of personal jurisdiction will be denied. Zonet's arguments to the effect that exercising jurisdiction would burdensome will be addressed where they were raised: in the context of Zonet's motion to transfer venue.

## II. Zonet's Motion To Transfer Venue

Zonet requests that the action be transferred to the United States District Court for the Central District of California if the Court rejects the motion to dismiss for lack of personal jurisdiction. (Mot. to Dismiss, Docket No. 13.) Zonet's [*30] primary argument is that venue is inappropriate under *28 U.S.C. § 1400(b)*. In the alternative, Zonet contends that venue should be transferred under *28 U.S.C. § 1404(a)*.

### 1. § 1400(b)

*Section 1404(b)* states: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." *28 U.S.C. § 1404(b)*. *Section 1391(c)* further clarifies the meaning of "resides": "[A] defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." *28 U.S.C. § 1391(c)*.

The Federal Circuit's view of motions alleging improper venue in the patent infringement context is distinguishable from similar motions in other contexts. In a situation very similar to the one here presented, the Federal Circuit explained:

> [A]lthough [Plaintiff] moved to dismiss for lack of personal jurisdiction and improper venue, the venue point is a non-issue. Venue in a patent action against a corporate defendant exists wherever there is personal jurisdiction. Therefore, no separate venue [*31] inquiry is necessary.

*Trinitec Indus. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, (Fed. Cir. 2005) (citations omitted).

Taltwell has adequately set forth a *prima facie* case that this Court has personal jurisdiction over Zonet. Accordingly, the motion to transfer venue, to the extent venue is alleged to be improper under *28 U.S.C. § 1400(b)*, will be denied.

### 2. § 1404(a)

In the alternative, Zonet asks the Court to exercise the discretionary authority conferred by *28 U.S.C. § 1404(a)* to transfer the action to the Central District of California. *Section 1404(a)* provides: "For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)*. Unlike matters of personal jurisdiction and venue under *§ 1400(b)*, the law of the Fourth Circuit governs this Court's venue analysis under *§ 1404(a)*. See *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 836 (Fed. Cir. 2003) ("In reviewing a district court's decision regarding a motion to transfer venue under *28 U.S.C. § 1404(a)*, this court applies the law of the appropriate regional circuit.").

Assessing [*32] a motion under *§ 1404(a)* requires the court to make two inquiries: "(1) whether the claims might have been brought in the transferee forum; and (2) whether the interests of justice and convenience of the parties and witnesses justify transfer to that forum." *E. Coast Res., LLC v. Hempstead*, 2007 U.S. Dist. LEXIS 51285, at *8 (E.D. Va. 2007) (quoting *Koh v. Microtek Int'l, Inc.*, 250 F.Supp.2d 627, 630 (E.D. Va. 2003)).

### 3. Whether The Claims Have Been Brought In The Central District Of California

The court may only transfer venue if the plaintiff could have maintained the action in the target forum. See *One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F.Supp.2d 824, 829 (E.D. Va. 2004). For a corporate defendant in a patent infringement action, venue would be proper in any forum where personal jurisdiction could be exercised. See *28 U.S.C. §§ 1404(b)*, *1391(c)*. Thus, the action could have been brought in the Central District of California if that forum could properly exercise personal jurisdiction over Zonet. It is undisputed that the action could have been brought in the Central

District of California.

## 4. Whether Other Factors Warrant The Transfer of Venue

For the second aspect [*33] of the analysis under *§ 1404(a)* - whether transferring venue is in the interests of justice and convenient to the parties and witness - the Court should consider a number of factors: "(1) ease of access to sources of proof; (2) the convenience of the parties and witnesses; (3) the cost of obtaining the attendance of witnesses; (4) the availability of compulsory process; (5) the interest in having local controversies decided at home; (6) in diversity cases, the court's familiarity with the applicable law; and [(7)] the interest of justice." *BHP Int'l Inv., Inc. v. Online Exch., Inc., 105 F.Supp.2d 493, 498 (E.D. Va. 2000)*.

The weight given to each of these factors and the ultimate decision to transfer "is committed to the sound discretion of the court." *Verosol B.V. v. Hunter Douglas, Inc., 806 F.Supp. 582, 591 (E.D. Va. 1992)*. However, the plaintiff's choice of forum is entitled to "substantial weigh" and "due deference" unless these other factors "clearly outweigh" the plaintiff's choice. *Bd. of Trustees v. Baylor Heating & Air Conditioning, Inc., 702 F.Supp. 1253, 1256 (E.D. Va. 1988)*.

In support of its motion to transfer venue, Zonet advances several arguments as to why the Central [*34] District of California is a more convenient forum: (1) "there is little or no nexus between this District [Eastern District of Virginia] and underlying cause of action"; (2) the transferee district "is a more convenient forum for Zonet"; (3) Zonet's preferred sources of proof, including members of the PCMCIA trade association, are primarily located in California; and (4) the availability of compulsory process of California-based witnesses weighs in favor of venue in California. (Def.'s Mem. at 10.) Zonet concedes that "the convenience of witnesses does not point strongly in favor of either party at this time other than for the potential witnesses drawn from the PCMCIA" and that the "interest of justice factor does not strongly point in favor of or against transfer." (*Id.* at 11.)

Zonet's first argument, that there is an insufficient nexus between this forum and the cause of action, misses the mark because that is Taltwell's home forum and that alone establishes a significant nexus in this forum. Thus, the contention does not auger in favor of transfer.

Zonet's second argument, that a transfer of venue is more convenient for Zonet, is likewise unavailing. A party challenging venue does [*35] not prevail if "transfer does [nothing] more than merely 'shift the inconvenience' to the other party." *E. Coast Res., 2007 U.S. Dist. LEXIS 51285, at *8 (citing JTH Tax, Inc. v. Lee, 482 F.Supp.2d 731, 736 (E.D. Va. 2007)); see also Bd. of Tr. v. Sullivan Ave. Prop., LLC, 508 F.Supp.2d 473, 478 (E.D. Va. 2007)* (noting that "when Plaintiff files suit in its home forum, 'convenience to parties rarely, if ever, operates to justify transfer.'").

Zonet's third and forth arguments, pertaining to the availability of witnesses and compulsory process, can be considered together. Zonet states that members of the PCMCIA trade association are primarily located in California and that "it is reasonable to expect the parties and the Court might seek" witness therefrom. (Def.'s Mem. at 10.) Zonet does not assert that there are other factual or expert witnesses located in California.

Zonet's third and fourth arguments can be dismissed for several reasons. First, Zonet has not asserted that Califorina-based PCMICA witnesses are necessary to either party's case or, correspondingly, that other appropriate expert witnesses could not be drawn from within the Eastern District of Virginia. Second, because [*36] Zonet's arguments mention only expert, rather than factual, witnesses located in the transferee forum, there is no reason to believe that compulsory process will be necessary. Indeed, experts can, and usually do, travel to the forum where the litigation is being conducted to give their testimony. Lastly, assuming that Zonet will rely primarily on expert testimony from California-based PCMCIA witnesses, this factor only slightly weighs in favor of venue transfer; "[I]t is less inconvenient for an expert witness to travel in order to testify, because an expert can be well-compensated for his or her time." *One Beacon Ins., 312 F.Supp.2d at 831*.

Considering the seven factors outlined in *BHP*, Zonet has not met its burden to show that transfer to the Central District of California outweighs Taltwell's choice of forum. The majority of factors are essentially neutral or not addressed by Zonet, and only one factor weighs slightly in favor of transfer. Accordingly, Zonet's motion to transfer venue under *§ 1404(a)* will be denied.

## III. Taltwell's Motion For Expedited Jurisdictional Discovery

Taltwell filed a motion to expedite jurisdictional discovery, consisting of limited requests for document [*37] production, interrogatories, admissions, depositions, and third-party discovery. (Taltwell's Mot. for Expedited Jurisdictional Discovery, Docket No. 17.) The stated purpose of the expedited discovery is uncover evidence to rebut Zonet's arguments against this Court's jurisdiction and venue. However, Taltwell has prevailed on the jurisdictional issue except as to one of three possible statutory grounds under the Virginia long-arm statute. Expedited discovery is not necessary for the court to dispose of Zonet's jurisdictional motion. However, as explained previously, Taltwell may conduct discovery respecting personal jurisdiction under the long-arm statute and on the topic of general jurisdiction. Thus, the defendant's Motion To Dismiss For Lack Of Personal Jurisdiction, Motion To Dismiss for Failure To State A Claim Upon Which Relief Can Be Granted, Or In The Alternative To Transfer Venue (Docket Nos. 7, 12 and 13) will be denied on the merits and Taltwell's Motion For Expedited Jurisdictional Discovery (Docket No. 17) will be denied as moot.

## IV. Zonet's Motion To Dismiss For Failure To State A Claim

In order to survive a motion under *Fed. R. Civ. P. 12(b)(6)*, a complaint must aver "enough [*38] facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*. In evaluating plausibility, the Court may not rely on mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id. at 1965*. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id. at 1965*, and critical elements of a claim must be, at a minimum, "suggested by the facts," *id. at 1973*. The Court should also "accept[] all well-pleaded allegations in the plaintiff's complaint as true and draw[] all reasonable inferences from those facts in the plaintiff's favor." *Chao v. Rivendell Woods, Inc., 415 F.3d 342, 346 (4th Cir. 2005)*; *see also Structural Concrete Products, LLC v. Clarendon American Insurance Co., 2007 U.S. Dist. LEXIS 61714, *7 (E.D. Va. Aug. 22, 2007)* (maintaining inference standard in light of *Twombly*).

A motion to dismiss for failure to state a claim upon which relief can be granted is not a procedural matter implicating unique issues of patent law, and thus the law of the Federal Circuit is not controlling. *See McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1355-56 (Fed. Cir. 2007)*. [*39] The Fourth Circuit has not, however, had the occasion to discuss a motion to dismiss a patent infringement action in light of the *Twombly* decision. The sole Federal Circuit decision to do so thus far, *McZeal,* draws on Fifth Circuit precedent but provides appropriate guidance on the present issue nonetheless. *See McZeal, 501 F.3d at 1355-60.*

In *McZeal,* the Federal Circuit concluded that a Complaint stating patent infringement cause of action is sufficiently pled under the *Twomly* standard if it: (1) asserts that the plaintiff owns the patent at issue; (2) names the defendants; (3) states that the defendant infringed the patent; (4) describes, in general terms, the means by which the patent was infringed; (5) and identifies the specific parts of patent law that are implicated. *Id. at 1357*. Fulfilling each of these elements is sufficient to put the defendant on notice and permit the action to survive a *Rule 12(b)(6)* motion. *Id.*

Assuming Taltwell's allegations are true, as the Court must, Taltwell has set forth sufficient allegations in its Complaint to state a claim upon which relief may be granted. Each of the *McZeal* factors can be identified in the Complaint. The Complaint alleges that [*40] Taltwell owns the *'660 patent* and that Zonet allegedly infringed said patent (Compl. PP 7, 9), fulfilling the first three factors. Respecting the fourth factor, the Complaint alleges that Zonet infringed "directly or under the doctrine of equivalents, one or more claims of the *'660 patent* by making, using, offering for sale, and/or selling the communication devices in the United States that are within the scope of the claims of the *'660 patent*." (*Id.* P 12.) Lastly, the fifth factor is satisfied because Taltwell invokes *35 U.S.C. § 271* (*Id.* P 2), thus putting Zonet on notice as to which patent law is implicated. Taltwell need not specify which claims of the *'660 patent* have been performed by the allegedly infringing products. *McZeal, 501 F.3d at 1357* ("[A] plaintiff in a patent infringement suit is not required to specifically include each element of claims asserted in the patent.").

Taltwell has averred enough facts to state a claim that is plausible on its face. Therefore, Zonet's motion to dismiss for failure to state a claim be denied.

## CONCLUSION

For the reasons stated above, the defendant's Motion

To Dismiss For Lack Of Personal Jurisdiction, Motion To Dismiss for Failure To State  [*41] A Claim Upon Which Relief Can Be Granted, Or In The Alternative To Transfer Venue (Docket Nos. 7, 12 and 13) are denied and Taltwell's Motion For Expedited Jurisdictional Discovery (Docket No. 17) is denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel by facsimile and regular mail.

It is so ORDERED.

/s/ REP

Robert E. Payne

Senior United States District Judge

Richmond, Virginia

Date: December 19, 2007

LEXSEE 2007 U.S. DIST. LEXIS 74860



Analysis
As of: Sep 03, 2008

**TAKEDA PHARMACEUTICALS COMPANY LIMITED and TAKEDA PHARMACEUTICALS NORTH AMERICA, INC., Plaintiff, -v- SANDOZ, INC., Defendant.**

**07 Civ. 3844 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 74860*

**October 9, 2007, Decided**
**October 9, 2007, Filed**

**PRIOR HISTORY:** *Takeda Chem. Indus. v. Ranbaxy Labs., Ltd., 2007 U.S. App. LEXIS 15883 (Fed. Cir., June 28, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff pharmaceutical companies sued defendant generic drug manufacturers, who sought to manufacture generic versions of a chemical compound used in the treatment of diabetes, and for which the pharmaceutical companies held certain patents. Before the court was one manufacturer's motion for judgment on the pleadings and motion to dismiss, and the pharmaceutical companies' cross-motion to stay the proceedings.

**OVERVIEW:** The complaint adequately pled a claim for a violation of *35 U.S.C.S. §§ 271(b)* and *271(e)(2)* based on the contents of the manufacturer's abbreviated new drug application. The pharmaceutical companies had given fair notice to the manufacturer of their claims that the manufacturer had taken and would take acts to induce infringement of the pharmaceutical companies' combination-use patents and had the requisite intent to induce infringement. The manufacturer's justiciability

argument had previously been considered and rejected in the litigation. A claim of induced infringement filed prior to the occurrence of direct infringement did not violate the case or controversy requirement of U.S. Const. art. III, and the manufacturer had taken sufficient action in preparation for an entry into the market to create a dispute that was "definite and concrete," that touched the legal relations of parties having adverse legal interests, and that was real and substantial. Finally, a stay of the proceedings was warranted, as there was substantial evidentiary and legal overlap between the action and four other actions presently consolidated and stayed before the court.

**OUTCOME:** The manufacturer's motions were denied, and the pharmaceutical companies's cross-motion to stay the proceedings was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*

2007 U.S. Dist. LEXIS 74860, *

[HN1] Under the pleading standard set forth in *Fed. R. Civ. P. 8(a)*, complaints must include a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. A plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests. *Fed. R. Civ. P. 8* is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is not meant to impose a great burden upon a plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] When considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a trial court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party. The court must apply a flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN3] In deciding a *Fed. R. Civ. P. 12(c)* motion, a court must apply the same standard as that applicable to a motion under *Fed. R. Civ. P. 12(b)(6)*, accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN4] A patentee may bring an action for inducing infringement under *35 U.S.C.S. § 271(b)*. To establish liability under *35 U.S.C.S. § 271(b)*, a patent holder must prove that once the defendant knew of the patent, it actively and knowingly aided and abetted another's direct infringement. Knowledge of the acts alleged to constitute infringement is insufficient; rather, specific intent and action to induce infringement must be proven.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN5] Once jurisdiction is established, the substantive determination whether actual infringement or inducement

will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-abbreviated new drug application context, the only difference being that the inquiries are hypothetical where the allegedly infringing product has not yet been marketed.

*Patent Law > Infringement Actions > Infringing Acts > Use*
[HN6] The holding that the request to make and sell a drug labeled with a permissible (non-infringing) use cannot reasonable be interpreted as an act of infringement (induced or otherwise) is read to apply only when the request refers to a patent on an unapproved use.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Limited Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN7] On a motion to dismiss for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)*, the plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. A court must accept as true all material factual allegations in the complaint, but refrain from drawing from the pleadings inferences favorable to the party asserting jurisdiction. A district court may properly dismiss a case for lack of subject matter jurisdiction under *Fed. R. Civ. P. 12(b)(1)* if it lacks the statutory or constitutional power to adjudicate it. The inquiry is distinct from whether the plaintiff can state a claim for relief.

*Civil Procedure > Justiciability > Ripeness > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN8] A claim of induced infringement filed prior to the occurrence of direct infringement, does not violate the case or controversy requirement of U.S. Const. art. III.

*Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > General Overview*
[HN9] Courts in the United States Court of Appeals for the Second Circuit must balance five factors when

2007 U.S. Dist. LEXIS 74860, *

considering whether to stay civil proceedings: (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

**COUNSEL:** [*1] For Plaintiffs: Anthony J. Viola, Joseph E. Czerniawski, Edwards Angell Palmer & Dodge LLP, New York, New York.

For Defendant: Richard J. Basile, Stephen P. McNamara, David W. Aldrich, Benjamin C. White, St. Onge Steward Johnston & Reens LLC, Stamford, Connecticut.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION AND ORDER*

DENISE COTE, District Judge:

This is the fifth case in a series of related lawsuits filed by Takeda Pharmaceuticals Company Limited and Takeda Pharmaceuticals North America, Inc. (collectively, "Takeda"), against pharmaceutical companies seeking to manufacture generic versions of pioglitazone, a chemical compound used in the treatment of diabetes and for which Takeda holds certain patents. This Opinion addresses defendant Sandoz's motions for judgment on the pleadings and to dismiss, and Takeda's cross-motion to stay the proceedings. For reasons to be discussed, Sandoz's motions are denied, and Takeda's cross-motion is granted.

BACKGROUND

Takeda owns several patents related to the chemical compound pioglitazone, which is manufactured and sold as the diabetes drug Actos(R). Three of these patents are particularly relevant to this case: *U.S. Patent No. 4,687,777* [*2] (the "'777 Patent"), which covers the chemical compound itself, and *U.S. Patents Nos. 5,965,584* (the "'584 Patent") and 6,329,404 (the "'404 Patent"), which cover the combination of pioglitazone with other antidiabetic agents. The '777 Patent is slated to

expire in 2011; and the '584 and '404 Patents will expire in 2016, as will the remainder of Takeda's combination-use patents.

The patents are covered by the regulatory framework established under the Hatch-Waxman Act. *See Takeda Chem. Indus. v. Watson Pharm., Inc., 329 F. Supp. 2d 394, 397-98 (S.D.N.Y. 2004) ("Takeda I")*. To date, five generic drug manufacturers, including Sandoz, have filed an abbreviated new drug application ("ANDA") with the Food and Drug Administration ("FDA") seeking to market a generic version of pioglitazone. Takeda has filed suit against each of these manufacturers in order to protect its patent rights under the Hatch-Waxman Act, alleging patent infringement and inducement of infringement.

In three of those suits, the generic drug manufacturer defendants moved to dismiss certain counts of Takeda's complaints for lack of subject matter jurisdiction or failure to state a claim. Each of these motions to dismiss [*3] was denied. *See Takeda I, 329 F. Supp. 2d 394; Takeda Chem. Indus., Ltd. v. Ranbaxy Labs.*, No. 03 Civ. 8250 (DLC), Docket No. 40; *Takeda Chem. Indus., Ltd. v. Alphaharm Pty. Ltd, et al.*, No. 04 Civ. 1966 (DLC), Docket No. 30. Additionally, in two of those suits, the defendant generic drug manufacturer claimed that the '777 Patent was invalid. This challenge was rejected, *see Takeda Chem. Indus. v. Mylan Labs, 417 F. Supp. 2d 341 (S.D.N.Y. 2006)*, and that decision was affirmed by the United States Court of Appeals for the Federal Circuit, *see Takeda Chem. Indus. v. Alphapharm Pty., Ltd., 492 F.3d 1350 (Fed. Cir. 2007), reh'g and reh'g en banc denied*, No. 2006-1329 (Fed. Cir. Sept. 27, 2007). In 2005, the four previous suits were consolidated and, in March 2006, the consolidated cases were stayed so that the parties could revisit their claims closer to the expiration of the '777 Patent in 2011. A status letter is due in January 2009, to set the stage for the completion of the litigation, which may entail additional discovery to prepare for the trial on these claims. [1]

> [1] Discovery on Takeda's claims of infringement of its combination-use patents was essentially complete as of the time [*4] the trial of those claims was severed from the trial on the validity of the '777 Patent.

Sandoz is the fifth generic drug manufacturer to be sued by Takeda over pioglitazone. Sandoz filed a Paragraph III certification with respect to the '777 Patent,

indicating that it agreed not to sell pioglitazone until 2011 when the *'777 Patent* expires. *See .21 U.S.C. § 355(j)(2)(A)(vii)(III)*. It filed Paragraph IV certifications with respect to the *'584* and *'404 Patents, see 21 U.S.C. § 355(j)(2)(A)(vii)(IV)*, and Section viii statements with respect to the *'584* and *'404 Patents*, as well as five additional Takeda method-of-use patents for pioglitazone. A Paragraph IV certification asserts that the patent is invalid or will not be infringed by the sale of the generic drug. *21 U.S.C. § 355(j)(2)(A)(vii)(IV)*. With a Section viii statement, a filer represents that it is not seeking approval for the patented method of use. *Id. § 355(j)(2)(A)(viii)*.

Counts I and II of Takeda's complaint allege infringement and inducement of infringement of the *'584* and *'404 Patents* under *35 U.S.C. § 271(e)(2)(A)*, which provides that it "shall be an act of infringement to submit [an ANDA] for a drug claimed in a patent [*5] or the use of which is claimed in a patent." Under the Hatch-Waxman Act, Sandoz's filing of the Paragraph IV certifications for these two patents required Takeda to file suit within forty-five days of receiving notice of the certifications if it wished to delay FDA approval of the ANDA. *See Takeda I, 329 F. Supp. 2d at 397 n.1*. Sandoz has challenged these two claims through a *Rule 12(c)* motion on the ground that it cannot, as a matter of law, induce infringement of these two patents.

Counts III through IX of the complaint allege that Sandoz's sale of pioglitazone will induce infringement of the *'584* and *'404 Patents* as well as other Takeda combination-use patents, in violation of *35 U.S.C. § 271(b)*. Section *271(b)* provides that whoever "actively induces infringement of a patent shall be liable as an infringer." *35 U.S.C. § 271(b)*. The substantive analysis of an infringement claim is the same for each of the counts on which Takeda has sued Sandoz; *§ 271(e)(2)* "simply provides an 'artificial' act of infringement that creates case-or-controversy jurisdiction to enable the resolution of an infringement dispute before the ANDA applicant has actually made or marketed the proposed product." [*6] *Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1365 (Fed. Cir. 2003)*.

Takeda seeks both a judgment declaring that Sandoz's making, using, offering for sale, selling, and/or importing pioglitazone, or inducing such activities, will infringe at least one of Takeda's combination-use patents, as well as a permanent injunction barring these activities.

Takeda also seeks a declaratory judgment providing that the effective date of any FDA approval of Sandoz's sale of a product containing pioglitazone be no earlier than the expiration of the last to expire of Takeda's patents.

DISCUSSION

Sandoz does not contest that this Court has subject matter jurisdiction over this action and counts I and II. As a consequence, this Opinion will first address the motion to dismiss each of the claims in this action for its failure to state a claim. It will then address the argument that counts III through IX should be dismissed for lack of subject matter jurisdiction. Finding that each of these motions to dismiss should be denied, the Opinion will conclude with a discussion of Takeda's motion to stay this action due to the substantial evidentiary and legal overlap between it and the four consolidated actions, [*7] which are presently stayed.

I. Motions to Dismiss

Sandoz moves to dismiss counts III through IX pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, and for judgment on the pleadings on counts I and II under *Federal Rule of Civil Procedure 12(c)*. [2] [HN1] Under the pleading standard set forth in *Rule 8(a) of the Federal Rules of Civil Procedure*, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006)*. *Rule 8* is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*.

> 2   The *Rule 12(b)(6)* motion was filed first. The *Rule 12(c)* motion was brought roughly three weeks later.

[HN2] When considering a motion to dismiss under *Rule 12(b)(6)*, a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)* [*8] (citation omitted). The court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations

in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).* [HN3] In deciding a *Rule 12(c)* motion, a court must "apply the same standard as that applicable to a motion under *Rule 12(b)(6)*, accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Desiano v. Warner-Lambert & Co., 467 F.3d 85, 89 (2d Cir. 2006)* (citation omitted).

[HN4] A patentee may bring an action for inducing infringement under *Title 35, § 271(b) of the United States Code.* To establish liability under *§ 271(b)*, a patent holder must prove that once the defendant knew of the patent, it "actively and *knowingly* aid[ed] and abett[ed] another's direct infringement." *Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988).* "[K]nowledge of the acts alleged to constitute infringement" is insufficient; rather, "specific intent and action to induce infringement must be proven." *Warner-Lambert, 316 F.3d at 1363-64* (citation [*9] omitted). As noted above, the substantive analysis of an infringement claim under *§ 271(e)(2)(A)* is the same. That provision serves only to create case-or-controversy jurisdiction over an alleged injury that, at the time of the filing of the ANDA, would be merely hypothetical. But, as the Federal Circuit has explained, [HN5]

> [o]nce jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context, the only difference being that the inquiries now are hypothetical because the allegedly infringing product has not yet been marketed.

*Id. at 1365.*

Takeda has pleaded that Sandoz's seeking approval to sell pioglitazone for use in monotherapy will infringe or induce others to infringe Takeda's combination-use patents, and that approval of Sandoz's ANDA is "substantially likely to result in the commercial manufacture, importation, offer for sale, and/or sale, or inducement thereof, of a drug product which is marketed

and sold for use in a method claimed in" its combination-use patents. Specifically, [*10] Takeda has alleged that at the time Sandoz filed its ANDA, it was

> aware of the widespread use of pioglitazone in combination therapy; was aware that patients routinely take pioglitazone with a biguanide or an insulin secretion enhancer; and was aware that its customers would know of the use of pioglitazone in combination therapy. Moreover, at the time of the filing of its ANDA, Sandoz manufactured the very products that, when used in combination with pioglitazone, are covered by Takeda's patents: Sandoz sells metformin (a biguanide), covered by the *'584 Patent*, and glimepride (an insulin secretion enhancer), covered by the *'404 Patent*.

Further, Takeda has alleged that Sandoz listed generic products on its website and referred customers to a corresponding brand product for further information, and also that (on information and belief) Sandoz's proposed label does not restrict the use of pioglitazone to monotherapy or instruct physicians not to prescribe it in combination with other antidiabetic agents. These allegations adequately plead a claim for relief under *§§ 271(b)* and *271(e)(2)(A).*

Sandoz claims that *DSU Medical Corp. v. JMS Co., Ltd., 471 F.3d 1293 (Fed. Cir. 2006)* (en banc), [*11] substantially heightened the burden imposed on patent holders to prove inducement of infringement, and that consequently Takeda cannot show the requisite "specific intent," *id. at 1306* (citation omitted), to encourage another's infringement as opposed to mere knowledge of the acts alleged to constitute inducement, because its allegations at most show Sandoz's knowledge of possible infringement of Takeda's combination-use patents. Sandoz makes much of the language in *DSU Medical Corp.* that requires a patent holder to produce "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct inducer's activities." *Id.* [3] But in *DSU Medical Corp.*, the Federal Circuit reviewed the sufficiency of the evidence of inducement following trial. It did not address the sufficiency of a claim. Applying Rule 8's pleading standard, Takeda has given fair notice to Sandoz of its claims that Sandoz has taken and will

take acts to induce infringement of Takeda's combination-use patents and has the requisite intent to induce infringement.

> 3 Sandoz tries to justify this repetitive motion, in which it essentially rehashes arguments made by [*12] three other generic drug companies in their unsuccessful efforts to dismiss Takeda's inducement claims, on the ground that *DSU Medical Corp.* "has clarified the law concerning actions for inducing infringement." In truth, *DSU Medical Corp.* explicitly affirmed the Federal Circuit's 1990 articulation of the patent holder's burden in inducement of infringement suits, as stated in *Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 554 (Fed. Cir. 1990). DSU Medical Corp., 471 F.3d at 1306.*

Sandoz next argues that as a matter of law its conduct cannot induce infringement of Takeda's combination-use patents. This articulation of its motion to dismiss is another futile effort to impose upon Takeda at the pleading stage a burden that it will not face until it is time for summary judgment motions or trial. The Sandoz arguments require the weighing of evidence and inferences. Whether Takeda will succeed on its claims or is even likely to succeed is beyond the scope of these motions to dismiss.

Sandoz makes one additional argument that is relevant to counts I and II alone. Relying on the Federal Circuit's decisions in *Warner-Lambert and Allergan, Inc. v. Alcon Labs., Inc., 324 F.3d 1322, 1332 (Fed. Cir. 2003),* [*13] Sandoz argues that these counts must be dismissed because a § *271(e)(2)* inducement claim must be judged solely on the basis of what Sandoz has requested in its ANDA. [4] Each of these decisions reached the Federal Circuit after summary judgment was granted by the district court; that is, these decisions do not deal with pleading requirements for the purpose of a motion to dismiss. The instant complaint adequately pleads a claim for a violation of §§ *271(b)* and *271(e)(2)* based on the contents of Sandoz's ANDA. To the extent it were necessary to reach this issue to resolve this motion to dismiss, [HN6] the holding of *Warner-Lambert* that "the request to make and sell a drug labeled with a permissible (non-infringing) use cannot reasonable be interpreted as an act of infringement (induced or otherwise)" is read to apply only when the request refers "to a patent on an unapproved use." *Warner-Lambert, 316 F.3d at 1364-65.*

Here, the FDA has approved the patented uses of pioglitazone in combination with other therapies, and the specific holdings in *Warner-Lambert* and *Allergan* do not control. A careful application of their holdings is particularly warranted given the disagreement with the decisions [*14] expressed by members of the Federal Circuit bench. *See Allergan, 324 F.3d at 1334* (Schall, J., and Clevenger, J., concurring). [5]

> 4 To support this argument, Sandoz has attached a proposed label for its generic drug, which it has submitted to the FDA for its approval. This label was not available to Takeda when it filed this litigation, it is not properly considered on a motion to dismiss, and Sandoz does not argue in its reply that it is entitled to have it considered.
>
> 5 To the extent other district courts have read *Warner-Lambert* and *Allergan* more expansively, this Court respectfully declines to do so. *See Aventis Pharma Deutschland GmbH v. Cobalt Pharms., Inc., 355 F. Supp. 2d 586 (D. Mass. 2005); ICN Pharms., Inc. v. Geneva Pharms. Tech. Corp., 272 F. Supp. 2d 1028 (C.D. Cal. 2003).*

In essence, Sandoz asks for a ruling that a generic drug manufacturer cannot induce infringement of combination-use patents as a matter of law after the principal patent has expired. It cites no authority for this proposition. To the extent Takeda's combination-use patents survive challenges to their validity, then those patents will be entitled to the full protection granted by § *271(b)*. On the other hand, [*15] Takeda will not be entitled to a *de facto* extension of the life of the '777 *Patent* through frivolous § *271(b)* claims premised on the theory that its combination-use patents are being infringed. Judgment on the merits of these issues, however, must await the completion of discovery, summary judgment, and/or trial.

## II. Justiciability

Sandoz moves to dismiss counts III through IX on the ground that they concern only speculative activity that will not occur any earlier than 2011, when the '777 *Patent* on the pioglitazone chemical compound expires. [HN7] On a motion to dismiss for lack of subject matter jurisdiction pursuant to *Rule 12(b)(1),* "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. System, Inc., 426 F.3d 635, 638 (2d*

*Cir. 2005)*. A court must "accept as true all material factual allegations in the complaint," *Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998)* (citing *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974))*, but refrain from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]," *APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003)* (citation omitted). [*16] "[A] district court may properly dismiss a case for lack of subject matter jurisdiction under *Rule 12(b)(1)* if it lacks the statutory or constitutional power to adjudicate it." *Aurecchione, 426 F.3d at 638* (citation omitted). The inquiry is distinct from whether the plaintiff can state a claim for relief. *Carlson v. Principal Fin. Group, 320 F.3d 301, 305-06 (2d Cir. 2003)*.

This identical argument regarding justiciability has previously been considered and rejected in this litigation. In *Takeda I*, Watson argued that no case or controversy existed because any alleged infringement of the patents at issue would occur in the future -- that is, when the exclusivity period for the patents would expire. This argument was rejected primarily on the basis of the Federal Circuit's pronouncement that [HN8] "[a] claim of induced infringement . . . filed prior to the occurrence of direct infringement, does not violate the case or controversy requirement of Article III," *Allergan, 324 F.3d at 1332*, and Takeda's demonstration that Watson had taken "concrete steps . . . with the intent to conduct activity that would induce infringement," *Takeda I, 329 F. Supp. 2d at 402* (citation omitted). Further, Watson [*17] "disingenuous[ly]" argued that, "since it is not challenging the validity of the *'777 patent*, the earliest it could market its generic pioglitazone is 2011, making Takeda's lawsuit 'speculative' and not ready for adjudication." *Id.* This argument was rejected because Watson had "reserved the right to market generic pioglitazone as soon as it receives FDA approval." *Id. at 402-03*.

Sandoz identifies two reasons, however, why its claims differ from those rejected in *Takeda I*. First, Sandoz observes that at the time *Takeda I* issued, the viability of the *'777 Patent* was unclear, as it was being challenged by two generic drug manufacturers. As noted above, the *'777 Patent* has since been upheld, and that decision was affirmed by the Federal Circuit. Sandoz claims that by filing a Paragraph III certification with respect to the *'777 Patent*, it has agreed not to sell pioglitazone until the *'777 Patent* expires in 2011 and has

thus confirmed that it cannot commit any acts of direct infringement.

Contrary to Sandoz's argument, the upholding of the *'777 Patent* does nothing to make Takeda's allegations less timely or concrete. If anything, the fact that the *'777 Patent* is enforceable but will expire [*18] in 2011, only four years from now, makes the dispute between these two parties more concrete and susceptible to adjudication. Just as in *Takeda I*, Takeda in this case has alleged that Sandoz "has taken significant steps towards manufacturing and testing its generic pioglitazone products." *Takeda I, 329 F. Supp. 2d at 402*. Takeda has alleged that Sandoz "has both the capability and intent to offer for sale or sell pioglitazone immediately upon FDA approval" and that "there is nothing in Sandoz's proposed label that would restrict the use of its generic pioglitazone product to monotherapy." Moreover, Sandoz's label "does not state that it may not be used for combination therapy." The reasoning of *Takeda I* does not lose any of its force in light of the upholding of the *'777 Patent*'s validity. Takeda has alleged an inducement claim of "sufficient immediacy and reality." *Lang v. Pacific Marine & Supply Co., Ltd., 895 F.2d 761, 765 (Fed. Cir. 1990)* (citation omitted).

Second, Sandoz contends that because there is no guarantee that it will sell pioglitazone, this controversy is not ripe for resolution. Sandoz emphasizes that it has not yet obtained FDA approval for its sale of pioglitazone; [*19] that it has not made the final business decision to enter the market for the drug; and that the general prescribing practices that will exist in 2011 are unknown. Takeda, however, has shown that Sandoz has taken sufficient action in preparation for an entry into the market to create a dispute that is "definite and concrete," that touches "the legal relations of parties having adverse legal interests," and that is "real and substantial." *MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007)* (citation omitted). The motion to dismiss seven claims for lack of subject matter jurisdiction over them is denied.

III. Takeda's Cross-Motion to Stay

Takeda claims that because of the substantial evidentiary and legal overlap between this action and the four actions presently consolidated and stayed before this Court, the instant action should be stayed. It claims that the counts of the complaints asserting the combination-use patents against all five defendants are

nearly identical, and that evidence relating to the use of pioglitazone will be both important and substantially the same in all cases, as will the law governing patent infringement and inducement of infringement. Sandoz pointedly [*20] observes that Takeda filed its lawsuit against Sandoz and then immediately sought a stay of that lawsuit. But in opposition to Takeda's motion, Sandoz essentially reiterates the arguments made in its substantive motions to dismiss and for judgment on the pleadings. [6]

> [6] Sandoz has filed a submission indicating that it wants a ruling on its motions to dismiss and for judgment on the pleadings so that it can deprive the other generic drug defendants of the 180-day exclusivity period to which one or the other of them would otherwise be entitled under the Hatch-Waxman Act. *See 21 U.S.C. § 355(j)(5)(B)(iv)(I)-(II).* Two of those defendants, Mylan and Ranbaxy, have objected, and have requested a stay of Sandoz's motions. Because this Opinion has denied Sandoz's two motions, Sandoz will not be able to leap over either Mylan or Ranbaxy and obtain an unfair advantage in bidding for the 180-day exclusivity period.

[HN9] Courts in this Circuit must balance five factors when considering whether to stay civil proceedings:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests [*21] of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Kappel v. Comfort, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996).* Applying these factors to the facts of the instant case, it is clear that a stay is warranted.

The substantial similarities between the five cases militate in favor of their simultaneous resolution on the merits. The plaintiff's interest in prosecuting the five actions simultaneously is clear, and the prejudice to Takeda from having to prosecute two nearly identical actions separately is evident. Moreover, Sandoz's

protestations notwithstanding, a stay of this action might redound to its benefit as well, as changes in circumstances over the next four years "could even eventually obviate the need for further litigation altogether," as was observed in the consolidation order. As the Order staying the consolidated cases stated, "in addressing the Combination Use Patents it will be necessary to make factual determinations, such as the prescription practices of physicians that treat diabetes, that may change over time." This is no less true for the claims at issue in the [*22] instant case, and thus this reasoning applies with equal force here. Finally, no prejudice will be wrought on Sandoz as, pursuant to its own representations, it is unable to advance its pioglitazone-related activities until the *'777 Patent* expires in 2011.

The court's interest in judicial economy should be plain. The relevant non-parties to this action -- the four defendant generic drug manufacturers in the consolidated actions -- will benefit from a stay because simultaneous resolution of all claims will preclude Sandoz, the last of the five generic manufacturers to file an ANDA with respect to pioglitazone, from leapfrogging over them and becoming the first to reach final resolution of Takeda's claims against it. Finally, the public has an interest in the judicial economy wrought by a stay. Accordingly, Takeda's cross-motion to stay the instant action is granted.

CONCLUSION

Sandoz's July 20, 2007 motion for judgment on the pleadings with regard to counts I and II, and its June 28 motion to dismiss counts III through IX, are denied. Takeda's July 27 cross-motion to stay the proceedings is granted. Takeda may restore its claims to this Court's active calendar by letter application. Further, [*23] a status letter from Takeda is due on January 9, 2007.

SO ORDERED:

Dated: New York, New York

October 9, 2007

DENISE COTE

United States District Judge

# EXHIBIT D

# FEDERAL RULES

## OF

# CIVIL PROCEDURE

———

### WITH FORMS

———

DECEMBER 1, 2007



Printed for the use
of

## THE COMMITTEE ON THE JUDICIARY
### HOUSE OF REPRESENTATIVES

115             FEDERAL RULES OF CIVIL PROCEDURE

**Form 18. Complaint for Patent Infringement.**

(Caption – See Form 1.)

1.    (Statement of Jurisdiction — See Form 7.)

2.    On ___*date*___, United States Letters Patent No. _____ were issued to the plaintiff for an invention in an *electric motor*. The plaintiff owned the patent throughout the period of the defendant's infringing acts and still owns the patent.

3.    The defendant has infringed and is still infringing the Letters Patent by making, selling, and using *electric motors* that embody the patented invention, and the defendant will continue to do so unless enjoined by this court.

4.    The plaintiff has complied with the statutory requirement of placing a notice of the Letters Patent on all *electric motors* it manufactures and sells and has given the defendant written notice of the infringement.

Therefore, the plaintiff demands:

(a)    a preliminary and final injunction against the continuing infringement;

(b)    an accounting for damages; and

(c)    interest and costs.

(Date and sign – See Form 2.)

# EXHIBIT E

AO279, VALDEZ

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.2.2 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:08-cv-03248

SP Technologies, LLC v. Garmin Limited et al
Assigned to: Honorable Rebecca R. Pallmeyer
Cause: 35:271 Patent Infringement

Date Filed: 06/05/2008
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**SP Technologies, LLC**                    represented by    **Raymond P. Niro**
Niro, Scavone, Haller & Niro, Ltd.
181 West Madison Street
Suite 4600
Chicago , IL 60602
(312) 236-0733
Email: rniro@nshn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sally Wiggins**
Niro, Scavone, Haller & Niro, Ltd.
181 West Madison Street
Suite 4600
Chicago , IL 60602
(312) 236-0733
Email: wiggins@nshn.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Garmin Limited**                          represented by    **Adam P. Seitz**
*TERMINATED: 08/28/2008*
Shook, Hardy & Bacon
2555 Grand Blvd
Kansas City , MO 64108
(816) 474-6550
Email: aseitz@shb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric A. Buresh**

Shook, Hardy & Bacon
2555 Grand Blvd
kansas city , MO 64108
(816) 474-6550
Email: eburesh@shb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Garmin International, Inc.**                 represented by   **Walter Jones , Jr.**
Pugh, Jones, Johnson & Quandt,P.C.
180 North LaSalle Street
Suite 3400
Chicago , IL 60601-2700
(312) 768-7800
Fax: 312-768-7801
Email: wjones@pjjq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam P. Seitz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric A. Buresh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark Douglas Andrews**
Pugh, Jones, Johnson & Quandt,P.C.
180 North LaSalle Street
Suite 3400
Chicago , IL 60601-2807
312-768-7800
Fax: 312-768-7801
Email: mandrews@pjjq.com
*ATTORNEY TO BE NOTICED*

**Uma Chandrasekaran**
Pugh, Jones, Johnson, & Quandt, P.C.
180 N. LaSalle
Suite 3400
Chicago , IL 60601
(312) 768-7800
Fax: (312) 768-7801
Email: uchandrasekaran@pjjq.com

*ATTORNEY TO BE NOTICED*

**Defendant**

**TomTom, Inc.**                    represented by **Lesley Gayle Smith**
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago , IL 60606
(312) 701-9300
Email: lgsmith@sw.com
*ATTORNEY TO BE NOTICED*

**Peter Vincent Baugher**
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago , IL 60606
(312) 701-9300
Email: baugher@sw.com
*ATTORNEY TO BE NOTICED*

**Todd H. Flaming**
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago , IL 60606
(312) 701-9300
Email: flaming@sw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Magellan, Navigation, Inc.**      represented by **Brian A Carpenter**
GREENBERG TRAURIG, LLP
1200 Seventeenth Street
Suite 2400
Denver , CO 80202
(303) 572-6500
Email: carpenterb@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Daniel T McCloskey**
GREENBERG TRAURIG, LLP
1900 University Avenue
5th Floor
East Palo Alto , CA 94303
(650) 328-8500
Email: mccloskeyd@gtlaw.com

*ATTORNEY TO BE NOTICED*

**Earl Patrick Ellisen**
GREENBERG TRAURIG, LLP
1900 University Avenue
5th Floor
East Palo Alto , CA 94303
(650) 328-8500
Email: ellisenp@gtlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Herbert H. Finn**
Greenberg Traurig, LLP.
77 West Wacker Drive
Suite 2500
Chicago , IL 60601
(312) 456-8400
Email: finnh@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Kevin John O'Shea**
Greenberg Traurig LLP
77 West Wacker Drive
Chicago , IL 60601
312 456 8400
Email: osheak@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Magellan, Navigation, Inc.**          represented by   **Brian A Carpenter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel T McCloskey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Earl Patrick Ellisen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Herbert H. Finn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin John O'Shea**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**SP Technologies, LLC**

represented by **Raymond P. Niro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sally Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Garmin International, Inc.**

represented by **Walter Jones , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam P. Seitz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric A. Buresh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark Douglas Andrews**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Uma Chandrasekaran**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**SP Technologies, LLC**

represented by **Raymond P. Niro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sally Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**TomTom, Inc.**                represented by **Peter Vincent Baugher**
(See above for address)
*ATTORNEY TO BE NOTICED*


V.

**Counter Defendant**

**SP Technologies, LLC**        represented by **Raymond P. Niro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sally Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*


| Date Filed | # | Docket Text |
|---|---|---|
| 06/05/2008 | 1 | COMPLAINT filed by SP Technologies, LLC; Jury Demand. Filing fee $ 350. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(kjc, ) (Entered: 06/06/2008) |
| 06/05/2008 | 2 | CIVIL Cover Sheet. (kjc, ) (Entered: 06/06/2008) |
| 06/05/2008 | 3 | ATTORNEY Appearance for Plaintiff SP Technologies, LLC by Raymond P. Niro. (kjc, ) (Entered: 06/06/2008) |
| 06/05/2008 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by SP Technologies, LLC. (kjc, ) (Entered: 06/06/2008) |
| 06/05/2008 | 5 | LR 3.4 NOTICE by SP Technologies, LLC of claims involving Patents. (kjc, ) (Entered: 06/06/2008) |
| 06/05/2008 | 7 | SUMMONS Issued as to Defendants Garmin Limited, and Garmin International, Inc. (kjc, ) (Entered: 06/06/2008) |
| 06/06/2008 | 9 | ATTORNEY Appearance for Plaintiff SP Technologies, LLC by Sally Wiggins (Wiggins, Sally) (Entered: 06/06/2008) |
| 06/12/2008 | 10 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Status hearing set for 8/12/2008 at 09:00 AM, courtroom 2119. Mailed notice (etv, ) (Entered: 06/12/2008) |
| 07/07/2008 | 11 | AMENDED complaint by SP Technologies, LLC against all defendants (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 |

| | | Exhibit E, # 6 Exhibit F)(Wiggins, Sally) (Entered: 07/07/2008) |
|---|---|---|
| 07/28/2008 | 12 | SUMMONS Issued as to Defendants TOMTOM, INC., MAGELLAN, NAVIGATION, INC. (aac, ) (Entered: 07/29/2008) |
| 07/28/2008 | 13 | ALIAS Summons Issued as to Garmin Limited, Garmin International, Inc. (aac, ) (Entered: 07/29/2008) |
| 08/12/2008 | 14 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Status hearing held on 8/12/2008. Status hearing set for 9/18/2008 at 09:00 AM. Mailed notice (etv, ) (Entered: 08/12/2008) |
| 08/13/2008 | 15 | ATTORNEY Appearance for Defendant MAGELLAN, NAVIGATION, INC. by Herbert H. Finn (Finn, Herbert) (Entered: 08/13/2008) |
| 08/13/2008 | 16 | ATTORNEY Appearance for Defendant MAGELLAN, NAVIGATION, INC. by Kevin John O'Shea (O'Shea, Kevin) (Entered: 08/13/2008) |
| 08/13/2008 | 17 | *Magellan Naviagation, Inc.'s* ANSWER to amended complaint *for Patent Infringement*, COUNTERCLAIM filed by MAGELLAN, NAVIGATION, INC. against SP Technologies, LLC. by MAGELLAN, NAVIGATION, INC.(O'Shea, Kevin) (Entered: 08/13/2008) |
| 08/14/2008 | 18 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000003022502. (Ellisen, Earl) (Entered: 08/14/2008) |
| 08/14/2008 | 19 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000003022558. (McCloskey, Daniel) (Entered: 08/14/2008) |
| 08/15/2008 | 20 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motions for leave to appear pro hac vice [18, 19] granted as to E. Patrick Ellisen and Daniel T. McCloskey on behalf of Magellan Navigation, Inc. Mailed notice (etv, ) (Entered: 08/15/2008) |
| 08/15/2008 | 21 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000003026450. (Carpenter, Brian) (Entered: 08/15/2008) |
| 08/15/2008 | 23 | Enter In Error (kj, ) Modified on 8/19/2008 (kj, ). (Entered: 08/19/2008) |
| 08/18/2008 | 22 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to appear pro hac vice 21 granted as to Brian A. Carpenter to appear on behalf of Magellan Navigation, Inc. Mailed notice (etv, ) (Entered: 08/18/2008) |
| 08/19/2008 | 24 | NOTICE of Correction regarding 23 - The document has been filed in the incorrect case. The text of the entry has been edited and the PDF file has been replaced. (kj, ) (Entered: 08/19/2008) |
| 08/19/2008 | 25 | ATTORNEY Appearance for Defendant Garmin International, Inc. by Walter Jones, Jr (Jones, Walter) (Entered: 08/19/2008) |
| 08/19/2008 | 26 | ATTORNEY Appearance for Defendant Garmin International, Inc. by Uma Chandrasekaran (Chandrasekaran, Uma) (Entered: 08/19/2008) |

| 08/19/2008 | 27 | ATTORNEY Appearance for Defendant Garmin International, Inc. by Mark Douglas Andrews (Andrews, Mark) (Entered: 08/19/2008) |
| 08/19/2008 | 28 | ANSWER to amended complaint, COUNTERCLAIM filed by Garmin International, Inc. against SP Technologies, LLC. by Garmin International, Inc.(Chandrasekaran, Uma) (Entered: 08/19/2008) |
| 08/19/2008 | 29 | MOTION by Defendant Garmin International, Inc. for partial dismissal of Plaintiff's amended complaint. (Chandrasekaran, Uma) Modified on 8/20/2008 (kj, ). (Entered: 08/19/2008) |
| 08/19/2008 | 30 | NOTICE of Motion by Uma Chandrasekaran for presentment of motion to dismiss 29 before Honorable Rebecca R. Pallmeyer on 8/27/2008 at 08:45 AM. (Chandrasekaran, Uma) (Entered: 08/19/2008) |
| 08/19/2008 | 31 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Garmin International, Inc. (Chandrasekaran, Uma) (Entered: 08/19/2008) |
| 08/20/2008 | 32 | ATTORNEY Appearance for Defendant MAGELLAN, NAVIGATION, INC., Counter Claimant MAGELLAN, NAVIGATION, INC. by Daniel T McCloskey (McCloskey, Daniel) (Entered: 08/20/2008) |
| 08/20/2008 | 33 | ATTORNEY Appearance for Defendant MAGELLAN, NAVIGATION, INC., Counter Claimant MAGELLAN, NAVIGATION, INC. by Earl Patrick Ellisen (Ellisen, Earl) (Entered: 08/20/2008) |
| 08/20/2008 | 34 | ATTORNEY Appearance for Defendant MAGELLAN, NAVIGATION, INC., Counter Claimant MAGELLAN, NAVIGATION, INC. by Brian A Carpenter (Carpenter, Brian) (Entered: 08/20/2008) |
| 08/20/2008 | 35 | ATTORNEY Appearance for Defendant TOMTOM, INC. by Peter Vincent Baugher (Baugher, Peter) (Entered: 08/20/2008) |
| 08/20/2008 | 36 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by TOMTOM, INC. (Baugher, Peter) (Entered: 08/20/2008) |
| 08/20/2008 | 37 | ANSWER to amended complaint, COUNTERCLAIM filed by TOMTOM, INC. against SP Technologies, LLC *for Patent Infringement*. by TOMTOM, INC.(Baugher, Peter) Modified on 8/21/2008 (kj, ). (Entered: 08/20/2008) |
| 08/20/2008 | 38 | NOTICE by TOMTOM, INC. re answer to amended complaint, counterclaim 37 (Baugher, Peter) (Entered: 08/20/2008) |
| 08/20/2008 | 39 | ATTORNEY Appearance for Defendant TOMTOM, INC. by Todd H. Flaming (Flaming, Todd) (Entered: 08/20/2008) |
| 08/20/2008 | 40 | ATTORNEY Appearance for Defendant TOMTOM, INC. by Lesley Gayle Smith (Smith, Lesley) (Entered: 08/20/2008) |
| 08/25/2008 | 41 | AMENDED NOTICE of Motion by Uma Chandrasekaran for presentment of motion to dismiss 29 before Honorable Rebecca R. Pallmeyer on 8/28/2008 at 08:45 AM. (Chandrasekaran, Uma) Modified on 8/26/2008 (kj, ). (Entered: 08/25/2008) |

| 08/26/2008 | 42 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000003053351. *(on Behalf of Defendants Garmin Ltd and Garmin International, Inc.)* (buresh, eric) (Entered: 08/26/2008) |
| 08/26/2008 | 43 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000003053426. *(on Behalf of Defendants Garmin Ltd and Garmin International, Inc.)* (seitz, adam) (Entered: 08/26/2008) |
| 08/28/2008 | 44 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 07520000000003059191. (Wallace, James) (Entered: 08/28/2008) |
| 08/28/2008 | 45 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motions for leave to appear pro hac vice [42, 43] granted as to Eric A. Buresh and Adam P. Seitz to appear on behalf of Defendants Garmin Ltd and Garmin International Inc. Mailed notice (etv, ) (Entered: 08/29/2008) |
| 08/28/2008 | 47 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Garmin International, Inc.'s motion for partial dismissal of Plaintiff's Amended Complaint 29 entered and continued for briefing. Response to be filed by or on 9/3/2008; reply 9/10/2008. Defendant Garmin Limited dismissed voluntarily - case continues as against other Defendants. Status hearing set for 9/18/2008 at 9:00 to stand. Mailed notice. (kj, ) (Entered: 09/02/2008) |
| 09/02/2008 | 46 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to appear pro hac vice 44 granted as to James H. Wallace, Jr. to appear on behalf of Defendant Tom Tom, Inc. Mailed notice (etv, ) (Entered: 09/02/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/03/2008 13:41:20 | | |
| **PACER Login:** | ns0012 | **Client Code:** | DGA |
| **Description:** | Docket Report | **Search Criteria:** | 1:08-cv-03248 |
| **Billable Pages:** | 6 | **Cost:** | 0.48 |

# EXHIBIT F

# Affidavit of Process Server

SP Technologies, LLC       vs   Garmin Limited et AL   08CV3248
**PLAINTIFF/PETITIONER**           **DEFENDANT/RESPONDENT**      **CASE #**

TOM LOSH

duly sworn, on my oath, I
re that I am a citizen of the United States, over the age of eighteen and not a party to this action.

**Service:** I served  Garmin International
                         NAME OF PERSON/ENTITY BEING SERVED

with the (documents)  ☐ Subpoena with $_____witness fee and mileage

☒ Summons, + amended Complaint for Patent infringement

_____

_____

by serving (NAME)   GARMIN INTERNATIONAL

at ☐ Home_____

☒ Business   1200 E.151st Street, Olathe, KS 66062

☒ on (DATE)   JULY 30, 2008 _____ at (TIME)   2:33 P.M. (CST)

Thereafter copies of the documents were mailed by prepaid, first class mail on (DATE) _____

from (CITY) _____ (STATE) _____

## Manner of Service:
☐ By Personal Service.
☒ By leaving, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof,
  namely   KIM SHAFFER, Contracts Attorney
☐ By leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards, and informing that person of the general nature of the papers,
  namely_____
☐ By posting copies in a conspicuous manner to the address of the person/entity being served.

## Non-Service:   After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):
☐ Unknown at Address        ☐ Evading                    ☐ Other: _____
☐ Address Does Not Exist    ☐ Service Cancelled by Litigant
☐ Moved, Left no Forwarding ☐ Unable to Serve in a Timely Fashion

## Service Attempts:   Service was attempted on: (         )_____, (         )_____
                                            DATE      TIME              DATE      TIME
( )_____, ( )_____, ( )_____
   DATE    TIME         DATE    TIME         DATE    TIME

## Description:
| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Male | ☒ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☒ 21-35 Yrs. | ☐ 5'0"-5'3" | ☒ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blond Hair | | ☒ 36-50 Yrs. | ☒ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Mustache | ☐ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| ☐ Glasses | ☐ Red Skin | ☐ Red Hair | ☐ Beard | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

OTHER IDENTIFYING FEATURES: _____

State of Illinois       County of Cook

_____
SERVED BY
LASALLE PROCESS SERVERS

Subscribed and sworn to before me,
a notary public, this 30th day of JULY , 20 08

_____
NOTARY PUBLIC

★ OFFICIAL SEAL ★
SONDRA S. LOSH
NOTARY PUBLIC, STATE OF KANSAS
MY COMMISSION EXPIRES
9/25/2009



CHARTER MEMBER NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS.

AO 440  (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

SP TECHNOLOGIES, LLC

Plaintiff,

v.

GARMIN LIMITED, GARMIN INTERNATIONAL,
INC., TOMTOM, INC., and MAGELLAN
NAVIGATION, INC.,

Defendants.

**ALIAS**
**SUMMONS IN A CIVIL CASE**

CASE NUMBER:        08 CV 3248

ASSIGNED JUDGE:     REBECCA R. PALLMEYER

DESIGNATED
MAGISTRATE JUDGE:  MARIA VALDEZ

TO:                    GARMIN INTERNATIONAL, INC.
                       Any duly authorized representative or agent of
                       1200 East 151st Street
                       Olathe, Kansas  66062

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Raymond P. Niro
Sally Wiggins
**NIRO, SCAVONE, HALLER & NIRO**
181 West Madison Street – Suite 4600
Chicago, IL  60602
(312) 236-0733

an answer to the complaint which is herewith served upon you, within        20        days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against
you for the relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a
reasonable period of time after service.

---

CLERK                                          DATE

Michael W. Dobbins, Clerk

_____                      _____
DEPUTY CLERK                                              **July 28, 2008**
                                                             Date



AO 440 (Rev. 05/00) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[(1)] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
              Date                          *Signature of Server*


                          _____
                          *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.