**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SP TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 3248 |
| | ) | |
| GARMIN INTERNATIONAL, INC., | ) | Judge Rebecca R. Pallmeyer |
| TOMTOM, INC., and MAGELLAN | ) | |
| NAVIGATION, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff SP Technologies, LLC, the assignee of Patent No. 6,784,873 (the "'873 patent"),

brought this patent infringement claim against Defendants TomTom, Inc., Garmin International, Inc.,

and Magellan Navigation, Inc. Defendant TomTom, Inc. (hereinafter "Defendant" or "TomTom")

now moves for summary judgment, arguing that the '873 patent is unenforceable due to inequitable

conduct on the part of the inventors. Specifically, Defendant argues that the creators of the '873

patent intentionally made material misrepresentation to the United States Patent and Trademark

Office (USPTO) when applying for the patent. For the reasons that follow, Defendant's motion is

denied.

**FACTUAL BACKGROUND**

Inventors Dr. Peter Boesen, a medical doctor, and Thomas Mann, a software developer,

filed the application for what would become the '873 patent in August 2000. (Def.'s 56.1 ¶ 6.) The

USPTO issued the patent on August 31, 2004. (*Id.*) The patent is entitled, "Method and Medium

for Computer Readable Keyboard Display Incapable of User Termination." (Pl.'s 56.1 ¶ 1.) Claim

1 of the '873 patent describes in general terms the general method covered by the patent:

> A method of entering data on a touch screen display, the method comprising:
> Invoking a computer program in which user input is sought;
> Invoking an input area, including a plurality of data input fields;
> Invoking a graphical keyboard area incapable of user termination independent of
> termination of the input area, the graphical keyboard area having a plurality of keys

on the display;
Selecting keys on the keyboard to provide the desired input; and
Automatically terminating the graphical keyboard area after the desired input is
received in the input area.

(*Id.* ¶ 2.)  In layman's terms, the key features of this invention are a touch-screen keyboard that the user cannot move, resize, or close, but that the program closes automatically once the user has provided the necessary information.

The claims of the '873 patent were rejected by the Patent Examiner at least four times prior to the issue of the patent.  (Def.'s 56.1 ¶ 25.)  In response to the March 21, 2002 rejection, the inventors stated, "The Applicant notes that in rejecting original claim 1, the Examiner indicated that Buxton[1] discloses a keyboard incapable of user termination.  The Applicant submits that Buxton does not disclose the keyboard of the Applicant's invention."  (*Id.* ¶ 26.)  In subsequent amendments to their application, the inventors emphasized that the uniqueness of their invention is shown in substantial part by the fact that the "user has no ability to move, resize, remove, or close the graphical keyboard."  (*Id.* ¶ 27.)  When they filed the '873 patent on August 4, 2000, both Boesen and Mann made the following declarations: "I believe I am the original, first and sole inventor of the subject matter which is claimed and for which a patent is sought."  (Def.'s 56.1 ¶ 31.)

Defendant's motion alleges that the inventors acted inequitably in two ways.  First, Defendant claims that twenty lines of the computer code included in the patent originated from a third party, a fact that the inventors did not disclose in their application or in any of the amendments.  The lines of code at issue perform the function of disabling the "X button" on the keyboard, the button that would normally allow a user to close the keyboard.  (Pl.'s 56.1 ¶ 18.)  These twenty lines of code are identical to those that were found on a third-party website on April 23, 1999, more than

---

[1]      "Buxton" refers to Patent No. 6,094,197, invented by William A.S. Buxton and Gordon P. Kurtenbach, which created "[a] system and method for a graphical keyboard that benefits from the expressive power and intuitive ease of use associated with pen strokes and gestures." U.S. Patent No. 6,094,197, col. 2 (filed May 17, 1995).  Buxton is cited in the '873 patent as applicable prior art.

one year prior to the filing of the '873 patent application. (Def.'s 56.1 ¶ 16.) The lines of code on

that website are identical to the code in the '873 patent, including misspelling the word "separator."

(*Id.* ¶¶ 14-15.) Both inventors nevertheless stated in affidavits that they had no knowledge of the

website in question. (Pl.'s 56.1 ¶¶ 20, 22.) In fact, Mann, the only one of the two inventors who is

a software programmer, stated that he never even visited the website prior to filing the '873 patent.

(*Id.* ¶¶ 19, 23.) During his deposition,[2] Mann did concede that the lines of code in question may

have come from a "Microsoft support document" which he had access to as part of an agreement

with Microsoft as one of their developers. (Mann Dep. 147:5-19, Ex. N to Def.'s 56.1.)[3] Mann also

admitted that while he was working on the code in the '873 patent, he reviewed a number of

subroutines,[4] some of which may have been provided by Microsoft Visual Basic online support.

(Pl.'s 56.1 ¶ 26.) Mann did not specifically recall relying on that support system for the twenty lines

of code that disable the "X" button, however. (Mann Dep. 113:4-7, Ex. N to Pl.'s 56.1.)

Defendant also argues that Plaintiff failed to disclose Palm handheld devices that, according

to Defendant, disclose or suggest all the elements of the asserted claims of the '873 patent.

Defendant asserts that "Palm devices, such as the Palm III, do not include a button that allows the

---

[2]     The citation is to a rough draft of the deposition transcript.

[3]     The court notes with disapproval an argument advanced by Defendant in its reply brief, that Mann actually admitted that he did not author the code. According to Defendant's brief, Mann participated in the following exchange: "Q. And you don't contend that you're the author of this code, correct? A. "I don't contend that I'm the author of this code[.]" (Def.'s Reply at 2 (alteration in original).) Upon review, the deposition shows that Mann actually replied to the question by *asking*, "I don't contend that I'm the author of this code*?*" (Mann Dep. 199:14-15, Ex. N to Pl.'s 56.1 (emphasis added).) That the question mark is in fact the appropriate punctuation in this circumstance is shown by counsel's response, in which he restates his question in a different manner. (*Id.* at 16-17 ("Q. Of this, of these lines right here that we're talking about?").) The change in punctuation clearly changes the meaning of Mann's statement, from asking for clarification to an admission of copying.
        Defense counsel's misrepresentation is disappointing.

[4]     The term "subroutine" refers to "a sequence of computer instructions for performing a specified task that can be used repeatedly." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1173 (10th ed. 1997).

user to minimize, maximize, or move the graphical keyboard and instead require hitting the "Done" button after entering the desired input." (Def.'s 56.1 ¶ 20.) And, Defendant notes, there is evidence that the inventors knew about Palm devices: Dr. Boesen had previously filed a patent application that referred to "Palm Pilot[s]" and the "Palm O[perating ]S[ystem." *See* U.S. Patent No. 6,560,468, col. 4 (filed Oct. 11, 1999). Plaintiff contends that the inventors did not withhold any relevant information concerning "Palm devices," and in fact cited two newspaper articles that discuss Palm devices in the patent itself. (Pl.'s 56.1 ¶ 16.) Plaintiff has further moved to strike several of Defendant's statements as violating Local Rule 56.1(a).

### DISCUSSION

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). All reasonable inferences must be drawn in favor of the party opposing summary judgment. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1378 (Fed. Cir. 2008).

Defendant claims that the '873 patent is unenforceable because the inventors engaged in inequitable conduct by breaching their duty of candor and good faith when dealing with the PTO. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313 (Fed. Cir. 2008). To prove inequitable conduct, Defendant must prove that the inventors (1) "failed to disclose material information [] or submitted false material information, and (2) intended to deceive the [PTO]." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (citing *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007)). In this inquiry, materiality and intent are inversely related: "The more material the omission or misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997). If Defendant proves both elements by clear and convincing evidence, then "the district court must still balance the equities to determine whether

the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable." *Star Scientific*, 537 F.3d at 1365 (citing *Monsanto Co. v. Bayer BioScience N.V.*, 363 F.3d 1235, 1239 (Fed. Cir. 2004)).  Defendant will therefore be entitled to summary judgment on the ground of inequitable conduct if no reasonable jury could conclude that the materiality and intent elements are met by clear and convincing evidence, and that the balance of equities favors holding the patent unenforceable.  *Innogenetics*, 512 F.3d at 1378.

## I.      Alleged Copying of Code

Before addressing the questions of materiality and intent, the court must consider a preliminary matter germane to this issue.  Plaintiff has moved to strike Defendant's Exhibit D, which consists of a print-out of a website showing the twenty lines of code that are in dispute.[5]  The website is maintained by the Internet Archive, "a website that provides access to a digital library of Internet sites."  (Butler Aff. [182] ¶ 2.)  Exhibit D purports to show a website maintained by a third party that, in 1999, contained the twenty lines of code the inventors used to disable the "X" button on the '873 patent.  According to Plaintiff, the website has not been authenticated pursuant to Federal Rule of Evidence 901.  That rule, however, requires only "evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a).  Here, Defendant has attached an affidavit from a manager at the Internet Archive, who explained how that website saves old web pages and that Defendant's Exhibit D was created in 1999.  (Butler Aff. [182].)  Plaintiff's argument amounts to a suggestion that the printout of this website would be admissible only if a person with direct knowledge of the website's existence in 1999 testified that the printout was a true and accurate copy of the contents of the website on that date.  Such a high standard is not required for other types of evidence, and is beyond what Rule 901 requires.  *See United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (Rule 901 "requires only a *prima facie*

---

[5]      The URL of the website is: http://web.archive.org/web/19990423170623/http://www.vb-world.net/tips/tip117.html.

showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence"). The court therefore notes Plaintiff's concerns about the reliability of the printout, but nevertheless concludes that the printout is admissible as evidence and denies the motion to strike. *Accord Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, at *6 (N.D. Ill. Oct. 15, 2004) (admitting evidence from the Internet Archive when accompanied by an affidavit from an Internet Archive official).

The website itself, however, is of little value for purposes of this motion. Given Mann and Boesen's statements that they have never accessed this site, there is at least a genuine issue of material fact as to whether they in fact copied the code *from this site.* This does not end the matter; even if the inventors did not copy the code from the website in question, they still may have copied it from somewhere else. Indeed, the fact that the code on the website in 1999 appears identical to the code in the '873 patent, creates a strong inference that Mann did not write the code himself. Mann's statements further buttress this conclusion, as he stated that the code that disables the "X" button "appears to be probably something that I would have extracted from one of my Microsoft support documents . . . . This would not have been the first time that I used this type of methodology." (Mann Dep. 147:5-8, Ex. N to Def.'s 56.1.) This statement, in conjunction with the identical code maintained on the third-party website in 1999, supports, by clear and convincing evidence the conclusion that Mann did not write the twenty lines in question. The court therefore turns to the questions of whether omitting to tell the PTO of this fact was material, and whether the inventors intended to deceive the PTO by the omission.

## A.     Materiality

Materiality is "what a reasonable examiner would have considered important in deciding whether to allow a patent application." *Innogenetics*, 512 F.3d at 1378. Accordingly, the Federal Circuit routinely turns to the PTO's regulations for determining what constitutes material information.

*See Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007). Those regulations state:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in . . . [a]sserting an argument of patentability.

37 C.F.R. § 1.56(b).[6] Here, the information withheld—that the inventors did not write a portion of the source code—is not cumulative to other information that the inventors provided in the patent application and subsequent amendments. The court therefore considers whether either of the other two conditions for materiality are met.

"A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction." *Id.* None of the claims in the patent at issue here deal solely with disabling the "X" button. Claims 1 and 10 both mention that the graphical keyboard cannot be terminated by the user independent of termination of the input area, but they do so in the context of discussing other functions of the method, including: invoking the input area, which may include numerous data input fields; use of a touch screen display; disabling the ability of the user to move, maximize, or minimize the keyboard; determining when no further input from the user is required; and automatically terminating the keyboard area after the input is received in the input area. U.S. Patent No. 6,784,873, cols. 20, 22. The inventors did not claim that each and every one of these functions was a new concept

---

[6] The Federal Circuit also has held that omissions that are material under the regulation that preceded the current rule are material for purposes of inequitable conduct claims. *See Cargill*, 476 F.3d at 1364 (citing *Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1316 (Fed. Cir. 2006)). That standard, which held a statement material if "'there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent,'" has not been advanced by Defendant in this motion, and the court does not consider it. *See Cargill*, 476 F.3d at 1364 (quoting 37 C.F.R. § 156(a) (1991)).

originating with them, nor were they required to do so; indeed, they devoted a substantial portion of the amendment process to differentiating their graphical keyboard from other graphical keyboards that had previously been patented. Rather, the matter the PTO found patentable in the '873 patent was the sum total of these parts, producing what it deemed to be a new, nonobvious invention. Defendant has failed to show, by clear and convincing evidence, that simply disclosing that one other aspect of the device was the product of the work of others would have rendered the whole unpatentable. This argument for the materiality of the inventors' omission therefore fails.

Withheld information is also considered material if it is inconsistent with a position the applicant took in asserting an argument of patentability. Defendant argues that withholding information about the true source of the twenty lines is inconsistent with the statement the inventors made when they filed the '873 patent in 2000. That statement asserts "I believe I am the original, first and sole inventor of the subject matter which is claimed and for which a patent is sought." (Def.'s 56.1 ¶ 31.) First, this statement does not comprise a "position" taken by the inventors in "[a]sserting an argument of patentability." 37 C.F.R. § 1.56(b)(2)(ii). Swearing an oath is not taking a "position" in any ordinary sense of the term. Furthermore, Defendant's interpretation of this statement encounters the same problem as discussed above, namely, that not every line of code in the invention needed to be originally created by Mann and Boesen. The oath only makes sense if the "subject matter which is claimed" is understood as the entire patent, and not every constituent part. Few inventors could claim to be the "original, first and sole inventor" of every part of their invention—indeed, a subroutine is not unlike a material, such as metal or plastic, that another inventor might use to make up the whole of his work. The statement cited by Defendant thus does not establish that the inventors' omission was material.

The court concludes that Defendant has not established the absence of disputes concerning its contention that the omission is material. In reaching that conclusion, the court takes no position on whether the inventors in fact should have mentioned that parts of the code came from other

sources. As the Federal Circuit previously warned patent applicants, "To avoid a finding of inequitable conduct, doubts concerning whether information is material should be resolved in favor of disclosure." *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001).

**B.    Intent**

Even if the evidence supported a finding that failing to disclose Mann's assistance in writing the lines of code in question, the inequitable conduct charge would fail because Defendant has not shown an absence of disputes regarding the inventors' intent to deceive. "Typically, a finding of inequitable conduct hinges on whether the evidence as a whole indicates that patentees or their representatives acted with the intent to deceive." *Brasseler*, 267 F.3d at 1380-81. In this case, the record as a whole reflects no such intent on the part of either inventor. Mann stated in his declaration to this court that the code contained in the '873 patent "is not intended to be dissected" and that it is only "the entirety of the software code that is to be considered." (Mann Decl. ¶ 14, Attach to Pl.'s 56.1.) The court need not hold forth on the veracity of this claim as a matter of law. It is enough at this stage to observe that Defendant has provided the court with no reason to doubt that Mann honestly believes that to be the case. As noted above, materiality and intent are inversely related. *See Critikon*, 120 F.3d at 1256. So even if one considered the inventors' failure to disclose the source of the twenty lines of code a material omission, it is just barely material and therefore requires a strong showing that the inventors intended to deceive the PTO. Defendant has failed to show by clear and convincing evidence that the inventors possessed any such intent to deceive

**II.    Disclosure of the Palm Devices**

Defendant next argues that the inventors intentionally withheld information about the Palm III from patent examiners, and that "the Palm III discloses or suggests all elements of the asserted

claims of the '873 patent."[7]  (Mem. in Supp. at 13.)   The court considers the same standards discussed above in determining whether the inventors acted inequitably.

## A.     Materiality

Defendant's proof that the Palm III performed in substantially the same way as the '873 patent is limited to a picture of the Palm III displayed beside Figure 1 from the patent.  According to Defendant, the picture demonstrates that neither of the two possess a "move, resize, or close button," that both invoke similar input areas, that both use graphical keyboards, and that both automatically terminate when input is complete.   The court finds this evidence insufficient to demonstrate that Defendant is entitled to judgment as a matter of law.   While the photo is now adequately authenticated as a photo of a Palm III, the explanation of how it functions consists of nothing more than attorney argument.   Defendant does cite to the Palm III instruction manual, but the cited pages demonstrate only that the device contains a graphical keyboard and that the keyboard can be closed by tapping the "Done" button.

The '873 patent, however, does not claim any novelty in the creation of either a graphical keyboard or in terminating the keyboard when an "OK" or "Done" button is pressed.   There is also no suggestion that this graphical keyboard recognizes when no further input is required from the user and automatically terminates at that point, which is one of the key parts of Claims 1 and 10 of the '873 patent.   Without further evidence of how the Palm III functions, Defendant cannot provide clear and convincing evidence that the device in fact functions in a manner that suggests many of the claims of the '873 patent.   There are, in short, disputes of material fact concerning Defendant's

---

[7]     Plaintiff has also moved to strike statements concerning the Palm III from Defendant's 56.1 Statement on the ground that the statements are inadequately supported. Plaintiff's objections go to the weight the court should afford these statements, and the court considers the objections in that context.   The motion to strike is therefore denied.   Similarly, Plaintiff's motion to strike the photograph of the Palm III is also denied, now that Defendant has submitted an affidavit stating that the photograph is in fact of a Palm III and Plaintiff has provided the court no reason to doubt its authenticity.

assertion that the inventors withheld material information from the PTO during the patent application process.

**B.    Intent**

If the Palm III does all that Defendant claims it does—which, as noted above, Defendant has not shown to be the case by clear and convincing evidence—information concerning the Palm III would undoubtedly be material.[8]  Defendant would still not be entitled to summary judgment, however, because it has also failed to show that the inventors intended to deceive the PTO by clear and convincing evidence.

As direct evidence of an intent to deceive the PTO will often be hard to uncover, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988).  Defendant emphasizes that the inventors were "familiar" with "Palm devices," noting that Dr. Boesen had previously applied for a patent that explicitly referenced the Palm Pilot and the Palm Operating System.  Boesen did not, however, specifically reference the Palm III, and Defendant has produced no evidence that either inventor had any knowledge of how the Palm III functioned.  Even if the inventors should have conducted a wider survey of available software prior to submitting their patent, "[g]ross negligence is not sufficient" to support a finding of intent to deceive.  *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1360 (Fed. Cir. 2008).

Plaintiff observes, in addition, that  the articles the inventors did refer to in the '873 patent constitute evidence of good faith.  The first article concerned doctors using "personal digital assistants," in particular the Palm Pilot, in their work.  (Ex. K to Def.'s 56.1.)  The second article,

---

[8]    The court expresses no opinion as to whether a Palm device, or any other device, demonstrates that the claims supported by the '873 patent were "known or used by others in this country" and therefore render the '873 patent invalid under 35 U.S.C. § 102.  (*See* Def. TomTom's Answer [37] at 11.)

from the New Orleans *Times-Picayune*, discussed an electronics convention that showcased many cutting edge wireless devices, in particular the Palm VII. (Ex. L to Def.'s 56.1.) Both articles included pictures of the Palm devices. According to Plaintiff, the inclusion of these articles demonstrates good faith on the part of the inventors in disclosing the existence of Palm devices to the PTO. Defendant disagrees, and contends that these articles only selectively disclosed information about Palm devices, further obscuring any evidence that the functionality of those devices overlapped with the functionality of the claimed invention. *See Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. 2:06 CV 381, 2009 WL 781334, at *6 (E.D. Tex. Mar. 23, 2009) (finding intent where inventor "disclosed only that part of the brochure that did not threaten the patentability of the invention"). Both arguments are plausible, but Defendant bears the burden of establishing intent by clear and convincing evidence. As the Federal Circuit has noted, the standard for proving intent in inequitable conduct cases sets "a high bar." *Eisai*, 533 F.3d at 1360. Defendant has not cleared that bar in this case.

In short, based on this record, Defendant has not demonstrated with clear and convincing evidence that the Palm III performed in substantially the same way as the method claimed under the '873 patent or that the inventors knew about the Palm III and intended to deceive the PTO by withholding information about it. Plaintiff did not move for summary judgment on the inequitable conduct claims, and so the matter remains for a jury to decide.

**CONCLUSION**

For the reasons stated above, Defendant TomTom, Inc.'s Motion for Summary Judgment of Unenforceability of the '873 Patent Due to Inequitable Conduct [117] is denied. Plaintiff's Motion to Strike Certain Evidence Submitted in Support of Defendants' Motion for Summary Judgment of Unenforceability [163] is also denied.

ENTER:

Dated: September 30, 2009

REBECCA R. PALLMEYER
United States District Judge