**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SP TECHNOLOGIES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 08 C 3248 |
| | ) |
| GARMIN INTERNATIONAL, INC. and | ) Judge Rebecca R. Pallmeyer |
| TOMTOM, INC., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Dr. Peter Boesen and Thomas Mann invented and patented a method for obtaining input on a computer with a touch-screen display. Plaintiff SP Technologies, LLC, the assignee of the patent, U.S. Patent No. 6,784,873 (the "'873 Patent"), charges Defendants TomTom, Inc. and Garmin International, Inc., makers of touch-screen navigation devices, with infringing the '873 Patent. The parties have presented arguments for competing interpretations of five terms in the claims of the '873 Patent. The court's construction of those terms follows.

**BACKGROUND**

**A.      The Invention**

One advantage of computing devices with touch-screen displays is that, by using an on-screen keyboard, they can obtain input from a user without the use of a keyboard, mouse, or similar input device. Today, the most familiar example of such a device is Apple's iPhone.[1] The '873 Patent responds to a specific problem with on-screen keyboards—users who inadvertently move, resize, or close the on-screen keyboard before they are finished using it may then have difficulty

---

[1] In fact, SP Technologies has alleged that the iPhone infringes the '873 Patent. That case settled. *SP Technologies, LLC v. Apple, Inc.*, No. 6:07-cv-367 (E.D. Tex. June 2, 2008) (dismissing case). So did a similar suit against two other makers of cell phones, Samsung and HTC. *SP Technologies, LLC v. Samsung Group,* No. 08 C 3760 (N.D. Ill. March 7, 2009) (dismissing claim against Samsung); *SP Technologies, LLC v. HTC Corp*, No. 08 C 3760 (N.D. Ill. July 15, 2009) (dismissing claim against HTC).

recovering the keyboard to a usable state. ('873 Patent, col. 1, ll. 34-45.) To solve this problem, the '873 Patent takes the ability to alter the keyboard away from the user and gives it to the computer program, which removes the keyboard only after the user has entered the necessary input. (*Id.*, col. 21, l. 2, col. 22, ll. 20-22.)

**B.     The Disputed Claims of the '873 Patent**

The '873 Patent, titled "Method and Medium for Computer Readable Keyboard Display Incapable of User Termination" sets forth ten claims. The five[2] disputed terms, emphasized below, are in Claims One and Ten:

> 1.     A method of entering data on a touch screen display, the method comprising:
> invoking a computer program in which user input is sought;
> invoking an input area, including a **plurality of data input fields**;
> invoking a **graphical keyboard area incapable of user termination independent of termination of the input area**, the graphical keyboard area having a plurality of keys on the display;
> **selecting** keys on the keyboard to provide the **desired input**; and
> automatically terminating the graphical keyboard area after the desired input is received in the input area.
> 
> . . .
> 
> 10.    A method of providing a user interface for receiving information from a user using a user immutable graphical keyboard linked to an input area, comprising:
> invoking the input area;
> determining that input from the user using the graphical keyboard is needed within the input area;
> invoking the graphical keyboard on a touch screen display to receive input from a user, the graphical keyboard placed in a set position;
> persistently maintaining the graphical keyboard on the touch screen display such that the user cannot move, resize, remove, or close the graphical keyboard through the user interface while the input area remains and requires input;
> receiving input within the input area from the user through the graphical keyboard;

---

[2]     The parties' briefs on claim construction addressed six terms, but following the *Markman* hearing, they agreed to construe "automatically terminating the graphical keyboard area after the desired input is received in the input area," step five of Claim One, as "the computer application or program terminates the keyboard area after the desired input is received in the input area."

> > ***determining that further input from the user is no longer needed in the input area***; and
> > removing the graphical keyboard.

**C.     Prosecution History**

Boesen and Mann first filed their patent application in August 2000.  (Pl's Ex. 2, at 20-74.) The patent was rejected four times (*id.* at 144-153, 163-174, 184-193, 203-212) and amended four times (*id.* at 154-162, 176-180, 195-201, 216-224) before ten claims were allowed in January 2004 (*id.* at 225-231), and the patent was granted in August 2004.  ('873 Patent.)  One of the patent examiner's principal concerns throughout prosecution was that the invention was not patentable over Patent No. 6,094,197 ("Buxton"), a "system and method for a graphical keyboard that benefits from the expressive power and intuitive ease of use associated with pen strokes and gestures." U.S. Patent No. 6,094,197 (filed May 17, 1995).  Eventually, though, the patentees satisfied the examiner that the prior art did not teach or suggest their invention.  They noted specifically that, although Buxton includes a graphical keyboard with an input area, unlike the graphical keyboard of the '873 Patent, the graphical keyboard claimed by Buxton could be terminated, moved, or resized before the user finished entering her input.  (Pl's Ex. 2, at 229.)

**D.     This Lawsuit**

Plaintiff filed suit in June 2008, alleging that Defendant Garmin's products infringe the '873 Patent.  One month later, Plaintiff filed an amended complaint that added TomTom and Magellan Navigation, Inc. as Defendants.  Plaintiff eventually settled with Magellan.  The remaining Defendants deny that their products infringe, and assert affirmative defenses including that the '873 Patent is invalid, and that the patentees engaged in inequitable conduct before the Patent and Trademark Office.  The court denied Defendants' motion for summary judgment on the latter issue. (Order of Sept. 30, 2009.)  The parties dispute the meaning of a number of terms in the '873 Patent. The court addresses the disputed language below.

## **DISCUSSION**

## A. Principles of Claim Construction

Because an invention is defined by the claims of the patent, claim construction—the process of giving meaning to the claim language—defines the scope of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311-12 (Fed. Cir. 2005) (en banc) (citing 35 U.S.C. § 112). Claim construction is a matter of law for the court to determine. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). As the Federal Circuit clarified in *Phillips*, the court begins the claim construction analysis with the words of the claims themselves, giving those words their ordinary and customary meaning, that is, the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13. And that person is assumed to read the claim terms "in the context of the entire patent, including the specification." *Id.* at 1313.

In addition to reading the claim terms in the context of the specification, the court may also consider the record of the patent's prosecution because it is evidence of how both the inventor and the Patent and Trademark Office understood the patent. *Id.* at 1317. Nevertheless, the court must be mindful that the prosecution history represents an "ongoing negotiation," so it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Finally, in some cases, the court must go beyond the claim, the specification, and the prosecution history—the so-called intrinsic evidence—to consider extrinsic evidence such as technical dictionaries, treatises, and expert testimony. *Id.* at 1317-18. That evidence, however, is less reliable than the intrinsic evidence for several reasons outlined by the Federal Circuit in *Phillips*. *Id.* at 1318-19.

Before continuing, the court notes Plaintiff's argument that in construing the claims, the court must also consider the allegedly infringing devices. (Pl's Br., at 2-3.) In both cases that Plaintiff cites for this proposition, the Federal Circuit was reviewing claim construction *after* a stipulated judgment on infringement. *MIT v. Abacus Software*, 462 F.3d 1344, 1350-51 (Fed. Cir. 2006); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350-51 (Fed. Cir. 2006). The appellate

court was concerned that because it did not know anything about the accused products, any ruling it made on claim construction might be an advisory opinion only. *MIT*, 462 F.3d at 1350-51; *Lava Trading*, 445 F.3d at 1350-51; *see also Jang v. Boston Scientific Corp.*, 532 F.3d 1330, 1337 (Fed. Cir. 2008). This case is in a much different posture: it is not being reviewed on appeal and the court is not yet considering the question of infringement. In that posture, the Federal Circuit instructs only that the district court *may* consider the accused devices for context, but ultimately claim construction is independent of the accused devices. *Serio-US Industries, Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1319 (Fed. Cir. 2006). Because Plaintiff has not explained how considering the accused products would be helpful to claim construction, the court will forgo any such consideration.

### B. Plurality of data input fields

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| plurality of data input fields | data input fields, occurring at various locations, as requested by the computer application or program | more than one simultaneously appearing data input field |

The first term for which the parties offer different constructions—"plurality of data input fields"—is found within the following step of Claim One: "Invoking an input area, including a plurality of data input fields." The parties agree that "plurality" refers to more than one data input field, but they disagree as to how the multiple fields can be displayed. Plaintiff's proposed construction would allow a broad range of display options, allowing for fields "occurring at various locations." Defendants' proposed construction is narrower, requiring that the data input fields appear "simultaneously."

Defendants support their proposed construction, first, by reading "an input area" as "one input area." (Defs' Br., at 21.) If the plurality of data input fields must be included in a single input

5

area, then they must appear simultaneously. Plaintiff responds that in this context, an open-ended claim containing the transitional word "comprising," "a" or "an" must be read as "one or more." (Pl's Resp., at 1-2, *citing Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).) Based on that reading, the plurality of data input fields may appear in one or more input areas, that is, not simultaneously. Plaintiff also urges that the input area should not be confused with the device's display. (Pl's Resp., at 2-3.) As the Patent's abstract explains, "The input area is created by a computer program on a display capable of receiving touch-screen input." ('873 Patent, at 1.)

Defendants next argue that even though the word "simultaneously" does not appear in the specification, their proposed construction is supported by the intrinsic record. (Def's Br., at 22.) They point, first, to the preferred embodiment of the claim, which displays seven data input fields simultaneously. That the preferred embodiment seems to display all data input fields simultaneously is not dispositive, however. It is well recognized that "the fact that the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language." *Howmedica Osteonics Corp. v. Wright Medical Technology, Inc.,* 540 F.3d 1337, 1345 (Fed. Cir. 2008). Defendants attempt to overcome this rule by pointing out that the specification calls the embodiment "a pictorial representation . . . of the present invention." ('873 Patent, col. 2, ll. 55-58.) But describing a figure as "a" representation does not demonstrate a "clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)). As Defendants conceded at the *Markman* hearing, the preferred embodiment does not limit the invention to uses that have seven data input fields. Similarly, it does not limit the invention to uses where all data input fields appear simultaneously.

Defendants also argue that their construction is consistent with arguments the inventors

made regarding the Buxton Patent. (Def's Br., at 22-23.) According to Defendants, the inventors successfully distinguished the '873 Patent from Buxton by arguing that Buxton had only one data input field while the '873 Patent had a plurality of data input fields. (Id.) In support of their contention, Defendants cite a statement by the inventors in an amendment filed in response to a rejection by the PTO:

> The graphical keyboard is always present with the "plurality of data input fields" of claim 1. Thus, where input is required for the data input fields, the graphical keyboard is always present as the user cannot accidentally terminate the graphical keyboard.

(P's Ex. 2, at 177.[3]) As the court reads that statement, it does not support Defendants' argument; the statement says nothing about displaying multiple input fields simultaneously. Instead, it emphasizes that, in contrast to Buxton, the keyboard described in the '873 Patent cannot be accidentally terminated. And that is especially clear when the selection is read in context with the remainder of the amendment (*id.*) and the patent official's rejection that preceded it. (*Id.* at 164-74.) For these reasons, the court declines to adopt Defendants' proposed construction of "plurality of data inputs."

The court thus turns to Plaintiff's proposed construction—"data input fields, occurring at various locations, as requested by the computer application or program." This construction relies principally on language from the specification: "The application may ask for user input at various locations through the use of text boxes or other fields." ('873 Patent, col. 3, ll. 14-20.) Defendants argue that this language—presumably, the word "may"—does not support the proposed construction because it is optional as opposed to mandatory. (Def's Br., at 24.) Defendants' argument is that Plaintiff's construction requires something that the specification states is optional.

---

[3] In their briefs, Defendants refer to documents within the more than 250 pages of prosecution history by the documents' titles only. The court cites instead to the record material provided by Plaintiff—specifically, a Bates-stamped copy of the prosecution history, permitting references to the individual pages by Bates numbers.

In fact, however, Plaintiff's proposed construction does not *require* that the input fields occur at various locations. It only allows for that possibility.

Defendants also contend that Plaintiff's proposed construction is inconsistent with the reading of the word "plurality" in another part of Claim One. (Def's Br., at 24.) The court presumes that when the same term appears in different portions of the claim it has the same meaning. *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009). According to Defendants, when Claim One refers to a "graphical keyboard having a plurality of keys," it refers to a keyboard on which all keys appear simultaneously. Aside from the preferred embodiment, Defendants provide no support for this argument, however. The court has already explained why it is not relying on the preferred embodiment in this context. Moreover, anyone who has used a touch-screen keyboard knows that some keys—for example keys representing numbers, symbols, or even emoticons—may be displayed on separate screens. For these reasons, Defendants' argument against Plaintiff's construction fail.

Accordingly, the court adopts Plaintiff's proposed construction of "plurality of data input fields" as "data input fields, occurring at various locations, as requested by the computer application or program."

**C.    Graphical keyboard area incapable of user termination independent of termination of the input area**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| graphical keyboard area incapable of user termination independent of termination of the input area | the graphical keyboard may not be terminated by the user unless the input area is also terminated | a graphical keyboard area that is always present with the plurality of data input fields and cannot be removed, minimized, maximized, deleted, closed or resized independent of termination of the input area |

The next contested phrase also comes from Claim One as part of an "invoking" step of the

8

claimed method.  Plaintiff's construction is all but a verbatim quotation of the claim language: "the graphical keyboard may not be terminated by the user unless the input area is also terminated." In contrast, Defendants' construction weighs down the definition with six terms they believe are synonymous with "user termination:" "a graphical keyboard area that is always present with the plurality of data input fields and cannot be removed, minimized, maximized, deleted, closed or resized independent of termination of the input area."

The court begins with the ordinary meaning of termination: "end in time or existence" MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 1216 (10th ed. 1997).  That ordinary meaning does not include minimizing, maximizing, or resizing.  Any novice computer user, let alone someone skilled in the art, would not read "termination" to include minimizing, maximizing, or resizing.  To overcome that ordinary meaning, Defendants must point to "contravening evidence from the specification or prosecution history."  *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008).

Defendants believe that they have such evidence: their construction is based on a statement by the patentees to the patent examiner during prosecution: "Because the graphical keyboard of claim 1 is '[incapable] of user termination independent of termination of the input area,' a user cannot accidentally remove, minimize, maximize, delete, close or resize the graphical keyboard." (Pl's Ex. 2, at 177) (alteration, adopted by both sides, corrects typographical error).  Plaintiff argues that the court should not rely on the statement because it was contradicted by a later statement in the prosecution.  (Pl's Br., at 13.)  The part of that later statement that Plaintiff emphasizes, though, that "the keyboard is provided when needed by an input area," (Pl's Ex. 2, at 221), says nothing about how to read the term "user termination."

Statements made during prosecution are part of the intrinsic evidence to be considered during claim construction, and patentees are held to what they declare during prosecution under the doctrine of prosecution disclaimer.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d

9

1366, 1374-75 (Fed. Cir. 2008). The doctrine does not apply, though, where the statement during prosecution is so ambiguous that a person of ordinary skill in the art would not rely on it. *Elbex Video, Ltd. v. Sensormatic Electronics Corp.*, 508 F.3d 1366, 1371-72 (Fed. Cir. 2007). Before going further, the court notes that this is a relatively unusual context for the doctrine of prosecution disclaimer because Defendants are arguing that the statement *expands* the scope of a claim term. In contrast, the doctrine is "typically invoked to limit the meaning of a claim term that would otherwise be read broadly." *800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1364 (Fed. Cir. 2008). Nevertheless, the court will consider whether the patentees should be held to the statements they made during prosecution. *Springs Window Fashions L.P. v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.")

Plaintiff argues against Defendants' construction by pointing to differences between Claim One and Claim Ten. (Pl's Br., at 14; Pl's Resp., at 5-6.) Claim One refers only to preventing "user termination," while Claim Ten refers to taking away the user's ability to "move, resize, remove, or close" the keyboard. ('873 Patent, col. 20, ll. 62-63, col. 22, ll. 13-14.) Under the doctrine of claim differentiation, differences between claims can be a "useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Thus, Claim Ten suggests that if the inventors had intended for Claim One to include more than just termination, they would have said so explicitly. Plaintiff's argument also finds support in the patentees' adoption of a definition for the word "immutable" that is identical to the meaning that Defendants want to attach to "terminated." (Pl's Resp., at 5-6.) As the specification explains, "The keyboard . . . may not be minimized, maximized, deleted, closed or resized and is therefore immutable." ('873 Patent, col. 3:43-46.) In cases where a patentee defines a claim term, that definition governs. *Honeywell Int'l, Inc. v. Universal Avionics Systems Corp.,* 493 F.3d 1358, 1361-62 (Fed. Cir. 2007). Thus, Plaintiff's construction finds further support in the presumption that different terms have different meanings. *Innova/Pure Water, Inc.*

*v. Safari Filtration Systems, Inc.*, 381 F.3d 1111, 1119-20 (Fed. Cir. 2004).

Defendants argue that the prosecution statement is actually supported by statements in the specification, but none of those statement gives meaning to the word "termination." (Def's Br., at 26-27.) Each one merely suggests that an attribute of the invention was that it prevented more than just inadvertent closing of the keyboard; it also prevented minimizing, maximizing, and resizing. In other words, Defendants' references to the specification show only that Claims One and Ten, when read together, cover inadvertent closing of the keyboard as well as inadvertent moving, resizing, and removing.

For all these reasons, the court concludes that the patentees erred in making the statement during prosecution that equated "terminate" with "remove, minimize, maximize, delete, close or resize." Although the statement purportedly referred to Claim One, it actually referred to some functionality encompassed by Claim Ten. The patentees' error is not one that would mislead a person of ordinary intelligence because, as explained, it is contrary to the ordinary meaning of the word "terminate," it is contrary to a reading of the claims, and it is not required by a reading of the specification. *Viskase Corp. v. American Nat'l Can Co.*, 261 F.3d 1316, 1322 (Fed. Cir. 2001); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1348 (Fed. Cir. 2001).

The court thus moves to Plaintiff's proposed construction, which relies on the claim language itself, but rewrites it in a few very minor ways. Plaintiff provides no explanation for its proposed revision aside from saying that it is supported by the plain and ordinary meaning of the claim's language. (Pl's Br., at 12.) The court agrees that it is so supported, but does not see any advantage that the revision provides. The court is also puzzled by Plaintiff's unexplained proposal to read "graphical keyboard area" as "graphical keyboard" only. Because relying on ordinary meaning alone sufficiently resolves the parties' dispute, the court concludes that the term "graphical keyboard area incapable of user termination independent of termination of the input area" requires

11

no further construction. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

## C. Desired input

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| desired input | information requested by a computer application or program for processing | user's complete input in the plurality of data input fields. |

The court next considers the term "desired input," which is found in step four of Claim One: "selecting keys on the keyboard to provide the desired input." It is also found in step five, but the parties have agreed to a construction of that step that includes the term without alteration. The principal dispute over construction of "desired input" is whether the user or the computer is the actor doing the desiring. Plaintiff says it is the computer and suggests construing the term as "information requested by a computer application or program for processing." Defendants say it is the user and suggest construing the term as "user's complete input in the plurality of data input fields."

As support for their proposed constructions, both sides rely on language from the patent specification that they believe shows the word "desired" being used as they define it. *Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1282, 1288-89 (Fed. Cir. 2009) ("The Federal Circuit's emphasis on the importance of the specification has been repeatedly stated."). The patent specification uses some form of the word "desire" in six places. In some uses, it is obvious that the user is the actor doing the desiring. ('873 Patent, col. 2, ll. 50-53) ("Computers with touch-screen displays, allowing a user to simply press on a desired location."). In others, it is obvious that the computer is the actor doing the desiring. (*Id.* col. 3, ll. 30-32) ("[I]f the software in which user input is desired is primarily financial software, the keyboard may include only numbers.") And in others, it is ambiguous just which actor is doing the desiring. (*Id.*, col. 1, ll. 49-50) ("An on-screen keyboard may be necessary

12

to provide the desired input."). The parties' references to the specification, therefore, do not answer the question of which actor is doing the desiring in step four of Claim One.

Looking only at the language of the Claim, Plaintiff argues that the antecedent of "desired input" in step four is "user input is sought" in step one. (Pl's Resp., at 11.) The parties agree that the computer program is the actor in step one, so the computer is the one seeking the input there. Thus, according to Plaintiff, it follows that the computer is the one "desiring" the input in steps four and five as well. Defendants argue that the antecedent of "desired input" is "user input" only, so the Claim links "desired input" and "user." (Def's Br., at 12.) A link between the user and the input does not necessarily mean that the user is the one doing the desiring in step four, though. Indeed, the specification's discussion of "software in which user input is desired" links user and input but, in that context, the software is the actor doing the desiring. ('873 Patent, col. 3, ll. 30-32.) Accordingly, the court finds that Plaintiff's reading of the claim is the better one.

Plaintiff's reading is further bolstered by considering how "desired input" is used in step five. *Paragon Solutions,* 566 F.3d at 1087 (presuming that when same term is used in different portions of the claim it has the same meaning). Step five reads as follows: "automatically terminating the graphical keyboard area after the desired input is received in the input area." ('873 Patent, col. 2, ll. 50-53.) In most cases, the user and the computer program desire the same input, but when the user misunderstands what input the computer program has requested, she may try to terminate the keyboard before providing that input. Allowing the user to mistakenly close the input area in such a situation is one of the problems that the invention is meant to solve. ('873 Patent, col. 2, ll. 27-29.) Thus, treating "desired input" as user's desired input would contradict one purpose of the invention.

For all these reasons, the court accepts Plaintiff's argument that it is the computer program doing the desiring in steps four and five. Nevertheless, the court does not adopt wholesale Plaintiff's proposed construction because Plaintiff provides no support for adding "for processing"

13

to the end of its construction. The court adopts the following construction for "desired input:" "information requested by a computer application or program."

## D. Selecting

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| selecting | to specify a block of data, text, or image on a screen by highlighting it or otherwise marking it with the intent of performing some operation on it | user selects |

The next disputed term, "selecting," is related to the previous one because both are found in the same sentence and the dispute about both centers on which actor does the selecting. The sentence containing both terms is the fourth step of Claim One: "selecting keys on the keyboard to provide the desired input." Plaintiff again argues that the actor is the computer, and Defendants again argue that it is the user. Plaintiff would construe "selecting" as "to specify a block of data, text, or image on a screen by highlighting it or otherwise marking it with the intent of performing some operation on it." Defendant's would construe "selecting" as "user selects."

Just as they did with respect to "desiring," Defendants argue that "selecting" is linked to the "user input" mentioned in step one of Claim One. (Defs' Br., at 6-7.) As Defendants see things, because the selecting "provides the desired input," and that "desired input" is the "user input," the user must be the one doing the selecting. This argument has some force even though the court has rejected Defendants' proposed construction of "desired input" based on the user's desire. That the selection is done in order "to provide" the information requested by the computer program certainly suggests that the entity doing the selecting is the same entity that provides the information—the user. Moreover, Claim One is a method of "entering data on a touch screen display." ('873 Patent, col. 20, l. 55.) In ordinary usage, the actor that enters data into a computer

14

is the user, not the computer, so it should be no surprise that the user performs one of the steps of the method.

Plaintiff would read the language of the claim differently; it argues that step four of Claim One must be read as being done by the same actor as the other four steps, the computer program. (Pl's Br., at 16.) Context is, of course, important in interpreting a disputed claim term, *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1396-97 (Fed. Cir. 2008), but Plaintiff provides no support for its argument that the same actor must be behind every step in a single claim. *Cf. Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328-29 (Fed. Cir. 2008) (all steps in single claim not performed by same actor).

Next, Plaintiff argues that because the patentees used the word "user" in other places in the claim, their failure to use it before "selects" is evidence that the user does not do the selecting. (Pl's Br., at 9-10.) By the same token, though, the inventors' failure to use the word "computer program" before "selects" is evidence that the computer program is not the actor doing the selecting. Using the phrase "steel baffles" suggests that not all baffles are made of steel, *Phillips*, 415 F.3d at 1314, but using the word "baffles" alone does not suggest that the writer intends to exclude baffles made of steel.

Finally, Plaintiff argues that if the computer program does not do the selecting in step four, it will be impossible for the invention to receive the desired input as required by step five. (Pl's Resp., at 8.) This argument also misses the mark as there are dozens of processes that an implementation of the invention would have to perform that are not explicitly stated in the claim. *Rambus Inc. v. Infineon Tech. Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003) ("[T]he claims need not recite every component necessary to enable operation of a working device.")

Moving beyond the claim terms, Defendants support their construction with references to the specification. (Defs' Br., at 7-8, *citing* '873 Patent, col. 1, ll. 20-22, col. 2, ll. 50-52, col. 3, ll.16-20, col. 20, ll. 42-45.) Only one of those references actually contains some form of the word

"select," but that single reference does support Defendants' construction: "Therefore, a user can input data by selecting keys 22 on the keyboard 20 as necessary." ('873 Patent, col. 20, ll. 42-45.) Plaintiff responds that the sentence in question describes only a possible implementation of the invention because it includes the word "can," and Defendants' citation to it is another attempt to limit Claim One to one of the specification's examples. (Pl's Resp., at 8.) The court disagrees that Defendants are attempting to limit Claim One. As the court reads the construction, it is a proper use of the text of the specification to understand the claim terms. *Abbott Labs*, 566 F.3d at 1288-89.

Both sides also refer to the prosecution history, (Pl's Br., at 17-18; Defs' Br., at 8), but the court finds it to be ambiguous. Defendants point to the inventors' statement that prior patents failed to disclose "determining that input from a user is no longer needed." (Pl's, Ex. 2, at 222.) This statement shows only that the invention involves user input; it does not show anything about how to interpret the word "selecting." The statement suggests that one step in the method might be taken by the user, but it does not require that. Plaintiff's argument about the prosecution history is that the patent examiner understood the "selecting" step to be equivalent to a certain part of the Buxton patent. (Pl's Br., at 17-18.) In summarizing reasons for rejecting the patent, the patent examiner wrote that, in Buxton, "the processor 5 and application program 50 process the data entry (selecting keys on the keyboard) from the display." (Pl's, Ex. 2, at 145.) Ignoring the last three words quoted, this reference supports Plaintiff's argument that selecting is done by the computer because selecting is equivalent to "process[ing] the data entry." When those last three words are considered, though, they suggest that the examiner equated "selected keys on the keyboard" with "data entry from the display," an interpretation that supports Defendants' argument. Accordingly, the prosecution history does not resolve the dispute.

Finally, Defendants appeal to common sense and argue that reading "selecting" as performed by the computer would be nonsensical. (Defs' Br., at 8.) The court does not agree that

16

Plaintiff's construction is nonsensical. Nevertheless, for all the reasons given, the court finds that Plaintiff's construction is not supported by the intrinsic record. The only support that Plaintiff has for its construction is the definition of "select" found in the Computer User's Dictionary published by Microsoft Press:

> **select** *vb.* **1.** In general computer use, to specify a block of data or text on screen by highlighting it or otherwise marking it, with the intent of performing some operation on it. **2.** In database management, to choose records according to a specified set of criteria. *See also* sort. **3.** In information processing, to choose from a number of options or alternatives, such as input/output channels.

MICROSOFT PRESS COMPUTER USER'S DICTIONARY at 312 (1998). Although general purpose dictionaries can be helpful in reading claim language, the Microsoft Computer Dictionary is a technical dictionary within the class of extrinsic evidence, so it is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1314, 1317-18; *see also Paragon Solutions,* 566 F.3d at 1092 (treating Microsoft Computer Dictionary as extrinsic evidence). In any event, the court does not understand the Microsoft Dictionary definition to be helpful to Plaintiff's argument because the definition does not require that the selecting be done by the computer.

Plaintiff's proposed construction suffers from two more serious defects. First, despite vehemently arguing that the actor doing the selecting is the computer, Plaintiff has proposed a construction that, like the definition it relies on, does not make that clear. The act of "specify[ing] a block of data, text, or image on a screen by highlighting it or otherwise marking it with the intent of performing some operation on it" *could* be performed by the computer program, but it could also be performed by the user. Second, Plaintiff's construction is simply not grammatical. The result of replacing the word "selecting" with Plaintiff's proposal is the following: "to specify a block of data, text, or image on a screen by highlighting it or otherwise marking it with the intent of performing some operation on it keys on the keyboard to provide the information requested by the computer program." That result would not help the jury.

Accordingly the court adopts Defendants' proposed construction, "user selects."

17

**E.    Determining that further input from the user is no longer needed in the input area**

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| determining that further input from the user is no longer needed in the input area | the computer application or program determines and/or concludes that further input from the user is no longer needed in the input area | determining that further input from the user is no longer needed in the input area because the user has completed the associated data input fields, [for example, after the user has pressed "Ok," "Done," "Save,"] or because the user has cancelled the display of the data input fields[4] |

The final disputed phrase is found in Claim Ten. The dispute again involves a disagreement over whether the user or the computer program is the actor. Plaintiff continues to argue that the computer program is the actor, suggesting the following construction: "the computer application or program determines and/or concludes that further input from the user is no longer needed in the input area." Defendants do not suggest that the user is doing the determining, but their proposals—TomTom and Garmin offer slightly different constructions—place extra emphasis on the user's conduct. The Defendants' proposed constructions (with TomTom's addition in brackets) are as follows: "determining that further input from the user is no longer needed in the input area because the user has completed the associated data input fields, [for example, after the user has pressed 'Ok,' 'Done,' 'Save,'] or because the user has cancelled the display of the data input fields."

The court first addresses the examples that TomTom wishes to include. TomTom wanted those examples included in the construction of another term, but withdrew the argument after the *Markman* hearing, perhaps in recognition of its weakness. The only support for the argument is that the preferred embodiment includes an "Okay" button, (Defs' Br., at 28), but the court has already

---

[4]    Defendant TomTom's proposed construction includes the text in brackets. Defendant's Garmin's does not.

18

explained why it will not rely on the preferred embodiment.

The remainder of Defendants' proposed construction simply adds the following to the claim term: "because the user has completed the associated data input fields or because the user has cancelled the display of the data input fields." Again, though, Defendants attempt to rely on the preferred embodiment for their construction. (Defs' Br., at 28-29.) Defendants also refer to a statement in the patent history (*id.* at 29), where the patent examiner gave as a reason for allowing the patent that prior art did not disclose, among other things, "displaying the graphical keyboard on the touch screen display such that the user cannot move, resize, remove or close the graphical keyboard through the user interface until the associated data input fields have been completed or display of data field[s] has been cancel[led]." (Pl's Ex. 2, at 239.) The patent examiner's statement, however, gives no indication of what claim it refers to, so it does not support Defendants' argument. Moreover, as Plaintiff points out (Pl's Resp., at 18), the language that Defendant wishes to import from the examiner's statement was originally found in Claim 26, which was rejected. (Pl's Ex. 2, at 219, 227-29.) Thus, it is likely that adopting the Defendants' construction would only compound an error by the patent examiner.

Finally, Defendants argue for their construction because, in contrast to Plaintiff's, it resolves the question of what underlies the determination "that further input from the user is no longer needed in the input area." (Defs' Br., at 30.) Resolving that question is unnecessary, though. As Plaintiff explains, the process defined by the patent is not limited to removing the keyboard when the user had completed the input fields or cancelled the display of the input fields. (Pl's Resp., at 16-17.) In fact, such an alternative use is suggested by the preferred embodiment itself, which includes a "help" button that when pressed, might call up a help screen and remove the on-screen keyboard. Defendants' construction, which attempts to limit the term to only two situations, is therefore rejected because the patentees showed no intent to include such a limitation. *Voda v. Cordis Corp*, 536 F.3d 1311, 1321-22 (Fed. Cir. 2008).

Plaintiff's proposed construction specifies that the computer is the actor determining that no further input is needed. So specifying is unnecessary, though, because it is obvious from the context. The jury will understand that the computer is the actor "determining that further input from the user is no longer needed." Plaintiff only other suggested modification is to construe the word "determines" as "determines and/or concludes." This reading, as Defendants argue, makes the phrase more confusing. (Def's Br., at 30.) The court does not find any meaningful difference between the words determine ("to come to a decision") and conclude ("to form a final judgment") in this context. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 239, 315 (10th ed. 1997). At the *Markman* hearing, Plaintiff stated that it wanted to add "concludes" to show that there was a logical process by the computer in doing its determining. The court finds that "determining" alone is sufficient.

Thus, the court finds that this term does not need construing because relying on ordinary meaning is sufficient. *O2 Micro*, 521 F.3d at 1361.

## **CONCLUSION**

Accordingly, claim terms in the '873 Patent are construed in accordance with the foregoing.

ENTER:

Dated: October 9, 2009

_____

REBECCA R. PALLMEYER
United States District Judge